1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4  JIMMY YAMADA, RUSSELL          )  CIVIL NO. 10-00497JMS
   STEWART, and A-1               )
   A-LECTRICIAN, INC.,            )  Honolulu, Hawaii
5                                 )  October 1, 2010
              Plaintiffs,         )  8:30 a.m.
6                                 )
          vs.                     )
7                                 )
   PAUL KURAMOTO, in his          )  MOTION FOR PRELIMINARY
8  official capacity as chair     )  INJUNCTION
   and member of the Hawaii       )
9  Campaign Spending              )
   Commission; Steven Olbrich,    )
10 in his official capacity as    )
   vice chair and member of       )
11 the Hawaii Campaign            )
   Spending Commission; Gino      )
12 Gabrio, Dean Robb, and         )
   Michael Weaver, in their       )
13 official capacities as         )
   members of the Hawaii          )
14 Campaign Spending              )
   Commission,                    )
15                                )
              Defendant.          )
16 _____ )

17

18              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE J. MICHAEL SEABRIGHT,
19           UNITED STATES DISTRICT COURT JUDGE

20 APPEARANCES:

21    For the Plaintiffs:      RANDY ELF
                               Bopp, Coleson & Bostrom
22                             1 South Sixth Street
                               Terre Haute, Indiana 47803

23                             JAMES HOCHBERG
                               Topa Financial Center
24                             Suite 1450, Fort Street Tower
                               745 Fort Street Mall
25                             Honolulu, Hawaii 96813

```
 1    APPEARANCES: (CONT.)

 2

 3    For the Defendants:        CHARLEEN M. AINA
                                 ROBYN B. CHUN
 4                               Office of the Attorney General -
                                 State of Hawaii Administration
 5                               Division
                                 425 Queen Street
 6                               Honolulu, Hawaii  96813

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Official Court           GLORIA T. BEDIAMOL, RPR, RMR
      Reporter:                 United States District Court
21                              P.O. Box 50131
                                Honolulu, Hawaii 96850
22

23

24    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).
25
```

1                           I N D E X

2    WITNESSES:                                        PAGE NO.

3

4    ANDREW GERAKAS
            CROSS-EXAMINATION BY MS. AINA                  8
5           CROSS-EXAMINATION BY MS. AINA                  8

6    RUSSELL STEWART
            CROSS-EXAMINATION  BY MS. AINA               17
7
     JIMMY YAMADA
8           CROSS-EXAMINATION BY MS. AINA                 25
            REDIRECT EXAMINATION BY MR. ELF               67
9

10

11   EXHIBIT:                                          PAGE NO.

12   Plaintiff's Exhibits 1-21 were received in          70
     evidence
13
     Defendant's Exhibit A-EE were received in evidence  74
14

15

16

17

18

19

20

21

22

23

24

25

1   Friday, October 1, 2010                              8:30 a.m.

2          THE CLERK:  Civil Number 10-00497 JMS, Jimmy Yamada et

3   al. versus Paul Kuramoto in his official capacity as chair

4   member of the Hawaii Campaign Spending Commission et al. Case

5   hearing on motion preliminary injunction.

6          May we have appearances please?

7          MR. ELF:  Randy Elf for the plaintiffs.

8          MR. HOCHBERG:  Jim Hochberg also present in the

9   courtroom, Your Honor, for the plaintiffs.

10         THE COURT:  Yes.  Good morning to both of you.

11         MS. AINA:  Good morning, Your Honor, Charleen Aina and

12   Robyn Chun deputy attorneys general for the defendants.

13         THE COURT:  Good morning to both of you as well.

14         All right.  So I did get the notice, Mr. Elf, that

15   we're not proceeding on the claim regarding the contributions

16   by A-1 as a state contractor.  That you have withdrawn at least

17   for now?

18         MR. ELF:  That's correct, Your Honor.

19         THE COURT:  I don't know how many of these defendants

20   exhibits that impacts.  I don't know if you are going to

21   withdraw any of these exhibits as a result of that, Ms. Aina,

22   or if you have thought through that at this point.

23         MS. AINA:  We were not -- Mr. Elf's notice did not --

24   does not require us to withdraw any of our exhibits.

25         THE COURT:  All right, okay.  Let's just talk about

1    these exhibits.  So I got a book of exhibits from the

2    plaintiffs.  Are these different than which I just got?  Are

3    these different from what is attached to your complaint,

4    Mr. Elf?

5            MR. ELF:  No, sir.

6            THE COURT:  Okay.  And are there any objections to

7    those exhibits for the purposes of this hearing?

8            MS. AINA:  The only one that we would challenge, Your

9    Honor, would be --

10           THE COURT:  Let me tell both sides.  There's not a

11   jury here.  As far as relevance, I can look at these, and if I

12   determine they are not relevant, I won't consider them.  I

13   don't have a problem with you telling me you believe it's not

14   relevant, but I don't want to have a lot of argument this

15   morning on what's relevant.  I want to get started this morning

16   because I do have a jury coming in at 1:15.  And as I've told

17   you, that jury is going to be in that box at 1:15 today.

18           MS. AINA:  No, Your Honor.

19           THE COURT:  All right.  Mr. Elf, where do you stand on

20   the Defendants' Exhibits?

21           MR. ELF:  We stand by what we've submitted yesterday.

22   I know you said we did need to discuss relevance; that's a

23   primary part of the objections, so we'll renew that here.

24   We're at a bit of a loss because we don't know to some extent

25   what the defendants are presenting their exhibits for.

1           THE COURT:  Okay.  Well, let's do this.  Like I say, I

2    think I'm very well situated to make a decision whether these

3    are relevant or not going forward.  I don't know that I need to

4    make that decision right now.

5           And in particular, given the one claim that has

6    dropped out, I might want to hear also what the relevance is

7    that's in the legislative history, for instance, and some of

8    those things, and we can talk about that a little later.

9           But why don't we go ahead and get started at this

10   stage with the evidentiary portion, unless there are any other

11   preliminary matters anyone wants to take up.

12          MR. ELF:  Not from us.

13          MS. AINA:  I wasn't clear, Your Honor, as to whether

14   you wanted to entertain objections with respect to the exhibits

15   as we go or whether you wanted us to respond to Mr. Elf's

16   objections.

17          THE COURT:  No, don't respond to them now.  Let's wait

18   and maybe when we're done with this -- I think what Mr. Elf is

19   saying is when we're finished with the evidentiary hearing,

20   maybe we'll have a little better idea what these are being used

21   for in part, and Mr. Elf can make his arguments in a more

22   crisper fashion at that point in time.

23          Is that accurate, Mr. Elf?

24          MR. ELF:  That would be fine.

25          THE COURT:  Okay.  All right, Mr. Elf, it is your

```
 1   motion, so you are going to rest then on the facts in the
 2   verified complaint.  The declaration attached to the reply only
 3   went to the contract or contribution issue as I understand it?
 4            MR. ELF:  Correct.
 5            THE COURT:  So you are withdrawing that as evidence
 6   for this hearing?
 7            MR. ELF:  We won't be needing that.
 8            THE COURT:  Okay.  All right.  And then do you rest on
 9   that evidence then?
10            MR. ELF:  Yes, sir.
11            THE COURT:  All right.  Ms. Aina, you've decided to
12   cross-examine three witnesses then?
13            MS. AINA:  Yes, please.
14            THE COURT:  All right.  Call your first witness then.
15            MS. AINA:  Defendants call Mr. Andrew Gerakas.
16            THE COURT:  Are there witnesses who are going to be
17   testifying in the courtroom right now?
18            Mr. Elf, I'm talking to you.
19            MR. ELF:  I'm sorry.
20            THE COURT:  If I'm talking to you, you pay attention
21   to me, not Mr. Hochberg.  Are there witnesses in the courtroom
22   right now that are going to be called?
23            MR. ELF:  Yes, sir, they are.
24            THE COURT:  Are you okay with them being in the
25   courtroom, or do you want them outside?
```

```
 1            MS. AINA:  Your Honor, except for Mr. Gerakas, they
 2    are plaintiffs and parties.
 3            THE COURT:  Okay.  Very well.
 4                 ANDREW GERAKAS, WITNESS, SWORN
 5            THE CLERK:  Please state your name and spell your last
 6    name.
 7            THE WITNESS:  Andrew Gerakas, G-E-R-A-K-A-S.
 8            THE COURT:  You may proceed, Ms. Aina.
 9                        CROSS-EXAMINATION
10    BY MS. AINA:
11    Q    Good morning, Mr. Gerakas.
12    A    Good morning.
13            MS. AINA:  Your Honor, may I approach the witness?  My
14    question will involve references to the --
15            THE COURT:  First of all, my rule is to move over to
16    the microphone.  If you are speaking in my courtroom, speak
17    into the microphone; okay?  Don't move away from the
18    microphone.
19            Yes, you have permission to approach the witness.
20            MS. AINA:   Thank you, Your Honor.
21    Q    Good morning, Mr. Gerakas.  What I just put before you is
22    a copy of the first amended verified complaint that the
23    plaintiffs have filed in this case.  And I've done that because
24    you've been called as a witness because you have submitted a
25    verification which appears at the very back of the complaint.
```

1    And it's essentially about the verification that you give that

2    I want to ask a few questions about.

3            Do you remember signing the verification entitled

4    Verification by Aloha Family Alliance Political Action

5    Committee?

6    A    Yes.

7    Q    Do you remember in the second paragraph, and you can look

8    at the verification if you need to, that you say you have

9    personal knowledge about AFA-PAC's activities including the

10   activities about AFA-PAC described in the complaint that was

11   filed to start this lawsuit, which is what you have before you?

12   A    Yes.

13   Q    Can you tell me what parts of the first amended verified

14   complaint you have firsthand knowledge about?

15   A    Please explain what you mean by first amendment?

16   Q    What particular parts were you verifying?  Maybe that's a

17   question that I should --

18           THE COURT:  I think there may be some confusion.  He

19   said first amendment.  So he heard "first amendment," not

20   "first amended complaint."

21           MS. AINA:  Oh, I see.

22           THE COURT:  So I think there's some confusion right

23   now in what he's understanding the question to be.

24           THE WITNESS:  That's correct.

25           THE COURT:  Do you understand what I'm saying?

1          MS. AINA:  Did I say first amendment?

2          THE COURT:  Well, I heard you say first amended

3    complaint.  I don't know if that's what you said.  What he

4    heard certainly or what he repeated was first amendment.  Okay?

5          MS. AINA:  Okay.

6    Q    Let me start again.  What you have before you,

7    Mr. Gerakas, is the first amended verified complaint that the

8    plaintiffs filed in this case to start the action that we're

9    having this preliminary injunction in.  And attached to that

10   complaint was a verification -- it was entitled Verification by

11   Aloha Family Alliance Political Action Committee, and it was

12   signed by Andrew Gerakas, chairman of the Aloha Family Alliance

13   Political Action Committee.

14         Do you recall signing this document?

15   A    Yes, I do.

16   Q    What it says in the second paragraph is, I have personal

17   knowledge about AFA-PAC's activities, including the activities

18   about AFA-PAC described in the complaint that was filed to

19   start this lawsuit.

20         Now, my first question is, can you tell me what parts

21   of this complaint specifically you have personal knowledge

22   about?  And if you need assistance, I will at least start you

23   off with a couple of paragraphs.  For instance --

24         THE COURT:  You're just talking right now.  Ask him a

25   question, Ms. Aina.  Direct him somewhere, do something, but

1    ask a question instead of just speaking.

2    Q    Mr. Gerakas, with paragraph 7 of the complaint, which

3    appears on page 7 of the complaint -- would that be one of the

4    paragraphs -- would that be one of the things that you have

5    personal knowledge about?

6    A    Yes.

7    Q    What is Aloha Family Alliance Political Action Committee

8    exactly?

9    A    It's a political action committee established under state

10   law, and it operates like any other independent political

11   action committee.

12   Q    When exactly was it created?

13   A    In July of this year.

14   Q    How many members does it have?

15   A    Well, it has a chairman; myself, vice chairman; and a

16   person that takes care of the books.

17   Q    That would be the treasurer of the pack?

18   A    Correct.

19   Q    Can you briefly explain how this political action

20   committee -- or what this political action committee was formed

21   for?

22   A    It was formed to essentially influence passage of

23   legislation that supports traditional marriages, the right to

24   life against such things as physician-assisted suicide, and

25   promoting the issue of life in our community.

1   Q    Would you look please at Exhibit 1 to the first amended

2   verified complaint?

3   A    Can you tell me what page that's on?

4   Q    It's towards the back and at the very bottom corner.

5        THE COURT:  Well, is that your Exhibit 1 in the

6   Plaintiff's Exhibit, Mr. Elf?  Is that the same thing?

7        MS. AINA:  Yes.

8        MR. ELF:  Yes, sir.

9        THE COURT:  Do we have a copy of the plaintiffs'

10  notebook up there?  That would be easier because it's tabbed.

11       Can you get him that, Ms. Miwa?

12       Mr. Elf, your exhibits are marked exactly as in the

13  first amended complaint number-wise that is?

14       MR. ELF:  Yes, sir.

15       THE COURT:  Thank you.

16  Q    Do you recognize what this is, Mr. Gerakas?

17  A    Yes.  This is a statement on our website.

18  Q    And does it accurately reflect what the AFA-PAC, what the

19  AFA-PAC's purpose and goals are?

20  A    Yes, on the issue of traditional marriage.  Yes.

21  Q    When you say "on the issue of traditional marriage," why

22  do you say that?

23  A    Because we're not limited to that one issue.

24  Q    And does that mean then that you have other pages on your

25  website for different subjects?

1  A    Not necessarily, no.

2  Q    Would you look please at the second paragraph, which I

3  would -- the fourth paragraph, if you consider each of these

4  blocks a paragraph, the one that says -- that starts, "The best

5  way to preserve traditional marriage"?

6  A    Yes.

7  Q    It says, "The best way to preserve traditional marriage is

8  to elect candidates into office who share our values."

9        How does AFA-PAC go about deciding which candidates

10  share AFA-PAC's values?

11  A    There have been surveys conducted particularly by the

12  Hawaii family forum of all the candidates as a result of the

13  response to those -- that survey and any others that come

14  across as we make our decisions as to which candidates we would

15  support.

16  Q    What is the form of the support that AFA-PAC provides?

17  A    Well, AFA-PAC is a new and small pack with limited funds,

18  so we do this by informing people.  One is on our website,

19  second way is we had an advertisement in one of the

20  periodicals, one of the newspapers, and that's how we normally

21  have done so far.

22  Q    Do you make direct contributions to the candidates that

23  you support?

24  A    No.

25  Q    How many contributions has AFA-PAC received since July?

1   A   The number?

2   Q   Yes.

3   A   I would have to take a guess.  I would say about 15 or 16.

4   Q   At this point in time, can you provide us with an estimate

5   of how much the total contributions have been since AFA-PAC was

6   formed?

7   A   Again, a rough estimate, about $4,500.

8   Q   Has AFA-PAC received contributions from Mr. Yamada, Jimmy

9   Yamada, one of the plaintiffs in this case?

10   A   Yes.

11   Q   Can you tell me or do you remember how much his

12   contribution was?

13   A   $1,000.

14   Q   Has AFA-PAC received any contribution from Russell

15   Stewart, the other individual plaintiff in this case?

16   A   No.

17   Q   Would you look now at paragraph 8 of the first amended

18   verified complaint?  That would be again on page 7.  Actually,

19   the sentence I'm interested in is at the top of page 8.  Is the

20   sentence at the very end of paragraph 8, which begins "AFA-PAC

21   wants to receive," is that one of the activities that your

22   verification was directed at confirming?

23   A   Yes.

24   Q   Have you conveyed this to Mr. Yamada and Mr. Stewart?

25   A   Yes.

```
 1          THE COURT:  Can they "this," meaning that they would
 2   like to receive the contributions?
 3          MS. AINA:  Yes.
 4   Q    That AFA-PAC did want to receive their contributions.  Was
 5   it your statement as well, or does your verification also cover
 6   the last phrase of that sentence which says, "But the
 7   contributions would violate Hawaii law"?
 8   A    Yes, that's my understanding.
 9   Q    And why would it violate Hawaii law?
10          MR. ELF:  Objection, calls for a legal conclusion.
11          THE COURT:  Well, he said it's his understanding.
12   You, Mr. Elf, are the one who decided to have this complaint
13   that talks about facts and intermingles law in it throughout.
14   And then you have this broad verification on verifying these
15   things.
16          So you really should have done separate declarations
17   as to each witness the way you were directed.  So I'm going to
18   give some leeway to Ms. Aina here.
19   BY MS. AINA:
20   Q    Let me ask the question again, Mr. Gerakas.  Was the last
21   phrase of the last sentence of paragraph 8, which is at the top
22   of page 8 of the first amended verified complaint, was that
23   phrase, "But the contributions would violate Hawaii law," was
24   that something that -- a statement that your verification was
25   intended to verify as something that you could -- you had
```

1    personal knowledge of?

2    A    Yes.  When we applied for a pack status with the spending

3    commission, we reviewed completely all the material they gave

4    us, and we noted that the contributions were limited to $1,000

5    per individual in the primary and $1,000 in the general.

6    Q    Can you tell us why the contributions of Mr. Yamada and

7    Mr. Stewart -- or the contributions that AFA-PAC wanted

8    Mr. Yamada and Mr. Stewart to make violated Hawaii law?

9    A    Well, because the amounts -- they wanted to contribute

10   $2,500 a piece, and that was above the limit established by the

11   spending commission.

12   Q    Thank you very much, Mr. Gerakas.  Those are the only

13   questions that I have for you.

14            THE COURT:  All right.  Thank you.

15            Mr. Elf, any redirect?

16            MR. ELF:  No questions of this witness, Your Honor.

17            THE COURT:  Ms. Aina, may he be excused, this witness?

18            MS. AINA:  Oh, yes.

19            THE COURT:  Mr. Elf?

20            MR. ELF:  Yes, sir.

21            THE COURT:  Sir, you may be excused.  You are free to

22   stay and watch the proceedings or you can stay if you like.

23            THE WITNESS:  Thank you.  I have a busy day.

24            THE COURT:  That's up to you, sir.

25            All right.  Ms. Aina, your next cross-examination

1   then.

2           MS. AINA:  Defendants call Mr. Russell Stewart.

3           THE COURT:  All right.  Mr. Stewart.

4                   RUSSELL STEWART, WITNESS, SWORN

5           THE CLERK:  Please state your name and spell your last

6   name.

7           THE WITNESS:  Russell Stewart, S-T-E-W-A-R-T.

8           MS. AINA:  Your Honor, may I approach the witness to

9   provide him with a copy of the first amended verified

10  complaint?

11          THE COURT:  It's not still up there?

12          MS. AINA:  This is the one that was there.

13          THE COURT:  Okay.  You may.  All right.

14                      CROSS-EXAMINATION

15  BY MS. AINA:

16  Q   Mr. Stewart, you were in the room earlier this morning,

17  and I hope that maybe that will help with the process that

18  we're going through here.

19          Do you recall signing a verification, dated September

20  3, 2010, for this first amended verified complaint?

21  A   I don't recall the exact date.  Could you help me?

22          THE COURT:  Look on page 58.

23          THE WITNESS:  Yes.

24  Q   Your verification says that the factual statements in this

25  complaint concerning me -- or you -- are true.  Can you tell me

```
 1   which of these factual statements you were referring to when

 2   you made this verification?

 3   A     Do you know exactly what page those statements are written

 4   on?

 5   Q     I would start you off by saying that there's a reference

 6   on page 7, paragraph 7, to yourself.

 7   A     Paragraph 7 is accurate, yes.

 8   Q     Can you tell me why you seek to contribute $2,500 to

 9   AFA-PAC as opposed to some other amount?

10   A     I felt that, number one, that's what I could afford;

11   number two, that that amount would be more helpful than a

12   smaller amount.

13   Q     Were you aware of the contribution limits specified in the

14   state campaign's finance laws of $1,000 when a contribution was

15   being made to a noncandidate committee such as AFA-PAC?

16   A     At what time do you mean?  When was I --

17   Q     Were you aware -- when you decided that you wanted to

18   contribute $2,500, were you aware that there was a

19   thousand-dollar limit?

20   A     I became aware after I decided how much I would like to

21   contribute.

22   Q     Were you aware of the limit when you allowed this

23   statement in paragraph 7 to be included in the complaint?

24   A     Yes.

25   Q     Are you related in any way to AFA-PAC as a member or an
```

1   officer?

2   A    No.

3   Q    Were you aware, before this morning's proceedings, how

4   AFA-PAC selected or how AFA-PAC decided to spend its money, the

5   contributions, that it receives?

6   A    I believe so.

7   Q    I'm sorry, I didn't hear you.

8        THE COURT:  He said "I believe so."

9   Q    What was your understanding of how AFA-PAC selected or

10  chose to -- decided how it would spend the money it received?

11  A    It was my understanding that they supported family values

12  and that they would use the money in support of those family

13  values.

14  Q    Were you aware that AFA-PAC made contributions to -- did

15  you believe that AFA-PAC made direct contributions to

16  candidates when you gave your money to AFA-PAC?

17       THE COURT:  Wait a minute.  You said when he gave his

18  money to AFA-PAC?

19  Q    I'm sorry.  I misstated that, yes.  Were you aware -- did

20  you know whether AFA-PAC made direct contributions to

21  candidates when you gave -- when you made the statement --  or

22  when the statement that you verified in paragraph 7 of this

23  complaint was given?

24  A    Okay, I was not aware that they would contribute at all to

25  candidates.

```
 1   Q    Does that mean that you did not know whether they did, or
 2   is it that they told you they did not?
 3   A    It was my understanding that they did not.
 4   Q    Thank you.  Did you have any preferences as to how AFA-PAC
 5   used the money you might contribute to it?
 6   A    Yes.
 7   Q    Can you tell us what those preferences would be?
 8   A    The preferences were that they would use the funds to
 9   support issues that pertain to traditional family values.
10   Q    Was that support -- or did you contemplate that the
11   support would be given in the context of elections?
12   A    I don't understand your question.
13   Q    Was your thought that AFA-PAC would use contributions it
14   received to urge or encourage voters to vote for particular
15   candidates?
16   A    No.
17   Q    What form did you think AFA-PAC's support of family values
18   would take?
19   A    To encourage voters to vote according to their -- to
20   traditional family values.
21   Q    To vote, if you will, for what?
22   A    For in favor of traditional family values, whoever the
23   candidates were, that supported those family values.
24   Q    So you wanted to contribute money to AFA-PAC so that it
25   could support those candidates who were in favor of family
```

1    values?

2    A    I guess I never thought of it in terms of particular

3    candidates.  It's just, you know, those that supported the

4    platform of family values, whoever the candidate was.

5    Q    Are you -- would you be interested in giving money to

6    AFA-PAC if this was not the year in which we were conducting a

7    general election in Hawaii?

8    A    That contemplation never entered my mind.

9    Q    Does that mean then that you would give the same amount of

10   money irrespective of whether there was an election within two

11   months of your contribution?

12   A    I don't know.  I would have to think about that.

13   Q    Why do you -- Mr. Gerakas testified that AFA-PAC had not

14   yet received a contribution from you.  Can you tell us why that

15   is?

16   A    I didn't believe that I was allowed to give that amount.

17   Q    And so unless you were allowed to give $2,500 you would

18   opt not to give any money at all?

19   A    I didn't say that, no.

20   Q    Do you anticipate giving AFA-PAC money before the general

21   election?

22   A    Yes, I do.

23   Q    At page -- paragraph 48 of the first amended verified

24   complaint which is at page 30 -- I'm sorry, let me back up and

25   say at paragraph 47, which is at page 30.  The complaint says,

1    "Fifth, the $2,500 contributions Yamada and Stewart each want

2    to make to AFA-PAC exceed Hawaii's $1,000 per-election limit on

3    contributions AFA-PAC receives, even if Yamada and Stewart

4    divide their contributions between the September primary and

5    November general election."

6            Then paragraph 48 says, "Therefore, Plaintiffs Yamada

7    and Stewart seek a declaratory judgment that the limit on

8    contributions noncandidate committees receive, Act 211,

9    Sections 11-KK, is unconstitutional as applied to Yamada's and

10   Stewart's speech."

11           Is this a paragraph that comes under your

12   verification?

13           THE COURT:  Wait.  Now you just read two paragraphs.

14   Q    Is paragraph 48 a paragraph that comes under your

15   verification?

16   A    Yes.

17   Q    What did you mean -- or what does this paragraph mean when

18   it says that Yamada and Stewart seek a declaratory judgment

19   that the limit on contributions noncandidate committees receive

20   is unconstitutional?  What is your understanding of why it is

21   unconstitutional?

22   A    I feel that the amount of speech that is -- that I can

23   give is directly connected with the amount of money that is

24   used to promote that speech.

25   Q    Is AFA-PAC the only organization in Honolulu that is

```
 1    interested in preserving family values -- or at least the

 2    family values that you want to see preserved?

 3    A    By organization, what do you mean?

 4    Q    Well, are there other groups that have the same objectives

 5    as AFA-PAC?

 6    A    Yes.

 7    Q    And have you given those groups any contributions?

 8    A    Maybe I'm not understanding.

 9         THE COURT:  She's asking if there were other packs or

10    other committees of any sort that also support traditional

11    family values that you have donated to.

12         THE WITNESS:  As far as packs or committees, I am not

13    aware of who they are.

14    BY MS. AINA:

15    Q    What about other organizations?  And I'm suggesting this

16    only because it's an organization that's not a pack.  Not that

17    I know what their position on family values is, but other

18    organizations like the YMCA --

19    A    Or church?

20    Q    Church groups?

21    A    Yes.

22    Q    Have you given contributions to groups such as those?

23    A    Yes.

24    Q    Can you tell us how much money you donated to them?

25    A    Well, I don't consider it a donation.  I put my tithe to
```

1    the church.

2    Q    Are there other groups, other than the church that you

3    have donated money to, other groups who are similar to AFA-PAC

4    want to protect and preserve traditional family values?

5    A    No.

6    Q    Are you related in any way to AFA-PAC as a member or an

7    officer?

8    A    No.

9    Q    Are you related in any way to the plaintiff A-1

10   A-Lectrician, Inc.?

11   A    No.

12          MS. AINA:  No further questions.

13          THE COURT:  Mr. Elf, any redirect?

14          MR. ELF:  No, Your Honor.

15          THE COURT:  All right, sir, you may step down.  Just

16   leave the document up there.  Thank you.

17          All right.  Well, timewise, you are doing very well,

18   Ms. Aina.  Your next witness.

19          MS. AINA:  Defendants now call Mr. Jimmy Yamada.

20          THE COURT:  Before we start with Mr. Yamada, I did

21   want to bring one thing to the attention of the parties.  I

22   don't know if this was attached as an exhibit, but the reality

23   is I saw, on the morning of the primary, an ad run by A-1 that

24   was in the newspaper.

25          Were you folks aware of that?  Ms. Aina, were you

1    aware of that?

2            MS. AINA:  I was going to inquire about that.

3            THE COURT:  Okay. All right.

4            MS. AINA:  Not about the ad, but whether any had been

5    published.

6            THE COURT:  I didn't know if everyone knew about that

7    for sure.  And I thought it was important people do.  And I

8    have had copies of it made if anyone wants to view it.

9            You may proceed.

10                   JIMMY YAMADA, WITNESS, SWORN

11           THE CLERK:  Please state your name and spell your last

12   name.

13           THE WITNESS:  James T. Yamada, Y-A-M-A-D-A.

14                      CROSS-EXAMINATION

15   BY MS. AINA:

16   Q    Good morning, Mr. Yamada.

17   A    Good morning.

18   Q    I will direct you to the back of the first amended

19   verified complaint, and I believe it's somewhere around page

20   58, 59.

21           THE COURT:  Page 59.

22   Q    There are actually two verifications?

23   A    I don't have page 59 -- oh, okay.  Okay.

24   Q    Let me ask --

25           THE COURT:  Pages 57 and 59.

1    Q    Yes.  I do want to ask you about the verification at page

2    59.  That document is entitled Verification by A-1

3    A-Lectrician, Inc., and it says that you are the chief

4    executive officer and director of A-1 A-Lectrician, Inc. And it

5    says that it's the verification of A-1 A-Lectrician, Inc.

6         In this verification, you are speaking for A-1

7    A-Lectrician, Inc.?

8    A    As I know the details, yes.

9         THE COURT:  Mr. Yamada, just back up maybe two inches

10   from the microphone.  You are a little too close.

11        THE WITNESS:  Okay.  As I know the details.

12   Q    By what authority are you speaking when you speak through

13   this verification?

14   A    As the CEO.

15   Q    Did the board of directors of A-1 A-Lectrician, Inc.

16   authorize you to sign the verification?

17   A    No.

18   Q    Under the bylaws of A-1 A-Lectrician, Inc., is the chief

19   executive officer of A-1 A-Lectrician, Inc. authorized to speak

20   as you do through this verification?

21   A    Yes.

22   Q    Can you direct me to what portion of the bylaws, and that

23   would be -- I believe the plaintiffs have attached bylaws of

24   A-1 A-Lectrician, Inc. at Plaintiff's Exhibit 18.

25   A    I have not looked at them for a while, but I will look at

1    them.  But I know in general -- can I just speak this way?

2          THE COURT:  Just answer the question.  You said that

3    the bylaws give you the authorization.  She asked you to point

4    out where.

5          THE WITNESS:  I have to look -- I have not looked at

6    them recently.

7    Q    First, let me back up and confirm whether Exhibit 18 are

8    the current bylaws of A-1 A-Lectrician, Inc.

9    A    I would not know if this exhibit is the current bylaws.

10   Q    Would part of your verification of this first amended

11   verified complaint include verifying that these are at least

12   the bylaws of A-1 A-Lectrician, Inc. I believe it's in 19 --

13   it's hard to say -- actually, that's a question I could ask you

14   I guess.

15         When are these bylaws effective -- or are these bylaws

16   effective today?

17   A    I am not sure, but my -- I'm the CEO, and I have officers,

18   and I have administrators, and as we move through, I direct

19   them what to do, and they do it.

20         So if I say to my vice-president, HR administration

21   person, to send on the bylaws because of something or sign a

22   contract, then they do it.  But I won't know for sure.  I would

23   imagine that they would be, but I cannot verify for sure that

24   they are.

25   Q    The reason --

1   A     So it should be is basically.

2   Q     The reason I'm asking, Mr. Yamada, and I don't mean to be

3   coy by this, was because I was reviewing this document, Exhibit

4   18, and particularly what the document describes as the powers

5   of the president and also noting in the review that there is no

6   reference to a chief executive officer.

7   A     These bylaws may be out of date and need to be amended.

8   Maybe at the next corporate meeting we'll do that.  Thank you

9   for pointing that out.

10  Q     But if you would look please at page 3, article 2, section

11  1 of these bylaws, the second sentence in that section says,

12  "The Board of Directors shall have entire charge of the

13  property, interest, business, and transactions of the

14  corporation, with full power and authority to manage and

15  conduct the same, and shall take all actions either by

16  resolution or motion."

17  A     Correct.

18  Q     What does that mean about anyone else's ability to act on

19  behalf of the corporation?

20  A     I'm also a member of the board.  The board has

21  effectively, and maybe we need to correct the bylaws, but we

22  have effectively authorized the president to run the

23  operations.

24        So we have a president that is running the operations,

25  and I'm also as the CEO, which now we need to maybe update

1    that, I'm operating as the executive and establishing policy,

2    investments, finances, how we give back -- one of the important

3    issues is for us to give back to society; so we have minutes

4    that we're doing those things.

5         So basically the authority comes from the power vested

6    in the officers to do whatever they have to do.  The board

7    cannot do the daily and weekly monthly things that come up.  So

8    they authorized the officers or the employees.

9    Q    So are you saying, Mr. Yamada, that the Board of Directors

10   has authorized you, and there are minutes to reflect that

11   authorization?

12   A    No, not specifically in this case.

13   Q    So is A-1 A-Lectrician, Inc. suing without the expressed

14   authority or even the delegated authority of the Board of

15   Directors of A-1 A-Lectrician?

16   A    Specific authority, yes.  But the way we operate as a

17   family business, the board has entrusted to me the

18   decision-making authority to transact business in the way that

19   we run our business, our investments, and the way that we give

20   back to society, influence -- bring influence.  So under the

21   general authority that we basically have, I'm within the

22   board's authority.

23   Q    But the board has not itself authorized the filing of this

24   lawsuit?

25   A    No.

1  Q    And the board has not delegated authority to you as the

2  chief executive officer to file this lawsuit?

3  A    No.

4  Q    Would you look please at the second paragraph of the

5  verification by A-1 A-Lectrician which says --

6  A    That page?

7  Q    That's back on page 59.

8  A    Okay.

9  Q    That says that you have knowledge of the corporation's

10  activities, including those set out in this complaint.

11       What does the word "corporation" in that sentence

12  refer to?  Does it refer to the entity that's registered as an

13  electrical contracting business at the Department of Commerce

14  and Consumer Affairs?

15  A    Yes.

16  Q    Does it refer to the entity that's registered as a

17  noncandidate committee at the Campaign Spending Commission?

18  A    They are one of the same.

19  Q    That's what we understood the complaint to say.  But we do

20  have some questions about that proposition.

21  A    About that what?

22       THE COURT:  Ms. Aina, you are just making statements

23  which really isn't appropriate.  Just ask questions that are

24  giving foundation as to where you are going.  He is

25  testifying -- he is saying it's one of the same.  That's where

1    the evidence is now.  If you want to cross-examine him on that,

2    you are free to do so.

3    BY MS. AINA:

4    Q    Mr. Yamada, would you look at Exhibit 2 of the --

5    Plaintiff's Exhibit 2 which is attached just behind that

6    verification, a few pages behind the verification you were

7    looking at earlier?

8    A    Exhibit 2?

9    Q    Yes.

10   A    I have that.

11   Q    I think -- at the bottom of the first paragraph, at the

12   end of the first paragraph it says, "A-1 had average revenues

13   in excess of 40 million dollars through the 2000's."

14   A    You are on page 1?

15          THE COURT:  Let me make sure you are looking at the

16   same thing.

17          THE WITNESS:  Okay.  First paragraph?

18   Q    Yes.

19   A    Okay.

20   Q    At the end of the first paragraph it says, "A-1 had

21   average revenues in excess of 40 million dollars through the

22   2000's"?

23   A    Yes.

24   Q    Would that mean that, this being 2010, that A-1 is at

25   least -- has at least average revenues of several million

```
 1   dollars?

 2   A    Several million?

 3   Q    Yes.

 4   A    Define "several."

 5   Q    Well, more than one?

 6   A    More than one, yes.

 7   Q    I would like you -- to your left is that thick binder, the

 8   black binder, the one to your left.

 9        THE COURT:  Now, Mr. Elf, to be clear, you can make

10   specific objections to exhibits as Ms. Aina is referencing in

11   the State's exhibits.

12        MR. ELF:  Very well, Your Honor.

13        THE COURT:   Just to be clear.

14   Q    Would you look please at tab S, as in Stanley?

15   A    Tab, did you say what?  What tab?

16   Q    S, as in Stanley.

17   A    Stanley okay.

18   Q    Do you recognize this document?

19   A    No, but I have an officer that takes care of this, so she

20   probably submitted it.  Sharon.

21   Q    Do you know offhand how much, in the way of contributions,

22   the noncandidate committee named A-1 A-Lectrician, Inc. has

23   received at the present time?

24        THE COURT:  From when to when?  From its inception

25   until now?
```

1  Q    I'm sorry, how much in the way of contributions A-1

2  A-Lectrician, Inc. noncandidate committee has on hand at the

3  present time?

4  A    No, I do not know how much we have on hand.

5  Q    Would it be the same amount as what A-1 A-Lectrician,

6  Inc., the electrical contractor, has on hand at the present

7  time?

8  A    I do not understand.  What do you mean "on hand"?

9  Q    Is the amount that the noncandidate committee has at the

10 present time the same amount of money that A-1 A-Lectrician,

11 Inc., the corporation, would consider to be its present cash

12 receipts?

13 A    No.

14 Q    Would the amount that A-1 A-Lectrician, Inc., the DCCA

15 registered entity, would the cash receipts for that entity be

16 larger or smaller than the ones for A-1 --

17 A    Repeat the question?

18 Q    Would the cash receipts --

19         THE COURT:  Ms. Aina, you need to back away from that

20 microphone a little bit.  There's a lot of extra noise that

21 comes out of that.

22 A    Can I tell you that --

23         THE COURT:  No, go ahead.

24         THE WITNESS:  I cannot hear because I'm hard of

25 hearing.  I cannot hear the high frequency sounds.  So F and D

1    and C, those things don't come across.  So you may want to

2    clearly enunciate.  I didn't understand your DCCA, did you say?

3    Q    Yes.

4    A    So repeat the question because I didn't catch that.

5    Q    Let me suggest this, may I throughout this

6    cross-examination refer to the electrical contractor, A-1

7    A-Lectrician, as "the corporation"?  Would that be okay with

8    you if I referred --

9    A    Why don't you just say A-1?

10    Q    The reason I don't want to do that --

11    A    Okay, corporation.

12    Q    If you will, let me just say that I will refer to the

13    electrical contractor that's registered at the Department of

14    Commerce and Consumer Affairs as "the corporation" for the rest

15    of this cross-examination.  And then I will refer to the

16    noncandidate committee, A-1 A-Lectrician, Inc., that's

17    registered at the Campaign Spending Commission as "the

18    committee."

19    A    They are one of the same.

20    Q    But for purposes of understanding some of the questions

21    that I will ask, it's necessary, and so I will -- I believe

22    it's necessary, and so I will use those labels.  I just want to

23    be sure you understand when I say "corporation," I'm referring

24    to the electrical contractor.  And when I say "committee," I'm

25    referring to the entity registered at the Campaign Spending

1   Commission.

2   A      You cannot -- may I.

3             THE COURT:  You may, yes.

4             THE WITNESS:  They are one of the same for us.  So

5   your questions will be confusing to me because they are one of

6   the same.  A-1 A-Lectrician is an electrical contractor and, at

7   the same time, it's a noncandidate committee.  My

8   understanding.

9             So there may be some law issues that you are concerned

10  with, but you are going to confuse me because to me they are

11  one of the same.  But you may go on and make that distinction

12  if you desire.

13            THE COURT:  Ask a question, Ms. Aina.  Move on.

14  Q      Thank you.  Who is the treasurer of A-1 A-Lectrician,

15  Inc., the electrical contractor?

16  A      That my wife Diana, I believe.

17  Q      Do you know who the treasurer of the A-1 A-Lectrician,

18  Inc. candidate committee -- noncandidate committee is?

19  A      Again, it's the same, I believe.

20  Q      Would you look please at Defendant's Exhibit BB, boy boy.

21  A      Boy boy.

22  Q      Do you recognize this document?

23  A      No.

24  Q      Would you look please halfway down the page under the

25  heading Officers.

1   A    Officers, okay.

2   Q    And to the right side Treasurer.  Is Sharon Ishii your

3   wife?

4   A    No.

5   Q    Who is Sharon Ishii?

6   A    She's my sister.

7   Q    But she is not the treasurer of the electrical

8   contracting --

9   A    I do not believe so.

10   Q    Who is the chairperson of the electrical contractor A-1

11   A-Lectrician, Inc.?

12   A    According to this report, it's Sharon Ishii.

13   Q    Who is the chairperson -- is Sharon Ishii the chairperson

14   of the electrical contractor that's registered at the

15   Department of Commerce and Consumer Affairs?

16   A    For A-1 A-Lectrician?

17   Q    Yes.

18   A    No.

19   Q    That would be you?

20   A    Yes.

21   Q    Mr. Yamada, why, when there are different officers for

22   these two A-1 A-Lectrician, Inc., do you maintain that they are

23   one of the same?

24   A    They are one of the same.  Sharon filled out the forms as

25   she thought she should.  I would say that over the past years

1    she's been working with the campaign commission, and she's

2    responsible for filling these out.  And she may have made an

3    error in how she filled it out, based on her understanding.

4         And maybe it might have been over the years, in ease

5    of submitting I think the current technical way that we

6    understand it, is that it's one entity.  So we may have a

7    technical oversight in this form.  I would have to look into

8    that further.  I do not know.

9    Q    Do you want it to be one of the same?

10   A    I may answer how I want to on that?

11        THE COURT:  I don't know what you mean by how he wants

12   it.  I don't know what that means.

13   Q    Is it one of the same because A-1 A-Lectrician, Inc.

14   consciously said it needs to be one of the same?

15   A    Well, we did it because, as we talked to the Campaign

16   Spending Committee, they told us how we should do it.  So

17   Sharon did it the way that she -- she filed the reports, and

18   she may have asked me, Oh, they're saying to do this; so I

19   would say go ahead and do it.

20        So we followed what they told us to do.  So as we

21   understand it now, they are one of the same.

22        May I talk -- well, I'll just answer the question.

23   Q    Would you want it to be two separate entities?

24   A    We do not want to be a noncandidate committee at all, as

25   we move forward; but for the sake of this discussion at this

1   time, no.

2   Q    How does A-1 A-Lectrician, Inc., the committee, determine

3   what to do with the contributions it receives?

4   A    We do not receive any contributions, and that's my point

5   that I'm trying to explain to you.  We make contributions from

6   A-1 A-Lectrician, from our own funds.  We do not raise

7   contributions from outside.

8           THE COURT:  Can I ask a question?  Go back to Exhibit

9   S, as in Sam.

10          THE WITNESS:  Sam?

11          THE COURT:  Right.  The first page.  You see line 3 it

12  says, Total receipts.  Do you see that on line 3?

13          THE WITNESS:  Total receipts, yes.

14          THE COURT:  All right.  And then it has column A

15  35,000 plus.  Do you see that?

16          THE WITNESS:  Okay.

17          THE COURT:  And column B is $45,000 plus, right?

18          THE WITNESS:  I don't know what these columns

19  represent, period and period to date. Okay.

20          THE COURT:  Yes, there's different time periods, but

21  they represent receipts, right?  Where does that money come

22  from?

23          THE WITNESS:  A-1 A-Lectrician, a corporation.

24          THE COURT:  Do you put it into a separate account, or

25  how does that work?  Or, does it all essentially come out of

1   the same account and this is the accounting for it?

2            THE WITNESS:  Yeah, it's one account basically.

3            THE COURT:  One account?

4            THE WITNESS:  Yes.

5   BY MS. AINA:

6   Q    Going back to tab BB, boy boy.

7   A    Okay.

8   Q    Under item 3 it says, Committee depository, Central

9   Pacific Bank.  Do you see that on the right side, a third of

10  the way down?

11  A    Yes.

12  Q    Central Pacific Bank is where you have -- do you have one

13  account as A-1 A-Lectrician at Central Pacific Bank, or do you

14  have two accounts?

15  A    Actually, we now bank at First Hawaiian Bank.

16  Q    But do you still have an account at Central Pacific Bank

17  for the A-1 A-Lectrician committee?

18  A    I am not sure.  I have a corporate CFO that handles all

19  the funding, and I'm not into the details.

20  Q    Would that be Lisa Mitchell?

21  A    Lisa, yes.

22           THE COURT:  Ms. Aina, I don't see a date on this BB.

23  Is there a date that organization report was filed?

24           MS. AINA:  It is the one that's posted.  I would need

25  to go -- we would need to look at the link.  There's an

1    internet link on the --

2            THE COURT:  Well, here's the problem.  Internet links

3    don't survive, and I don't know the answer to that.  I'm not

4    going to look it up.

5            MS. AINA:  I definitely can tell the court what the

6    date on that was.  I apologize.  Our efforts was to put the

7    document onto one page was much of a page as we could.  We

8    wiped out the bottom of the -- but I can submit, Your Honor --

9            THE COURT:  Well, in my view right now, it's almost

10   irrelevant.  Because, for example, where it says the banking

11   is, this could be from 10 years ago, it could be from

12   yesterday.  I don't know.

13           MS. AINA:  I can make a representation, but that would

14   simply be my representation that this is the current -- the

15   most recent organizational report, and it would have been

16   filed, I believe, on September 1.

17           THE COURT:  All right.

18           MS. AINA:  Or September 3, sorry.

19           THE COURT:  Okay.

20   Q    Mr. Yamada, you were saying that A-1 A-Lectrician, Inc. --

21   of the $35,600 on item S was --

22   A    Back to S, Sally?

23   Q    Yes.  Sally, Sam, Stanley.  You were saying that the

24   $35,600 in column A came from A-1 A-Lectrician?

25   A    Yes.

41

1   Q     And you don't consider that a contribution.  I thought I

2   understood you to say it's not a contribution?

3   A     Define what you mean by "a contribution."

4   Q     A contribution for purposes -- a contribution as the term

5   is used under the campaign spending law.

6   A     My understanding of the contribution, in the context that

7   I used it, is we did not receive a contribution from outside

8   funding into A-1 A-Lectrician in order to -- that's a

9   contribution.

10         So we are making funds directly from our account at

11  First Hawaiian Bank in any contributions that we probably made

12  in these totals here.  So that's why there's -- we don't put

13  into another account.  That's why it's confusing.  We cut the

14  check from our account.

15  Q     Have you ever, as James Yamada, human being?

16  A     I missed that.

17  Q     Have you ever contributed to the A-1 A-Lectrician, Inc.

18  committee?

19  A     As James Yamada?

20  Q     Yes.

21  A     No.

22  Q     Are you aware of anyone contributing to A-1 A-Lectrician,

23  Inc.?

24  A     For contributions -- campaign contributions?

25  Q     Yes.

1   A    No.

2        THE COURT:  So is what you are saying, Mr. Yamada,

3   that let's say you decide to put a -- run something in the

4   newspaper, let's not try to put a label on it, but you want to

5   run something in the newspaper and it costs $4,000, so you need

6   to cut a check to the Star Advertiser.  You are saying it comes

7   out of the regular account that your business uses, right?

8        THE WITNESS:  Yes.

9        THE COURT:  And then when this reporting is done

10  that's reflected as a receipt, a $4,000 receipt, and that's

11  also going to be reflected as a $4,000 expenditure?

12       THE WITNESS:  Right.

13       THE COURT:  So it's always going to zero out every

14  time because what you spend is what your receipts are, which is

15  what your expenditure is?

16       THE WITNESS:  Right.  Yes.  And you never make a

17  separate account for --

18       THE COURT:  Right.  It all comes out of the same pot

19  of money.

20       THE WITNESS:  It's like your checking account -- your

21  personal.

22       THE COURT:  Right.  Whatever receipts you get from

23  various jobs you have, it goes into some operating account, and

24  you're just saying you draw a check off of that operating

25  account, you use it for whatever it is you are doing for that

```
 1   piece in the newspaper, let's say, and then that's reflected as
 2   both a receipt and an expenditure to the Campaign Spending
 3   Commission?
 4           THE WITNESS:  Yes.
 5           THE COURT:  All right.
 6   BY MS. AINA:
 7   Q    Who decides how the money in A-1 A-Lectrician, Inc.'s
 8   account -- committee account, who decides, for instance, how
 9   the $45,600 in receipts that appears on item S, which is the
10   last report that the committee filed at the Campaign Spending
11   Commission as of September 3, 2010, who would decide how that
12   money was spent?
13   A    I do.
14   Q    Does anyone else participate in that decision?
15   A    No.
16   Q    Are you a member of the committee?
17   A    Same answer.  Basically we're a family business.  I decide
18   we're a family business, we're a family corporation.  I decide.
19   Q    Let me ask you --
20   A    That's how we run.
21   Q    Let me ask you to look please at paragraph 11 of the first
22   amended verified complaint.  That would be on page 9.
23   A    Of this black book?
24   Q    The first amended verified complaint, the one that's
25   opened there, yes.
```

```
 1   A     Page -- first amended complaint page?

 2   Q     9.  We're looking at paragraph 11 on page 9.

 3   A     Okay.

 4   Q     This paragraph says, "A-1 seeks to contribute $250 to each

 5   of the following Hawaii state-legislature candidates," and then

 6   it names I believe eight or nine candidates.

 7         Were you the person who chose who the contributions,

 8   the $250, would go to?

 9   A     Yes.

10         MR. ELF:  Objection.  This is part of the issues that

11   have been removed from the preliminary injunction.

12         THE COURT:  What is the relevance?

13         MS. AINA:  Your Honor, there remains a question in the

14   state defendants as to the capacity in which A-1 A-Lectrician

15   is claiming that the definition of noncandidate committee in

16   chapter 11 is unconstitutional.  To the extent that A-1

17   A-Lectrician, Inc. is claiming it's unconstitutional in the

18   capacity as the noncandidate committee itself, A-1

19   A-Lectrician, Inc. has been a noncandidate committee since I

20   believe the year 2000, for the last 10 years.

21         And so what these questions have been directed at, or

22   what I was asking the questions for, is to determine if in fact

23   A-1 A-Lectrician, Inc., the committee, is the plaintiff as

24   opposed to A-1 A-Lectrician, Inc., the electrical contractor

25   that has the contracts with the State of Hawaii is the
```

1   plaintiff.

2          It's unclear from the complaint which is speaking when

3   at various places references made to A-1 or Plaintiff A-1.

4   It's for purpose of clarifying in what capacity the challenge

5   to the definition of noncandidate committee is being made.

6   Because they are claiming that the definition is vague and

7   therefore unconstitutional.

8          At the same time, A-1 A-Lectrician, the committee, has

9   operated as an noncandidate committee for 10 years.  And this

10  is a proceeding on a motion for preliminary injunction to

11  enjoin the application of the definition of noncandidate

12  committee.

13          THE COURT:  Well, Ms. Aina, I understand all of that.

14  I know why we are here.  But I'm not sure where this is going.

15  I'll allow the question and the answer, but I want to stay away

16  from the contractor issue.  That has been removed from the case

17  at this point in time.

18          MS. AINA:  My only purpose, Your Honor, was, as I

19  said, I wanted to determine who thinks and makes decisions for

20  A-1 A-Lectrician, Inc.

21          THE COURT:  All right.  So he answered that he was the

22  one who picked those individuals.  All right.

23          MS. AINA:  Thank you.

24          THE COURT:  So I will overrule the objection.

25  BY MS. AINA:

1   Q     Does A-1 A-Lectrician, Inc. expect to make independent

2   expenditures with the thirty-five thousand -- I'm sorry,

3   $45,600 that it reported having received as of September 3,

4   2010?

5   A     Independent expenditures meaning -- define "independent

6   expenditures."

7   Q     Independent expenditures as the term is used in the

8   campaign spending statutes, which would mean an expenditure

9   to -- without coordination with a candidate.

10         THE COURT:  Can I interrupt because I'm confused.  You

11   asked him do they intend to use that $45,000?

12         MS. AINA:  Yes.

13         THE COURT:  As I read this report, that money has been

14   disbursed.  That money has been spent, unless I'm misreading

15   this.  It has total receipts and then line 5 is total

16   disbursements.

17         Am I misreading that, Ms. Aina?  That's set forth in

18   paragraphs 12 through 17.  There were contributions to

19   candidates of 28,000, expenditures of seventeen-five, just

20   those two.

21         MS. AINA:  You are right, Your Honor, I'm sorry.  I'm

22   going to revise the question.

23         THE COURT:  All right.

24   BY MS. AINA:

25   Q     Mr. Yamada, on page 3 of 3 of item S.

1   A     Which book?

2          THE COURT:  Okay, it's exhibit -- it's not item S.

3   It's Exhibit S.  If you look in the big thick binder.

4          THE WITNESS:  Back to the binder?

5   Q     Yes.  Under disbursements, item 13.

6   A     Item?

7   Q     13.  We're looking at --

8   A     Okay.  Item 13.

9   Q     Page 3 of 3, item 13 under disbursements.  Expenditures

10  made, $12,500.  What were those disbursements for?

11  A     I do not know.  I do not make this report, so I do not

12  know.

13  Q     Do you know as to item 12 which candidates contributions

14  totalling $20,100 were made to?

15  A     I do not know the breakdown, but I directed -- so whatever

16  the amounts were, which can be gotten, I do not know the

17  breakdown.  I do not know the details sitting here.  But I made

18  all the directions.  I authorized the amounts and the specific

19  candidates.  But sitting here I do not know the total.

20  Q     This was during the period January 1, 2010 through

21  September 3, 2010?

22  A     If that's what the report says, yes.  I have every -- yes.

23  Q     Would you look please now at paragraph 15 of the first

24  amended verified complaint?  That paragraph is at --

25  A     Page?

```
 1   Q    Page 12.

 2   A    Paragraph 15?

 3   Q    Yes.

 4   A    Okay.

 5   Q    This is the paragraph that says, "A-1 also seeks to do

 6   three newspaper ads in September and October."

 7        Is A-1 referring to the candidate committee --

 8   noncandidate committee, excuse me, or is it referring to the

 9   electrical contracting?

10   A    I answered that before.  We are one of the same.

11   Q    And so A-1 is going to make -- is going to provide the

12   funds for three newspaper ads?

13   A    We already did.  You saw the ad.

14        THE COURT:  I saw one ad.  I don't know how many.

15        THE WITNESS:  There were three.

16        THE COURT:  Okay.

17        THE WITNESS:  We already did that, yes.

18   BY MS. AINA:

19   Q    The monies for that ad came from your First Hawaiian Bank

20   account?

21   A    A-1 checking account, First Hawaiian Bank, yes.

22   Q    Was the newspaper published in the form of what is

23   attached to the first amended verified complaint as Exhibits

24   14, 15 and 16?

25   A    Do you want me to read them?
```

```
 1  Q    I want you to just look at them and tell me if what you

 2  published with the money from the First Hawaiian Bank was

 3  exactly like those -- each of those exhibits -- let me back up.

 4        Was what you published with the money from the First

 5  Hawaiian Bank these three exhibits -- or these three newspaper

 6  ads?

 7  A    I think the -- without looking at the exact content, I

 8  think Exhibit 16 looks incorrect because it didn't have the

 9  disclaimer.

10        THE COURT:  You mean 16 doesn't have a disclaimer, but

11  what you ran did have a disclaimer; is that what you are

12  saying?

13        THE WITNESS:  Yes.

14  Q    So when you say here that Exhibit 16 is what you want to

15  publish --

16  A    No, I didn't say that.  I said that what we published had

17  a disclaimer.  And, again, I'm not saying that I read the

18  content.  Unless you want me to read the content then I would

19  have to compare it with the content that we published, so I

20  don't --

21  Q    Mr. Yamada, let me see if I can help with that.  What

22  paragraph 15 says is that A-1 --

23  A    Paragraph?

24  Q    Paragraph 15.

25  A    Okay.
```

1   Q    A-1 also seeks to do three newspaper ads.  And then

2   there's a footnote 10, and it says -- the footnote 10 says, VC

3   Exhibits 14, 15 and 16?

4   A    Right.

5   Q    Is it incorrect for me to assume that the newspaper ad you

6   planned -- or you sought to do, when you verified this

7   complaint, what you published -- actually published last week?

8        THE COURT:  Ms. Aina, I didn't even begin to

9   understand that question.  Let me see if I can help.

10       How many ads did you run?

11       THE WITNESS:  Three.

12       THE COURT:  Three.  If you look at Exhibits 14, 15 and

13  16, are you able to tell if the ad you actually ran is what's

14  set forth in either 14, 15 or 16?

15       THE WITNESS:  We ran three different ads.

16       THE COURT:  You did run three different ads?

17       THE WITNESS:  Yes.

18       THE COURT:  Okay.  And are you able to tell whether

19  the ads you actually ran are the same as 14, 15 and 16?

20       THE WITNESS:  Would you like me to read them?  I can't

21  read the top part of the ads because of the printing.

22       THE COURT:  That's what you are trying to get at; is

23  that right?

24       THE WITNESS:  I believe the content is accurate, I

25  believe, but Exhibit 16 does not have the disclaimer.  We had a

1    disclaimer on all of the ads.

2            THE COURT:  Okay.  So what you're saying is --

3            THE WITNESS:  The one that we published had the

4    disclaimer.

5            THE COURT:  Okay.  So what you think you did is you

6    ran one ad that's reflected as Exhibit 14?

7            THE WITNESS:  Right.

8            THE COURT:  One ad, which is reflected as Exhibit 15?

9            THE WITNESS:  Right.

10           THE COURT:  And one ad, which is reflected as Exhibit

11   16, except you added a disclaimer on Exhibit 16?

12           THE WITNESS:  Right.  And I'm not sure of the

13   sequence.

14           THE COURT:  Is that correct?

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  So I understand you may not

17   know the timing of when you ran them, but you think you ran

18   these three ads but they all contained a disclaimer?

19           THE WITNESS:  I know the timing, Thursday, Friday and

20   Saturday; but I don't know which one was first, although I

21   think I remember.

22           THE COURT:  Okay.  All right.  I don't know that that

23   is critical.

24           MS. AINA:  Thank you, Your Honor.

25   Q    Mr. Yamada, on Exhibit 14, when you say "disclaimer," are

1    you talking about what appears in the parenthesis at the bottom

2    of the ad?

3    A    Yes.

4    Q    What does the phrase "the candidate" refer to?  Who is

5    "the candidate"?

6    A    What paragraph are you looking at?

7    Q    The last line.

8    A    Oh, the last line.

9    Q    The parenthetical which is the disclaimer, which you just

10   said was the disclaimer.  It says, Published without the

11   approval and authority of the candidate.

12   A    Well, because I mentioned a candidate's name, I need the

13   disclaimer.

14   Q    So the candidate -- who is the candidate that "the

15   candidate" refers to?

16   A    It's the candidate that is listed there in paragraph 1.

17   Q    Who would that be -- I'm sorry?

18   A    Can you read --

19   Q    Can you tell us what the name of the candidate is?

20   A    Blake Oshiro.

21   Q    Why didn't you put Blake Oshiro's name in the disclaimer?

22   A    It's self-explanatory.  There's only one candidate here

23   that I'm listing.

24           THE COURT:  Ms. Aina, can I ask a question, because I

25   don't know -- and, Mr. Elf, you can respond to this too -- does

1    the law require particular language in the disclaimer?  This is

2    the electioneering-communication law, is that right, we're

3    talking about here?

4          MS. AINA:  Yes.

5          THE COURT:  Does it have specific language as to how

6    the disclaimer must be worded?  The reason I ask is if the law

7    is very clear as to how it has to be worded, then these

8    questions are kind of irrelevant.

9          MS. AINA:  This is -- the disclaimer is at Section

10   11-YY.

11         THE COURT:  Right.  And it says in A2B, A notice in

12   prominent locations stating either that, and the important one

13   is the second one, the advertisement is published, broadcast,

14   televised or circulated without the approval and authority of

15   the candidate, which is exactly what it says.

16   Q    Is that why the disclaimer is worded as it is?

17   A    Yes.

18   Q    Who prepared the ad for you?

19   A    I did.

20   Q    So the words are yours?

21   A    The content is mine, but making sure that I'm following

22   the law.  So the -- making sure that I put the proper

23   disclaimer is with the advice of my attorney.  But the content

24   of the ad is mine.  I wrote the ad.

25   Q    Is this -- when the ad was published, did you publish it

1    with the intent that it be an electioneering-communication?

2    A    Define that.

3    Q    An electioneering-communication is defined -- is a

4    specifically defined term under the state campaign finance law,

5    and it's described at Section 11-Z.

6         THE COURT:  Ms. Aina, that doesn't help.  You are

7    asking -- I mean, you can ask him if he drew some legal

8    conclusion only if -- I think Mr. Elf's original objection on

9    this is well-founded.  He is not a legal expert, and he is not

10   here to testify as to that.  If there's some opinion he gave in

11   the complaint that deals with that, that's fine.  You can

12   question him on that.  But, otherwise, I think going down that

13   road is sort of fruitless.

14   BY MS. AINA:

15   Q    Mr. Yamada, would you look at paragraph 27 on page 18?

16   A    I think I'm on it.

17   Q    Paragraph 27 says, "A-1 is not under the control of a

18   candidate or candidates for state or local office in Hawaii."

19   It says it does not -- "A-1 does not spend the majority of its

20   money on contributions to, or independent expenditures for, a

21   candidate or candidates for state or local office in Hawaii."

22        Now, was it part of your verification on behalf of

23   A-1 -- was this paragraph part of your verification on behalf

24   of A-1 A-Lectrician, Inc.?

25   A    I don't understand the question.

1   Q     When you gave the verification for A-1 A-Lectrician, Inc.,

2   was this one of the paragraphs which you were verifying as

3   true?

4   A     Yes, this is a true statement.  Yes.

5   Q     And it says, "'independent expenditure' means expressed

6   advocacy as defined in Buckley and not coordinated with a

7   candidate, a candidate's committee, a candidates's agent, or a

8   party, which is the standard under the constitution."

9         That's your understanding of what an independent

10  expenditure is?

11  A     Not coordinated with the candidates you mean?  Not under

12  the control of the candidates?

13  Q     Yes.

14  A     Not under the control of the candidates, is that what you

15  are asking?

16  Q     Yes.

17  A     Yes.

18  Q     The three ads that you published last Friday, Saturday

19  and --

20  A     Not last but whenever it came out.

21        THE COURT:  Let's just be clear on that.  You said

22  Thursday, Friday and Saturday.  The Saturday being the Saturday

23  morning of the --

24        THE WITNESS: Of the election primary election, yes.

25        THE COURT:  So it was two days before, the day before,

1   and the day of the primary election?

2          THE WITNESS:  Right.

3   Q    Were those independent expenditures made by A-1

4   A-Lectrician?

5   A    Yes.

6          MR. ELF:  Objection.  Ms. Aina may be using the term

7   "independent expenditure" differently than the complaint uses

8   the term "independent expenditure."

9          The complaint uses the term "independent expenditure"

10  to mean noncoordinated expressed advocacy as defined by the

11  Supreme Court in Buckley versus Valeo.  Ms. Aina may be using

12  the term "independent expenditure" to mean spending for

13  political speech, whatever form it takes, that is not

14  coordinated with a candidate.

15         THE COURT:  Look, we have a layperson on the stand.  I

16  think what he is saying is he made the independent decision to

17  run those ads; is that right?

18         THE WITNESS:  Correct.

19         THE COURT:  That's what you are saying?

20         THE WITNESS:  Right.

21         THE COURT:  And there was nobody who told you to do

22  it?

23         THE WITNESS:  Yes, nobody told me to do it.

24         THE COURT:  You didn't coordinate with Blake Oshiro's

25  opponent for instance?

1          THE WITNESS:  No.

2          THE COURT:  It was a decision you made on your own?

3          THE WITNESS:  Yes.

4          THE COURT:  Without consultation with others?

5          THE WITNESS:  Yes.

6          THE COURT:  Does that clarify, Mr. Elf?

7          MR. ELF:  Yes, sir, it does.

8          THE COURT:  All right.  That's how I understood the

9    use of the term in this context to mean.

10   BY MS. AINA:

11   Q    Mr. Yamada, at paragraph 28 on page 19, the paragraph

12   following the one we were just looking at.  It says, "A-1

13   reasonably fears that if it does its 2010 speech as a

14   noncandidate committee, it will have to continue complying with

15   noncandidate committee burdens as the CSC has conveyed them to

16   A-1 over the years."

17          Is the reference to A-1 in that sentence the

18   electrical contracting company.

19   A    Yes.

20   Q    What does it mean when you say "A-1 reasonably fears that

21   if it does its 2010 speech as a noncandidate committee"?  What

22   does that mean?

23   A    A-1 is a noncandidate committee, and my understanding is

24   that we have an ad, we have speech, we have issue ads that

25   we're making, so we're making it through A-1.  It's one of the

1    same.  We are a noncandidate committee.

2    Q    What does "reasonably fears" refer to?

3    A    I would have to look at the rest of the context of the

4    paragraph to understand that.

5    Q    Please do.

6         THE COURT:  We have been going an hour with this

7    witness.

8         THE WITNESS:  I didn't answer the question.

9         THE COURT:  Hold on one second.  You've been going one

10   hour.  I'm not stopping you.  I'm just telling you what your

11   time is.

12        MS. AINA:  I don't think I'll need the entire hour.

13        THE COURT:  No, you've been going one hour now.

14        MS. AINA:  Yes, and I think I asked for two hours and

15   I --

16        THE COURT:  You asked for two hours total.

17        MS. AINA:  Yes.  And I don't think I will use the

18   entire two hours.

19        THE COURT:  Okay.  I'm not telling you to stop.  I'm

20   just letting you know what the time is; that's all.

21        Can you answer the question, Mr. Yamada?

22        THE WITNESS:  I think, as I understand it here, we

23   have two issues that we do not want to be a noncandidate

24   committee because the registrations are burdened as we are

25   going forward.  There's a tough economy.

```
 1              But if we are not a noncandidate committee and we
 2    still want to have a say in the world, in the political world,
 3    the issue world, there's some issues that we're concerned with,
 4    then if we are not a noncandidate committee, then the CSC is
 5    going to be -- I'll use my own language -- roping us in on
 6    those free speech and then I'm back to the same place I am.  So
 7    we have to say that we need to be free to speak.
 8    Q    Mr. Yamada, do you disagree with the legislature's
 9    decision or definition of what a noncandidate committee is?
10    A    Do I disagree?  Explain that.
11              THE COURT:  Ms. Aina, his personal view is irrelevant.
12    What's the relevance, if you are asking his personal view as to
13    whether he agrees or disagrees?
14    Q    I'm sorry.  I did not mean -- does A-1 disagree with the
15    definition of noncandidate committee?
16    A    We just comply.
17    Q    When you say then that you reasonably fear, if you are
18    just complying, what --
19    A    Repeat that?
20    Q    If you are just complying, what does A-1 reasonably fear?
21    A    Well, I think if you read the whole thing, what we're
22    saying is that we have issue ads that we are currently placing.
23    And but we're also asking for a declaratory judgment that we
24    can be -- we can operate as a noncandidate.  We can cease
25    operating as a noncandidate committee.
```

1           THE COURT:  When you say "issue ads," you are

2    referring to the three ads that we've just discussed?

3           THE WITNESS:  Those types.  Anything on the issues.

4    Because we're concerned with issues.  So if we -- if the court

5    allows us to not be a noncandidate committee, and then we come

6    into the issue ad area, then the courts or the system, the CSC

7    will say that we are doing electioneering campaigning, and

8    we're back to the same place.  We're regulated again.  We got

9    to go through the same documentations so we can't be -- so we

10   fear that if we win one we're back -- we still have the same

11   problem.

12          THE COURT:  I'm sorry.  So just to understand what you

13   are saying, when you reasonably fear, you're talking about

14   reasonably fearing having to comply and the burdens that go

15   with compliance?

16          THE WITNESS:  Yes.

17          THE COURT:  And you're saying there are two things you

18   reasonably fear.  One is that you have to stay registered as a

19   noncandidate committee and the reporting requirements that come

20   with that; is that accurate?

21          THE WITNESS:  Yes.

22          THE COURT:  And if you're not a noncandidate

23   committee, the speech may be electioneering communications, and

24   you are going to have reporting requirements as well?

25          THE WITNESS:  Yes.

```
 1              THE COURT:  And you are saying both of those are

 2    burdensome?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Are they equally burdensome?  If you can

 5    answer.

 6              THE WITNESS:  Yes.

 7              THE COURT:  All right.

 8    BY MS. AINA:

 9    Q    Mr. Yamada, would you look please at paragraph it 24 on

10    page 14?

11    A    Okay.

12    Q    What does the first sentence mean?

13    A    Can I read it?

14    Q    Yes.

15    A    The first sentence?

16    Q    Yes.

17    A    That we will be subject to continuous enforcement and

18    prosecution leading to whatever penalties, liabilities.

19    Q    For what?

20    A    If we don't follow the Hawaii law.

21    Q    Is that unusual?

22    A    I'm not a lawyer, so I'm not commenting on that.

23    Q    Are you saying that people who do not follow the law

24    shouldn't be prosecuted?

25    A    No.
```

1    Q    Mr. Yamada, on the three ads that you published in the

2    week of the primary election, were those electioneering

3    communications?

4    A    I don't know the law.  My intent was those were issues

5    that I'm dealing with.  If you look at the content, there are

6    issues.

7    Q    What was the objective of publishing those ads?

8    A    We have lost -- I believe we have lost our freedom in the

9    United States and Hawaii, and we have so much restrictions on

10   us that we are not free to speak.  And so the issue, the

11   objective was to let Hawaii know, those that read the papers,

12   that we are losing our freedom.  And there are some important

13   issues that are fruits of that.  And there is some important

14   issues that have caused us to lose our freedom.

15   Q    What was the purpose of including Representative Oshiro's

16   name in the ad?

17   A    I needed an example of how we have lost our freedom.  And

18   if you read the content, the way that the legislature seemed to

19   have gone about, in my opinion and that's what I'm expressing,

20   my freedom of speech, to be able to say that something is wrong

21   with a legislative body that can just take advantage of rules

22   and push forth legislation.

23        So to me the issue is not against Blake or any

24   particular person -- I mentioned Calvin Say -- but it's against

25   leaders in our community that the people need to look up to

1    like, George Washington and Abraham Lincoln.  And if the people

2    do not have leaders that they can look up to, then they go

3    berserk themselves.  This is part of the reason we have drug

4    problems.

5          So there's a disregard and disrespect for the leaders

6    of our communities today.  I think something needs to be done.

7    That's why I published the ad.  That was the objective.

8    Q   Was the ad in any way intended to urge the election or the

9    defeat of the individuals named in the ad?

10    A   No.

11          THE COURT:  What was the cost of each of those ads, do

12    you know?

13          THE WITNESS:  I don't know the exact cost, but I think

14    they were roughly 3,000 each, or thereabouts.

15          THE COURT:  That's an approximation?

16          THE WITNESS:  Yes.

17    BY MS. AINA:

18    Q   Did you file an information statement after the ads were

19    published?

20    A   Sharon would have done whatever she needed to do.  I do

21    not know what she does.

22    Q   If you didn't intend the ads to urge or advocate the

23    election or defeat of any of the individuals named in it, why

24    was it necessary in your mind to include a disclaimer?

25    A   My understanding is, as I need to have a disclaimer even

1    though it's an issue ad, because I mentioned a candidate.

2    Q    Just a few more questions, Mr. Yamada.

3    A    Thank you.

4    Q    Yours is a very long complaint.  About your other

5    verification, there was a second verification that you gave and

6    that was for yourself.  So the first question I want to ask you

7    is --

8    A    Are we looking at a page?

9    Q    The verification that I'm referring to now is at page 57.

10   A    Okay.

11   Q    And my question would be -- or is, what parts of the

12   verified complaint does this verification apply to?

13   A    What part of the complaint?  I have to look at a page or

14   just tell you the context?

15   Q    If you can just tell me a general description of the kinds

16   of statements that you intended this verification to apply to?

17   A    We wanted to make a contribution to AFA-PAC of 2500.

18          THE COURT:  When you say "we," who do you mean?

19          THE WITNESS:  When I say "we," my wife and I.  Just

20   me.  We're married, so I just think of us as one.  So I, but I

21   always say we because -- so I.

22   Q    Was Mrs. Yamada going to make --

23   A    No, no.

24   Q    I asked Mr. Stewart this question, and I'll ask the same

25   question of you.  Why $2,500 and not $2,100, $1,100, $3,000?

```
 1   A     That's a number that I chose.  It's an impact number.

 2   Q     Do you have any understanding of how your thousand-dollar

 3   contribution, I believe Mr. Gerakas said, would be used?

 4   A     I believe that statement was an oversight on his part.

 5   Because I believe we made it through -- we didn't make it

 6   through Jimmy Yamada personally.  The thousand dollars we gave

 7   I believe was through A-1 A-Lectrician.  I think, in his mind,

 8   he doesn't -- I think, as I listen to it, so I think, I

 9   think --

10   Q     Who made the decision to make that thousand-dollar

11   contribution from A-1 A-Lectrician?

12   A     I did.

13             THE COURT:  But the $2,500 that's something you

14   personally would --

15             THE WITNESS:  Personally, right.

16             THE COURT:  That would be the Jimmy Yamada checking

17   account?

18             THE WITNESS:  Right.  That's why we didn't -- yeah,

19   well.

20             THE COURT:  That would not be an A-1 check, that would

21   be a personal check?

22             THE WITNESS:  Right, personal check.  Right.  We

23   didn't make any contribution as far as I know.

24   BY MS. AINA:

25   Q     Do you expect to make a contribution to AFA-PAC before the
```

1    general election this year?

2    A    I have not thought about that.

3    Q    Do you know if any of the other employees or officers of

4    AFA-PAC would be interested or have made contributions to

5    AFA-PAC?

6    A    I know very -- no.

7    Q    Is there any reason why you would -- you have not made a

8    thousand-dollar contribution to AFA-PAC from your own

9    checkbook?

10   A    Is there a reason?

11   Q    Yes.

12   A    No.

13            THE COURT:  Ms. Aina, if I could follow-up.

14            Ms. Aina asked you if you expect to contribute to

15   AFA-PAC before the general election?

16            THE WITNESS:  No.

17            THE COURT:  You don't expect to?

18            THE WITNESS:  Well, pending this case.

19            THE COURT:  Well, that's what I wanted to get out.  It

20   was not clear to me what your answer meant.  If you were

21   permitted to?

22            THE WITNESS:  Yeah, then I would.

23            THE COURT:  Then you would?

24            THE WITNESS:  Yes.  If you guys say okay.

25            THE COURT:  I understand that.  If I were to permit

```
 1   you --

 2             THE WITNESS:  Oh, then I would.

 3             THE COURT:  Okay.  And if I said no --

 4             THE WITNESS:  Other than that, I won't.

 5             THE COURT:  You won't make any contribution then?

 6             THE WITNESS:  Yes.

 7             THE COURT:  So it's $2,500 or nothing?

 8             THE WITNESS:  Yes.

 9             MS. AINA:  Thank you, Your Honor. May I have a moment?

10             THE COURT:  Sure.  Certainly.

11             MS. AINA:  Your Honor we have -- I have no further

12   questions for Mr. Yamada.

13             THE COURT:  All right.  Mr. Elf.

14             MR. ELF:  Yes, we do briefly, Your Honor.

15             THE COURT:  All right.  How much time do you think you

16   need?  I'm trying to see if we should take a break.

17             MR. ELF:  Not more than a few minutes.

18             THE COURT:  Why don't you go ahead then.

19                         REDIRECT EXAMINATION

20   BY MR. ELF:

21   Q   Mr. Yamada, sir, good morning.

22   A   Good morning.

23   Q   You were mentioning that the board entrusts you, and I

24   don't recall your exact words, to run the corporation.  How

25   does that work?
```

1    A    I was the -- until last year, my father passed away in

2    1979, I had the voting stock of the corporation.  So basically

3    I'm the voter, and the family -- the Yamada family trusts me to

4    run the business.  So what basically what they say is, Dad's a

5    dictator.  What I say goes.

6         So I run the corporation, I'm on the board, I let the

7    board have their say, but they always agree with me.  So there

8    was never an issue that what I would not -- and I would not do

9    anything that would hurt the corporation, so they trust me.  So

10   they have empowered me to do the things in the running of the

11   business.  And one of the things we believe is to give back to

12   society.  This is part of it.

13   Q    In your experience with A-1, does the board ever run all

14   of the day-to-day operations of A-1?

15   A    No.

16   Q    In your experience with A-1, does the board ever make all

17   of the decisions about political speech in which A-1 engages?

18   A    No.

19   Q    Is that the sense in which the board --

20   A    Well, let me qualify the no.  Are you saying the board,

21   which I'm part of, or -- I'm assuming you are saying -- when I

22   answered no, I'm assuming you're saying the board as the

23   corporate board of A-1 versus me as the president or CEO,

24   right?

25   Q    Yes, sir, that's correct.

```
 1   A     The board does not, yes.  No.

 2   Q     In your experience, does the board, that is the Board of

 3   Directors, ever run the whole show in terms of the political

 4   speech in which A-1 engages?

 5   A     No.

 6            MR. ELF:  Thank you, Mr. Yamada.

 7            Nothing further, Your Honor.

 8            THE COURT:  Mr. Yamada, who is the president, do you

 9   know?

10            THE WITNESS:  My son Jason.  34.

11            THE COURT:  All right.

12            THE WITNESS:  And he agrees with his dad.

13            THE COURT:  Okay.  All right.  Thank you, Mr. Elf.

14            Ms. Aina, anything further?

15            MS. AINA:  No.

16            THE COURT:  You may step down, sir.

17            Is there any further evidence?  We're going to take a

18   break, but I just want to make sure that we have no further

19   evidence.

20            MR. ELF:  Not from us, Your Honor.

21            MS. AINA:  Your Honor, are you inviting us to ask the

22   court to admit the evidence or exhibits into evidence?

23            THE COURT:  Why don't we take that up after the break?

24   I think we need to give staff some time here.  But as far as

25   witnesses, you are done, Ms. Aina?
```

1          MS. AINA:  Yes.

2          THE COURT:  All right.  I'll go ahead and take a 15

3   minute recess.  People can stretch a little bit.  We can come

4   back and let's first talk about these exhibits.  Keep in mind

5   what I said about the relevancy on these.  And with that in

6   mind then we can talk about these exhibits; all right?

7   (Recess at 10:27 a.m. until 10:41 a.m.)

8          THE COURT:  Back on the record with counsel.

9          First, we have Plaintiff's Exhibits 1 through 21 in

10  their binder book.  Are there any objections to those being

11  entered for the purposes of this preliminary injunction hearing

12  only, Ms. Aina?

13         MS. AINA:  No.

14         THE COURT:  All right.  So exhibits Plaintiff's

15  Exhibit 1 through 21 are admitted.

16     (Plaintiff's Exhibits 1-21 were received in evidence.)

17         Now, we have for the defendants -- I can't tell where

18  it goes through, A through EE; is that right, Ms. Aina

19         MS. AINA:  Yes, Your Honor.

20         THE COURT:  Mr. Elf.

21         MR. ELF:  Your Honor, to the extent these exhibits are

22  statutes of administrative rules, the court is always free --

23         THE COURT:  So what's your objection?  What does it

24  matter if they are exhibits or not?  I can take judicial notice

25  they are there, I know about it, what does it matter?

1              MR. ELF:  Well, no one has authenticated this.  If the

2     court wants to let them in --

3              THE COURT:  One by one, Exhibit A, what's your

4     position on Exhibit A, Mr. Elf?  Let's do it that way.

5              MR. ELF:  All right.  There's been no authentication

6     to this, and there's been no testimony about this.

7              MS. AINA:  Your Honor.

8              THE COURT:  Why don't we do this?  Why don't we

9     continue the hearing until next week, Ms. Aina, and you can

10    bring on witnesses to authenticate your exhibits.  Would you

11    like to do that?

12             MS. AINA:  We can, and I was going to bring the

13    attention of Mr. Elf and the court to the footnote in our

14    submission, which was to suggest that these are all properly

15    self-authenticating under the Rules of Evidence 8025.

16             Now if Mr. Elf says that they are not, well, okay,

17    then we'll come back next week with the witnesses.

18             THE COURT:  Mr. Elf.

19             MR. ELF:  We stand by what we suggested before.

20             THE COURT:  All right.  Then let's pick a date to come

21    back next week and we'll put on evidence regarding exhibits.

22    My trial should be over probably Wednesday; right?  So maybe

23    Thursday or Friday.

24             What day works for you, Mr. Elf?

25             MR. ELF:  Either of those would be fine.  May I attend

1   by telephone?

2        THE COURT:  No, sir, you may not.

3        MR. ELF:  May we have a moment?

4        THE COURT:  Yes.  Mr. Hochberg can come in and do it,

5   Mr. Elf.  Let me be clear.  Mr. Hochberg is local counsel.  He

6   can be here and do it; you don't need to be here.

7        MR. ELF:  I understand that.

8        THE COURT:  Okay.  I just want to make sure you

9   understood that.

10        MR. ELF:  Your Honor, would the court be willing to go

11   ahead if we don't go through each exhibit?

12        THE COURT:  Would I be willing to do what now?

13        MR. ELF:  Would the court be willing to go through

14   each exhibit today and flip through each exhibit today?

15        THE COURT:  We don't have time to do that today;

16   that's the problem.  If I had time today, we would do it today,

17   but we don't have time.  And what I really wanted was for each

18   exhibit a very clear reason as to what the objection is.  And I

19   thought actually some of these would fall out because of the

20   contractor ban falling out.

21        But I think there's two ways to do this.  That's what

22   I'm saying.  One is to let these come in, and I will consider

23   the degree to which they are relevant and make the appropriate

24   determinations.  If you really have authenticity challenges,

25   then you can make those challenges.

1          The other way is to go through them one at a time.

2     And I will require some briefing regarding each of these

3     exhibits individually before we have a hearing then on the

4     admissibility of these exhibits.

5          MR. ELF:  Then we'll choose the former option.  Go

6     ahead today, let the court assess these as it will, and stand

7     on what we have said.

8          THE COURT:  But here's the way is works in court,

9     Mr. Elf.  Ms. Aina presumably is moving to admit Exhibits A

10    through EE, and you either object or you don't object.

11         MR. ELF:  Then we'll go ahead and let these in.

12         THE COURT:  So you don't object?

13         MR. ELF:  Correct.

14         THE COURT:  Now, if you wish to file something further

15    regarding why you think any of these particular documents are

16    not relevant, particularly after striking today's hearing of

17    the contractor ban, I'll let you do that.  I'll give you leave

18    to do that.  That way we can get to the argument here today.

19         Obviously, if Ms. Aina, in her arguments today,

20    Mr. Elf, references any of these exhibits that you think are

21    irrelevant, you can raise that issue.

22         MR. ELF:  Very well.

23         THE COURT:  Is that fair enough?

24         MR. ELF:  That's fine.

25         THE COURT:  All right.  So you are dropping any

1   authenticity objection?

2          MR. ELF:  Right.

3          THE COURT:  The exhibits are admitted for the purposes

4   of the hearing, but I will allow you to file by, let's say,

5   Wednesday any statement you wish as to why you believe any of

6   these exhibits are simply not relevant.

7          By next Friday, Ms. Aina, you can file a response to

8   that.  All right?

9          MR. ELF:  Very well.

10         THE COURT:  So I will admit A through EE as well.

11   With that are we ready to begin argument, Mr. Elf?

12       (Defendant's Exhibit A-EE were received in evidence.)

13         MR. ELF:  Yes, sir.  Your Honor, I would like to

14   begin, if I may please, with two brief words.  One word is

15   thanks and one word about what this action is not about.

16         The word of thanks goes to the court and the court

17   staff for its careful attention to all of the matters.  Having

18   had the thrill of being a district court law clerk, I know what

19   it's like when what looks like a big case comes flying over the

20   transom, or I guess now it comes flying over the electronic

21   filing system, and I know what it's like to sit in the position

22   of the law clerk, and I can imagine what it's like to sit in

23   the position of the judge and assess something like that.

24         And, Judge, I'm sure your law clerk is way smarter

25   than I ever was, but that does not diminish the appreciation

1    that we have for everyone's attention to this matter.

2           The second word is what this action is not about.

3    Mr. Yamada, for example, testified about why he wants to engage

4    in the speech he wants to engage in and why A-1 wants to engage

5    in the speech it wants to engage in.

6           The merits of the speech are not what this case is

7    about.  This case is about government's power to regulate

8    political speech, whatever the content of the particular

9    political speech is.

10          This action challenges five aspects of Hawaii law, and

11   four of those aspects are before the court on the preliminary

12   injunction motion.  The regulation of A-1 as a noncandidate

13   committee, the electioneering-communication reporting

14   requirements, the disclaimer requirements, and the limit on

15   contributions received by political committees, or as Hawaii

16   calls them, noncandidate committees, that do only independent

17   spending for political speech.

18          The law that the plaintiffs challenge, we submit, some

19   of it is vague and all of it fails in the appropriate level of

20   scrutiny.

21          THE COURT:  Can I make sure?  Part of the difficulty

22   I've had or at least where I've spent a lot of time trying to

23   understand, and I think getting some direction from both of you

24   might be helpful, is -- and part of this gets ahead of

25   ourselves to a certain degree -- but on the relationship

```
 1    between the noncandidate committee definition and who fits
 2    within that and the electioneering-communication.  Those issues
 3    can't be totally separated, it seems to me, because as I
 4    understand this law, if I were to rule, and please take all of
 5    this as very hypothetical because I'm going to throw a lot of
 6    hypotheticals here, so just accept those without trying to come
 7    back and argue, but that's not where things are, if I were to
 8    rule that the noncandidate committee definition -- that a
 9    particular firm, A-1 or any other hypothetically, fit into that
10    -- in other words, let's say you agreed with that, there's
11    clearly a political capital P committee that had to register
12    under Hawaii law, and let's do away with the facial vagueness
13    challenge for a minute, as I understand it, then the only thing
14    that the electioneering communication law -- the only
15    additional requirements put on them, that noncandidate
16    committee, is the disclaimer requirements in the
17    electioneering-communication law; is that accurate?
18              MR. ELF:  That's exactly right.
19              THE COURT:  Okay.  So some of it may be moot depending
20    on the electioneering-communication depending on how I rule on
21    the noncandidate committee?
22              MR. ELF:  That's exactly right.
23              THE COURT:  Okay.  So I'm just trying figure out the
24    pieces as to where we go on this.  And that's fully unrelated
25    to the issue of whether Mr. Stewart and Mr. Yamada can give
```

1    funds to AFA-PAC.

2           MR. ELF:  That's totally different.

3           THE COURT:  That issue is really separate from every

4    other issue?

5           MR. ELF:  Entirely separate.

6           THE COURT:  Thank you for that.

7           And you agree with that, Ms. Aina?

8           MS. AINA:  Yes.

9           THE COURT:  That's helpful framework for me.

10          MR. ELF:  That, by the way, is why A-1, when it did

11   its spending for political speech, when it did its three

12   newspaper ads, did not file an electioneering-communication

13   information statement.  Right now it's a noncandidate

14   committee, so it doesn't have to file an electioneering

15   communication information.

16          THE COURT:  And that's just part of the new

17   regulations you didn't know about when you filed the initial

18   complaint?  That's a relatively new thing, isn't it?  Or am I

19   mistaken on that?

20          MR. ELF:  I would have to check, Your Honor.

21          THE COURT:  It's probably irrelevant.  But for our

22   purposes.

23          MR. ELF:  As to vagueness.  We submit that the

24   noncandidate committee definition in Hawaii law, including the

25   expenditure definition, is unconstitutionally vague as a matter

1   of law, because it refers to influencing elections and for the

2   purpose of influencing elections.

3          THE COURT:  Was this statute written before or after

4   Buckley, do you know?

5          MR. ELF:  Well, the current statute was --

6          THE COURT:  No, the first time they used -- I

7   understand the current statute is very recent.  The first time

8   they used that influence language.

9          MR. ELF:  That I do not know.

10         THE COURT:  I think it was after Buckley.

11         Do you know, Ms. Aina?

12         MS. AINA:  The statute was passed --

13         THE COURT:  You'll have to use the microphone.

14         MS. AINA:  1978.

15         THE COURT:  And Buckley was what year?

16         MS. AINA:  1973.

17         MR. ELF:  1976.

18         THE COURT:  Okay.  So Buckley did preside the --

19         MS. AINA:  Preceded the Hawaii campaign spending

20   statute.

21         THE COURT:  Okay.

22         MR. ELF:  And we submit under Buckley 424 U.S. at 77

23   the phrase "for the purpose of influencing" is

24   unconstitutionally vague as a matter of law.

25         THE COURT:  So tell me why I can't put a narrowing

1    gloss on that then?

2          MR. ELF:  Because the federal court does not rewrite

3    state law.

4          THE COURT:  I understand that I can't rewrite it, but

5    what -- the consideration I'm giving, Mr. Elf, is if this term

6    "to influence," assuming I understand there are a lot of legal

7    fictions in place here, but assuming the Hawaii legislature, I

8    think you do assume, understood what the law was at the time

9    they passed it.  They understood what the Supreme Court

10   therefore said in Buckley, and therefore, you sort of

11   automatically read into it this narrowing gloss.  It's not

12   rewriting the statute, it's what really is part of the statute

13   already.

14         How do you argue against that?

15         MR. ELF:  We would suggest that that's still a matter

16   of rewriting the state law, because there is so much difference

17   between "for the purpose of influencing election" and anything

18   that would be constitutional that it amounts to rewriting the

19   state law.

20         THE COURT:  All right.

21         MR. ELF:  That's the first aspect of Hawaii law that

22   is vague.

23         Advertisement definition and by extension the

24   electioneering communication definition and the electioneering

25   communication requirements that go along with that, and the

1   disclaimer requirements by extension of those as well, refer to

2   what advocates or supports and refer to opposition.

3          We submit those are unconstitutionally vague, as a

4   matter of law, for the reasons we have explained in our

5   citations to that -- our persuasive citations of the Justice

6   Scalia concurrence in Wisconsin Right to Life.

7          THE COURT:  Where is the opposition language?  I know

8   about the advocate and support, but you say opposition?

9          MR. ELF:  Opposition.  The word "oppose" is part of

10   the phrase in federal law, promote, support, attack, oppose

11   that Justice Scalia writes is unconstitutionally --

12          THE COURT:  You are one step past me.

13          MR. ELF:  I'm sorry.

14          THE COURT:  What I'm looking at is the statute itself

15   and where the word "oppose" comes in.  My law clerk is trying

16   to help me out.

17          MS. AINA:  In the second paragraph of the definition

18   of advertisement.

19          THE COURT:  That's what I'm getting at, Mr. Elf.  I'm

20   looking for that.  Opposition, I see.  Okay, I got it.

21   Advocates or supports the nomination, opposition, or election

22   of the candidate.

23          MR. ELF:  Yes, sir.

24          THE COURT:  Okay. Thank you.

25          MR. ELF:  Then the third aspect of Hawaii law that we

1   submit is unconstitutionally vague, as a matter of law, is the

2   electioneering-communication definition itself which uses the

3   appeal to vote test.

4        After Citizens United, all that is left of the

5   Wisconsin Right to Life appeal to vote test is the point that

6   Justice Scalia made in his concurrence that that test is

7   unconstitutionally vague.  Citizens United v. FEC from earlier

8   this year, and the Supreme Court does away with the appeal to

9   vote test and leaves it unconstitutionally vague.

10       THE COURT:  That's what Citizens United says?

11       MR. ELF:  That is the upshot of Citizens United.

12   Citizens United does away with the appeal to vote test.

13       If I may back up for a minute.  In the beginning there

14   was no law, then along came Buckley versus Valeo which held

15   that when it comes to spending for political speech by

16   organizations, the government may not regulate -- may not

17   regulate as political committees.

18       Buckley held that government may regulate one and only

19   one thing; that was electioneering communications as defined --

20   pardon me, that was expressed advocacy as defined in Buckley.

21       Then came McConnell versus Federal Election Commission

22   which said that government may also regulate electioneering

23   communications as defined in the Federal Election Campaign Act.

24       Then came Wisconsin Right to Life which narrowed

25   McConnell by saying government may regulate electioneering

1    communications as defined in the Federal Election Campaign Act

2    when they passed the appeal to vote test.  That is, when they

3    are what McConnell called the functional equivalent of

4    expressed advocacy.  That is when their only reasonable

5    interpretation is an appeal to vote for or against a clearly

6    identified candidate.  That's where the law stood after

7    Wisconsin Right to Life.

8         Then came Citizens United, which said that even if law

9    is the functional equivalent of expressed advocacy, that is

10   even if the law passes the appeal to vote test, government --

11   even if the speech passes the appeal to vote test, government

12   can't ban it.  And even if it fails the appeal to vote test,

13   that is even if there is a reasonable interpretation other than

14   as an appeal to vote for a clearly identified candidate,

15   government may still regulate the speech by requiring

16   disclosure.

17        In other words, the appeal to vote test has no

18   relevance anymore.

19        THE COURT:  In the expenditure world?

20        MR. ELF:  In the spending world when it comes to

21   spending for political speech by organizations that government

22   may not regulate as political --

23        THE COURT:  And what about in the disclosure world?

24        MR. ELF:  In the disclosure world as well.  Under

25   Citizens United, the Supreme Court said that even if speech

1    fails the appeal to vote test, that is even if it has a

2    reasonable interpretation other than as an appeal to vote for a

3    clearly identified candidate, government can still require

4    disclosure of that speech.

5         In other words, the appeal to vote test is no barrier

6    to regulation of speech anymore.  All that is left of Wisconsin

7    Right to Life then is the inclusion -- is the statement by

8    Justice Scalia at 551 U.S. 492 through 494, that the appeal to

9    vote test is unconstitutionally vague.  That's all that's left

10   of the test.

11        THE COURT:  All right.

12        MR. ELF:  That takes care of vagueness.  As for

13   overbreadth, that is scrutiny, the government has the burden --

14        THE COURT:  Let's talk for a minute about what I think

15   is -- I have to say that I've spent a lot of time on this.  I

16   still don't have a firm view in my mind, I think I sort of know

17   what is right, and that is, as I understand it, you are arguing

18   as to the definition.  I want to just get to this issue now.

19   The definition, whether you fall within noncandidate committee

20   in the first place is subject to strict scrutiny.

21        MR. ELF:  Yes.

22        THE COURT:  And not exacting scrutiny.

23        MR. ELF:  Correct.

24        THE COURT:  All right.  That seems to be an issue that

25   courts are not real solid on right now as far as I can tell.

1    And I would like to get your view as to why that is, if you can

2    walk me through why that is.

3         MR. ELF:  Why are courts not solid on that right now?

4         THE COURT:  No, no, no.  Why should I apply strict

5    scrutiny as opposed to exacting scrutiny?

6         MR. ELF:  Well, we should apply strict scrutiny

7    because in Austin vs. Michigan Chamber of Commerce the Supreme

8    Court referred to a compelling government interest.

9         THE COURT:  Well, there's some sloppy language,

10   everyone recognizes that.  They also said in Citizens United

11   and DOE versus Reed that you can have burdens in political

12   speech, which doesn't prohibit political speech, that gives

13   rise to an exacting scrutiny standard.  And Judge Hornby in the

14   court that I think you folks practice in --

15        MR. ELF:  I was there that day.

16        THE COURT:  Okay.  Well, you know how that turned out.

17        MR. ELF:  I do.

18        THE COURT:  And we have the Tenth Circuit and I think

19   maybe speech now that applying exacting scrutiny.  I know you

20   think the Tenth Circuit is inconsistent with the previous Tenth

21   Circuit case and so forth.  But stepping aside from the fact

22   that courts maybe are not real consistent on this, tell me why

23   I should apply strict scrutiny?

24        MR. ELF:  Stepping aside from?

25        THE COURT:  In other words, you can get tied into the

1    weeds in this.  I'm sure you understand.  You can start looking

2    at individual cases and get so tied into that you need to step

3    back.  So take a broader approach and just tell me what is the

4    policy argument behind the strict scrutiny for the regulation?

5         MR. ELF:  It's the extraordinary burdens that being a

6    political committee, or as Hawaii calls it a noncandidate

7    committee, imposes.

8         THE COURT:  Well, Mr. Yamada said it's no different

9    than the burdens of having an electioneering-communication.

10        MR. ELF:  As the court responded to me, when I made an

11   objection, we had a lay witness on the stand there, Mr. Yamada,

12   despite his terrific testimony today, is not a practitioner of

13   law much less a practitioner of election law.

14        THE COURT:  I don't think it's a question of law

15   though.  It's a question of the law sets forth these things,

16   and he testified he didn't really see a difference in the

17   burdens.

18        MR. ELF:  The fact that Mr. Yamada did not see a

19   difference in the burdens does not mean that there is not, as a

20   matter of law, a difference in the burdens.  When an

21   organization is a political committee, it is constitutional --

22   it is constitutional for government to -- or when it is

23   constitutional to define an organization as a political

24   committee I should say -- it is constitutional for government

25   to require a registration, including a requirement to get a

1    particular bank account, set up other organizational

2    requirements, have termination requirements.  It's also

3    constitutional to require extensive recordkeeping requirements,

4    it's also constitutional to have extensive reporting

5    requirements.

6         All of those burdens are constitutional to impose on

7    organizations when it is constitutional to define those

8    organizations as political committees in the first place.

9    Those are extraordinary burdens, are very high burdens as the

10   Supreme Court has pointed out, particularly in MCFL and most

11   recently in Citizens United at 130 Supreme Court at 897.

12        And those are burdensome and onerous, as a matter of

13   law, even if -- Citizens United at 897 stands for this as

14   well -- even if there are not contribution limits or

15   contribution source bans that go along with political committee

16   status.

17        THE COURT:  But Citizens United and Reed, it seems to

18   me, and if you think this is an oversimplification you tell me,

19   seem to be saying that if you have a regulation or

20   requirements, whether it be disclosure disclaimer or whatever

21   it is, the requirements, that are a burden on free speech,

22   exacting scrutiny applies.  If there is a prohibition on

23   speech, then that can be a different story of course.

24        So you really have to pigeon hole your arguments, it

25   seems to me, in to there's an actual prohibition of speech as a

1    result of having to register as a noncandidate committee, am I

2    interpreting that correctly?

3          MR. ELF:  No, sir, that's not correct.  That's the

4    mistake that Judge Hornby made in the District of Maine in

5    August.  Even if, and we have provided the citations to this,

6    even if political committee status does not mean a ban on

7    speech, that is even if the organization itself has to become a

8    political committee, then those burdens of being a political

9    committee are still onerous as a matter of law.

10         The North Carolina law that the Fourth Circuit dealt

11    with, the New Mexico law that the Tenth Circuit just dealt with

12    in New Mexico Youth Organized, the Colorado law that the Tenth

13    Circuit dealt with in Colorado Right to Life all were

14    situations in which there was no ban on speech.  There was no

15    ban on speech.  But the organization itself had to bear

16    political committee burdens.  And it was unconstitutional to

17    regulate those organizations as political committees.

18         THE COURT:  But we're not at that point.  You are a

19    step ahead of me.  The Tenth Circuit I think in one case, and

20    correct me if I'm wrong, used exacting scrutiny and said it was

21    unconstitutional under exacting scrutiny.

22         MR. ELF:  That's correct.

23         THE COURT:  So we haven't gotten to that issue yet as

24    to whether under which standard whether it's constitutional or

25    not.  The question is what standard applies.  And I have to say

 1    right now my thought process is exacting scrutiny applies to

 2    that, but I disagree with you on the strict scrutiny.  But

 3    that's why I wanted to hear from you on this, and I have spent

 4    some time studying this.  But I readily admit it's not an easy

 5    issue.

 6              MR. ELF:  Even if exacting scrutiny applied, and we

 7    submit that it does not, even if it did apply, we still prevail

 8    under New Mexico Youth Organized because, as Your Honor just

 9    pointed out, the Tenth Circuit applied exacting scrutiny and

10    still found for the plaintiffs and held that it was

11    unconstitutional, as a matter of law, to regulate the two

12    plaintiffs in New Mexico Youth Organized as political

13    committees.

14              THE COURT:  In this case, and you can put in the

15    context of exacting scrutiny or strict scrutiny, but I think we

16    all understand those frameworks, so I don't know that it's as

17    important that you try to pigeon hole which test.  But tell me

18    in your view why, given the speech that A-1 A-Lectrician

19    engages in here and the facts before me, why if I find -- if I

20    do apply a narrowing gloss and find the noncandidate committee

21    definition not unconstitutional, in other words if I reject

22    your vagueness argument again hypothetically, if I go down that

23    road, and I apply exacting scrutiny, tell me why in this case,

24    as applied, the statute is unconstitutional?

25              MR. ELF:  Under exacting scrutiny, the statute would

1    still be unconstitutional even under exacting scrutiny, because

2    the burdens that the law imposes are out of proportion to the

3    state's interest.  That's the articulation of exacting scrutiny

4    that the Supreme Court applied in Davis versus Federal Election

5    Commission.

6         Those burdens are under Hawaii law registration,

7    extensive reporting requirements, and extensive recordkeeping

8    requirements.  And in addition to that, there are also

9    contribution limits and contribution source bans.  All of those

10   burdens are disproportional to whatever interest Hawaii may

11   believe it has under exacting scrutiny in regulating A-1 as a

12   noncandidate committee.

13        THE COURT:  Do you dispute that A-1 falls within the

14   definition -- if I give it the narrowing gloss we talked about

15   earlier, do you dispute that they fall within the definition?

16   Not whether or not it can constitutionally be applied to them

17   but whether or not they fit within that definition.

18        MR. ELF:  I'm sorry, what would the narrowing gloss

19   be?

20        THE COURT:  I would essentially follow what they did

21   in Buckley, use expressed advocacy or its functional

22   equivalent. That's the narrowing gloss I apply to the statutes

23   and to the definitions as the state has asked in its opposition

24   essentially.

25        MR. ELF:  In other words, if the political committee

1    definition covered only expressed advocacy --

2            THE COURT:  Well, expressed advocacy or its functional

3    equivalent.

4            MR. ELF:  Let me take those one at a time.

5            THE COURT:  It gets complicated, right?

6            MR. ELF:  Sure, it's complicated, but that doesn't

7    mean there's not an answer at the end of the day.  Sometimes

8    it's like my grandfather used to sit on the front porch untying

9    a fishing line, he would sit there doing it for hours, there's

10   a way to untie that fishing line, and there's a way to untie

11   this fishing line too.

12           If the political committee definition, that is the

13   noncandidate committee definition, reached only expressed

14   advocacy as defined in Buckley, then it would not rope in A-1

15   because A-1 does not do expressed advocacy.  Its three

16   newspaper ads are not expressed advocacy as defined in Buckley.

17           THE COURT:  How about functional equivalent?

18           MR. ELF:  As for the functional equivalent of

19   expressed advocacy, we don't know what that means because it's

20   unconstitutionally vague.  And the defendants may well conclude

21   that there is -- that the only reasonable interpretation of the

22   speech is an appeal to vote for or against a clearly identified

23   candidate.

24           Exhibit 19 of the verified complaint demonstrates, we

25   submit, why the speech is regulable in the first place under

1   Hawaii law.

2             THE COURT:  Say that again?

3             MR. ELF:  Exhibit 19 of the verified complaint.

4             THE COURT:  Hold on.  That's the letter from Ms. Wong.

5             MR. ELF:  Yes.

6             THE COURT:  I'm familiar with that.  I've read it.

7             MR. ELF:  Next comes Hawaii law electioneering

8   communications.  We get to this, as Your Honor pointed out

9   before, only if the court holds that Hawaii may not regulate or

10  does not regulate A-1 as a political committee.  Because if A-1

11  is a political committee or can be regulated as a political

12  committee, all of the disclosure requirements, except for the

13  disclaimer requirements that come along with electioneering

14  communications and electioneering-communication reporting

15  requirements, don't apply.

16            The electioneering communication definition and

17  reporting requirements and the disclaimer requirements fail, we

18  submit, exacting scrutiny.  And we have no disagreement here

19  that exacting scrutiny applies.

20            When it comes to persons that government may not

21  regulate, may not regulate as political committees under

22  Buckley, Supreme Court precedent establishes that government

23  may regulate two forms of speech.  And those are the two forms

24  of speech we were discussing earlier: Expressed advocacy, as

25  defined in Buckley, that comes from Buckley, and then

 1    electioneering communications as defined in Federal Election

 2    Campaign Act.  That comes from McConnell versus FEC and from

 3    Citizens United versus FEC from earlier this year.

 4            A-1's speech is not expressed advocacy, as defined in

 5    Buckley, nor is A-1's speech an electioneering communication as

 6    defined in the Federal Election Campaign Act, because it is not

 7    broadcast.  Those are the two types of speech that the Supreme

 8    Court has said government has a constitutional interest in

 9    regulating.

10            Now, does that mean for now and ever more that's all

11    that government may ever do?  No, that doesn't mean that.

12    Someday there may be more, someday there may be less.  But

13    right now that is what government has -- the Supreme Court has

14    said government has a constitutional interest in regulating.

15            Now, if the next question is, Well, why do we start

16    from the premise that government can only do what the Supreme

17    Court says?  Then the answer to that question is that in this

18    country, and indeed in all of western civilization, we start

19    from the premise of the story of western civilization.

20            It is a story of people who have set to establish

21    themselves as sovereign.  And it begins in ancient Israel,

22    ancient Greece and ancient Rome and through central Europe and

23    through England with the Magna Carta and then through

24    Philadelphia and the constitution and all the state

25    constitutions as well.

1          Under the United States constitution and under the

2     Hawaii constitution as well, government has only that power

3     that the people have surrendered to it in the first place.

4     That power includes to be sure the power to regulate elections.

5     But the power to regulate elections is self-limiting.

6          In addition to that, the first and 14th amendments

7     further limit the power of government by saying what government

8     may not regulate.  And at the very core of what the first

9     amendment protects is political speech.  It's not flag burning

10    or cross burning or nude dancing or dirty movies or walking

11    into the federal courtroom, and the court will please recall

12    everyone here will please recall, what was on that jacket in

13    Cohen versus California.  That's not what is at the core of the

14    first amendment.

15         The core of the first amendment is political speech,

16    and that's what this action is about.

17         So Hawaii law, we submit, is unconstitutional because

18    it regulates speech beyond expressed advocacy, as defined in

19    Buckley, and beyond electioneering communications as defined in

20    the Federal Election Campaign Act.

21         And if the defendants want to suggest that Hawaii can

22    regulate more than that, then it is up to the defendants to

23    prove, under Wisconsin Right to Life for example, that the law

24    survives the appropriate level of scrutiny.  Here that

25    appropriate level of scrutiny would be exacting scrutiny, and

1    it is up to the defendants to show that.

2          Hawaii law, when it comes to electioneering

3    communications, reaches beyond electioneering communications as

4    defined in the Federal Election Campaign Act because it does

5    not limit it to broadcast speech.  And because there is no

6    requirement that the speech that is regulated be targeted to

7    the relevant electorate, that suffices, we submit, to conclude

8    the inquiry as to A-1's speech under exacting scrutiny.

9          But there's more. The 24 hour reporting requirements

10   for electioneering communications have a burden -- establish a

11   burden of reporting that is so great that the government's

12   interest doesn't reflect the burden on speech.

13         The best case for that we've cited is the Davidson

14   case from the Tenth Circuit, and the defendants in their reply

15   brief have not disagreed with that point.

16         The disclaimer requirement, when it comes to spending

17   for political speech --

18         THE COURT:  Slow down just a little bit.  You are

19   getting on a roll, and you are going too fast.  Go ahead.

20         MR. ELF:  The disclaimer requirement in Hawaii law,

21   when it comes to spending for political speech other than

22   expressed advocacy, as defined in Buckley, or electioneering

23   communications, as defined in the Federal Election Campaign

24   Act, regulates the content of speech itself.

25         In addition to that, we submit it distracts readers,

 1   in this case readers, who receive the speech and make them

 2   think that the speech is somehow about elections when it is

 3   not.

 4         As Mr. Yamada testified this morning, this speech is

 5   about issues.  And there is a tendency sometimes, and I count

 6   myself among them having worked for government and having been

 7   involved in campaigns, to think that somehow everything is

 8   about elections --

 9         THE COURT:  Well, let me say this.  I found his

10   testimony lacking in credibility on that point.  He runs ads

11   Thursday, Friday in the morning, he's pointed out clearly that

12   Blake Oshiro is against family values, and Blake Oshiro was

13   running in the primary.  I mean, that clearly was intended,

14   regardless of what he said on the stand, it's obvious that I do

15   not find that testimony credible, that that ad wasn't intended

16   to appeal, if you will, to people to vote against Blake Oshiro.

17   That's my view, looking at the ads and based on his testimony

18   here today.

19         MR. ELF:  That is not the standard for whether

20   government may regulate political speeches.

21         THE COURT:  I'm not saying it's the standard.  I'm

22   just saying what he said on the stand I don't buy.

23         MR. ELF:  Even if that's true, that's not the standard

24   for whether it is constitutional for government to regulate a

25   speech.

1          The next subject is the limits.

2          THE COURT:  And you are just reading functional

3    equivalency of expressed advocacy out of the test that you just

4    relayed to me?

5          MR. ELF: Yes, sir. It's gone.

6          THE COURT:  You just think that's gone?

7          MR. ELF:  It's gone.  Citizens United put a stake

8    through the heart of the whole appeal to vote test.  It is

9    gone.  And it's not only removed as a limit on government

10   power, Citizens United renders the test itself

11   unconstitutionally vague.

12         THE COURT:  I'll take a look at that.

13         MR. ELF:  Even if government wants to regulate speech

14   by saying -- by putting in there some element about whether

15   speech is the functional equivalent of expressed advocacy, that

16   is whether the speech has, as its only reason for

17   interpretation, an appeal to both for clearly identified

18   candidates, that's unconstitutionally vague.

19         How is anyone supposed to know, trying to write a

20   political speech, whether its only reasonable interpretation is

21   an appeal to vote for clearly identified candidates.

22         THE COURT:  Well, I'm in district court, I'm not

23   Supreme Court.  So I'm looking to see whether or not what has

24   been established test for many years I no longer apply.  You

25   are telling me Citizens United has essentially done away with

1    it.  I'll take a careful look at that.

2         Has there been any court that has agreed with you on

3    this point since Citizens United?

4         MR. ELF:  Since Citizens United, that's just -- this

5    is September.  That was January, so that's nine --

6         THE COURT:  I'm not asking you to count.  I'm asking

7    you a question.  Are there any courts that have --

8         MR. ELF:  No, sir.

9         THE COURT:  Thank you.

10        MR. ELF:  As for the limits on contributions to

11   political committees that do only independent spending for

12   political speech, this is the easiest part of this case.

13        THE COURT:  You know what, you don't need to argue

14   that part of the case.  Because right now I agree with you a

15   hundred percent.

16        I'll hear from the state, if they have anything to say

17   on that that changes my mind, I'll let you know.

18        MR. ELF:  Then we will stand on what we submitted.

19        THE COURT:  Okay.  All right.  Ms. Aina, why don't you

20   start with that because what is in your brief is not at all

21   compelling.  I think the Long Beach case has spoken on this,

22   the DC circuit has spoken on it.  I think it naturally follows

23   from Citizens United.  I just don't see how you can limit these

24   contributions to an independent committee the way Mr. Stewart

25   and Mr. Yamada seek to do so.

1            And it just doesn't work to say, Well, they could give

2     to other people.  That's just not the constitutional test that

3     they can give to other people.  They should be able to give to

4     the entity that they want to give to.

5            MS. AINA:  I think the only point the state would make

6     with respect to the thousand-dollar limit on noncandidate

7     committees is that the law does what Buckley allows, and the

8     law does what we believe that the limits on contributions to

9     candidates would survive any kind of --

10            THE COURT:  That's not the issue before me though.

11            MS. AINA:  Well, if you will, Your Honor, I think what

12     the concern of the state is is if the contribution limits to

13     the $6,000, $4,000 and $2,000 are to be meaningful, then to

14     allow an opportunity to supplement, if you will, what the

15     legislature believes to be appropriate enough for candidates to

16     conduct a viable campaign, enough money so that they can

17     provide voters with a choice, so that they can be the vessels

18     through which each of us can express ourselves politically,

19     then if those limits are appropriate, constitutional, and

20     permitted, then to allow another avenue to augment those limits

21     by aggregation either of a whole bunch of $25-things or by

22     people who have the wherewithal to say, I have $2,500 and I

23     want to give it rather than a thousand dollars, so that what

24     you end up with is the noncandidate committee.  We're

25     presuming --

1          THE COURT:  Stop.  You are writing a very nice dissent

2      for Citizens United, but I'm not here to determine what the

3      best policy is.  That's not my job.  My job is to apply the

4      law.

5          MS. AINA:  I'm suggesting, Your Honor --

6          THE COURT:  Can you tell me legally, not policy-wise,

7      given Citizens United and Long Beach, how I can reach any

8      decision other than what the plaintiffs are seeking on this

9      point?

10          MS. AINA:  Only to provide the court with what would

11      be the government's interest in imposing the thousand-dollar

12      limit.

13          THE COURT:  All right.  Thank you.

14          MS. AINA:  Did you wish to hear from the state as to

15      any of the other points?

16          THE COURT:  Yes.  Yes.  Yes.

17          MS. AINA:  I have to say, Your Honor, that ours is a

18      more direct approach, I guess, or -- I don't want to diminish

19      our situation by calling it simple, but maybe straightforward

20      is the way to look at it.

21          As we see it, the plaintiffs are asking for three

22      things, one of which they have taken off the table.  They are

23      asking us -- they are asking the court to allow them to

24      participate in the political process without registration,

25      without filing, without making any kinds of disclosures in what

1   we see is the face of Citizens United.

2            As we see it, Citizens United recognizes, as you

3   pointed out earlier, that as long as speech is not prevented,

4   then it's important that the voters be given information about

5   where money is coming from, who is interested in what side of

6   which issue, and Citizens United says directly that those

7   things -- those kinds of processes are permitted; that they are

8   not --

9            THE COURT:  Well, they are not disputing it's

10  permitted.  The question gets down to the nitty gritty here,

11  not the broader -- I mean, Mr. Elf admits, it's in the brief,

12  and he said it here today, that there are instances, and he

13  doesn't dispute that, that a political committee, and I won't

14  try to define what that is exactly, there are instances where

15  it's appropriate so you have to register and go through all

16  these requirements.

17           He is saying Hawaii law is vague number one; and

18  number two, that as applied to A-1, it's unconstitutional.  So

19  my order isn't going to address these broad issues.  It's going

20  to be very specific as to these legal issues in confronting me.

21           MS. AINA:  I guess, Your Honor, the state's

22  position -- I think I have to say the state's position is that

23  the law is very clear, and that's why Mr. Yamada and A-1 is

24  suing.  The law is very clear that any organization, other than

25  one that is expending money to inform generally about the

1    election process, is a noncandidate committee.

2         Now, I understand where Mr. Elf is coming from in

3    saying that there needs to be a reason why every organization

4    has to, through a registration process, tell the world about

5    who their offices are, where their bank accounts are.  What is

6    the justification for that?

7         And we would fall back upon what I said previously,

8    which is Citizens United asks simply whether that prevents

9    speech.  And as long as it doesn't prevent speech, then there

10   is no vagueness about the statute.

11        THE COURT:  But you are asking me to place this

12   narrowing gloss on it?

13        MS. AINA:  I'm sorry?

14        THE COURT:  You are asking me to place a narrowing

15   gloss on this definition of noncandidate committee and so

16   forth, right?

17        MS. AINA:  Yes.

18        THE COURT:  All right.  So if I do that, as applied

19   here, given the speech that A-1 is involved in, for instance

20   these three ads -- let me ask you first of all, do you believe,

21   given the three ads that were run that they have -- if that's

22   the speech they engage in, do they have to register as a

23   noncandidate committee?

24        MS. AINA:  They have to register because they are

25   spending -- they are making contributions to candidates.  They

1    have to -- on the face of the statute, it says if you are an

2    organization and you make a contribution to a candidate, you

3    have to register.  If you -- it doesn't ask anything other than

4    that.

5          In this instance, Mr. Yamada admitted that they have

6    made contributions to candidates, which was somewhat startling

7    to me given the other issues in this case.  But be that as it

8    may, the statute says if you contribute to a candidate -- it

9    said that for at least the last 10 years, and that's one of the

10   other points that we would want to be sure that the court

11   understands is this is not new law.  This has been the

12   definition, since at least 1999, of what a noncandidate

13   committee is.

14         So, even if we were to -- even if you were to say,

15   Well, this expenditure part is a little vague and it's not

16   satisfying the test, and so you can't use it -- you are

17   enjoined from using that portion of the statute, as long as an

18   organization gave a contribution to a candidate, it would come

19   under the definition.

20         THE COURT:  All right.  You can go on.

21         MS. AINA:  The only other thing that I would point out

22   if is again with respect to the -- with respect to the

23   definition of electioneering communications, our focus is

24   simply on -- our focus is on the language in the electioneering

25   communications section itself.  Literally relying upon the same

1    language that Chief Justice Roberts relied on and confirmed the

2    constitutionality of in Wisconsin Right to Life, that being

3    that the -- that if there's any reasonable -- there's any

4    reasonable basis to say that it is not advocacy, then it

5    wouldn't fall within the definition.

6              THE COURT:  All right.  Okay.  Thank you.  Mr. Elf.

7              MR. ELF:  Couple of things I would like to respond to,

8    if I may.  I heard that Citizens United says that as long as

9    law does not ban speech, then there is no vagueness issue.  But

10   you can have a vagueness problem with law, even if there is no

11   ban on speech.  Buckley versus Valeo is an example of that.

12             I also heard that the law -- some of the law at issue

13   here has been the law since 1999.  But the age of the law does

14   not affect whether it is constitutional.

15             THE COURT:  I understand that.

16             MR. ELF:  We have nothing further.

17             THE COURT:  All right.  All right.  Well, here's what

18   I'm going to do.  I'm going to -- let me talk to you a little

19   bit about this.

20             I do think that the -- the one thing I'm fairly firm

21   on, let me put it that way, is that the proposed contributions

22   to the AFA-PAC, as it's been called here, as I understand the

23   law now limits one thousand in the primary period and one

24   thousand in the general -- do I have that right -- for a total

25   of 2000, and these two individuals want to contribute 2500

1    each, I think the restriction is unconstitutional.  The rest of

2    this I want to study a little more.

3          And I'm in trial right now.  So I know we have an

4    election coming up.  So I want to hear from the parties on

5    their views of the wisdom of how I handle that procedurally

6    going forward.  I could enter, for instance, a very limited

7    order granting the motion as to that point, just saying with

8    analysis to follow essentially, but setting that out.

9          Or, I could wait and sort of put everything out at the

10   same time, which would be before the general election, the

11   order won't come out after the election, but it's going to take

12   me a couple of weeks to probably get this all together.

13         So I'm just trying to procedurally -- I don't know

14   where I'm going to end up is what I'm telling you.  I want to

15   study this more and consider the arguments made and read

16   through the briefs again and look at Citizens United in your

17   argument regarding functional equivalency and appeal to vote

18   and so forth.  I want to look at all of that and study it more.

19         But the one thing I am firmly viewing right now is

20   sort of the outcome of this issue regarding the donations to

21   the independent nonaffiliated AFA.

22         So, Mr. Elf, do you want to speak to that as to how

23   you think best procedurally I should go forward on that?

24         MR. ELF:  A brief order on that subject would be fine

25   with the plaintiffs, Your Honor.

1           THE COURT:  Okay.  Ms. Aina, what's your view on that?

2           MS. AINA:  Your Honor, I'm not sure I understood.  Are

3      you asking or are you contemplating a brief order immediately

4      followed by a complete order as to the case?

5           THE COURT:  Right.  So if I do this, what I'm thinking

6      is I would put out a pretty brief order -- and when I say

7      brief, I mean pretty brief -- that would say the motion is

8      granted, the preliminary injunction is granted as to the

9      enforcement of that section whatever it is.

10          MS. AINA:  11-KK.

11          THE COURT:  11-KK.  As to --

12          MS. AINA:  If the court has come to a decision as to

13     that, I think the sooner the court issues the order, the

14     better.

15          THE COURT:  Okay.  So no one has a problem with just

16     an outright order saying that, at this point in time, that

17     would say the court's fuller analysis as to its reasoning will

18     follow.  And then when I put out the order with everything else

19     in it, it will include the reasoning behind that; is that

20     agreeable?

21          MS. AINA:  The state has no objection to that.

22          MR. ELF:  That's fine with us, Your Honor.

23          THE COURT:  Okay.  And it should include the

24     injunctive language.

25          MR. ELF:  Yes, sir.

1          THE COURT:  And so actually what I want you two to do

2     is to sit down together and so -- so, Ms. Aina, understand that

3     this is my ruling on this -- sit down and see if you can agree

4     on the exact injunctive language.

5          MR. ELF:  Sure.

6          THE COURT:  That's my typical way to proceed with

7     injunction is, because a lot of times you'll enter an

8     injunction and the party will come back and say, I want to you

9     change this language or that language.  So sometimes I'll let

10    you know this is the way I'm ruling.

11         But as far as the specific language, see if you folks

12    can agree on that.  If not, you can submit me proposed language

13    by when?  What is a time frame where you folks can talk and if

14    you can't agree you can get me proposed language?

15         MS. AINA:  I would assume Mr. Elf is leaving on

16    Sunday, so we would submit language, if we could not agree, on

17    Monday.

18         THE COURT:  Okay.  So if you can do agreed upon

19    language, submit it Monday.  If you can't, how about Wednesday

20    for your individual views as to how that should read?

21         MR. ELF:  That would be fine.

22         THE COURT:  Does that work?

23         MR. ELF:  Yes.

24         THE COURT:  All right.  I don't see why you couldn't

25    come to an agreement on that.  I just don't know.  I don't want

```
 1    to suggest that you shouldn't come to an agreement on it in any

 2    way.  I don't know if you will have any disagreements on it.

 3    But to be clear, so that everyone understands, that part of the

 4    motion I am going to grant on 11-KK; is that what it is?

 5            MS. AINA:  Yes.

 6            THE COURT:  And I'm going to grant the preliminary

 7    injunction on that.  So see if you can agree on the language by

 8    Monday.  If not, send me your individual views as to how that

 9    should read.  Just what the injunction language is.  I'm not

10    talking about the order itself.  Just the injunction language.

11            MS. AINA:  And so under the schedule, Your Honor, you

12    would anticipate that the formal order would be issued on

13    Thursday?

14            THE COURT:  I would think so.

15            MS. AINA:  But again, if we were to agree, it would

16    issue on Tuesday?

17            THE COURT:  Correct.

18            MS. AINA:  Or something like that?

19            THE COURT:  I don't know exactly.  Like I said, I'm in

20    trial, and I have a lot of things going on, but it will come

21    out in relatively short order; okay?

22            Mr. Elf, anything else?

23            MR. ELF:  May I have a moment?  Nothing further, Your

24    Honor.

25            THE COURT:  Ms. Aina, anything else?
```

1          MS. AINA:  No, Your Honor.

2          THE COURT:  As I study these issues, if I decide I

3    want supplemental brief, I will put out an order.

4          Mr. Hochberg, you are on CM/ECF; is that right?

5          MR. HOCHBERG:  At long last, yes, I am.

6          THE COURT:  At long last, all right.  So that's

7    typically how these come out.  I'm not saying I'm going to do

8    this, but if I get to that point where I want something in

9    addition, you'll know and you can contact Mr. Elf then, right?

10         MR. HOCHBERG:  Yes.

11         THE COURT:  Thank you all very much.

12    (Recess at 11:38 a.m. )

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2             I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that the foregoing is a true, complete and correct transcript

 5   from the record of proceedings in the above-entitled matter.

 6

 7             DATED at Honolulu, Hawaii, October 12, 2010.

 8

 9

10                              /s/ Gloria T. Bediamol

11                              GLORIA T. BEDIAMOL.

12                              RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25
```