IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JIMMY YAMADA, RUSSELL STEWART, AND A-1 A-LECTRICIAN, INC., | ) ) ) ) | CIVIL NO. 10-00497 JMS-RLP |
| Plaintiffs, | ) ) ) | ORDER (1) PERMANENTLY ENJOINING DEFENDANTS FROM ENFORCING HRS § 11-358 AS-APPLIED TO SPECIFIED |
| vs. | ) ) | CONTRIBUTIONS TO AFA-PAC, A COMMITTEE MAKING ONLY |
| MICHAEL WEAVER, IN HIS OFFICIAL CAPACITY AS CHAIR AND MEMBER OF THE HAWAII CAMPAIGN SPENDING COMMISSION; DEAN ROBB, CALMENTINA GOMES, AND G. WILLIAM SNIPES, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE HAWAII CAMPAIGN SPENDING COMMISSION, | ) ) ) ) ) ) ) ) ) ) ) ) ) | INDEPENDENT CAMPAIGN EXPENDITURES; AND (2) UPHOLDING THE CONSTITUTIONALITY, AS CHALLENGED, OF PROVISIONS OF HRS §§ 11-302, 355 & 391 |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER (1) PERMANENTLY ENJOINING DEFENDANTS FROM ENFORCING HRS § 11-358 AS-APPLIED TO SPECIFIED CONTRIBUTIONS TO AFA-PAC, A COMMITTEE MAKING ONLY INDEPENDENT CAMPAIGN EXPENDITURES; AND (2) UPHOLDING THE CONSTITUTIONALITY, AS CHALLENGED, OF PROVISIONS OF HRS §§ 11-302, 355 & 391**

## I. INTRODUCTION

Plaintiffs Jimmy Yamada ("Yamada"), Russell Stewart ("Stewart"),

and A-1 A-Lectrician, Inc. ("A-1") (collectively "Plaintiffs") filed this action in

August 2010, challenging the constitutionality of several Hawaii campaign finance laws in the wake of *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), which (among other matters) invalidated limitations on amounts of corporate independent campaign expenditures.

In October 2010, the court addressed most of Plaintiffs' challenges at a preliminary-injunction stage of the proceedings, and issued two comprehensive Orders granting in part and denying in part Plaintiffs' Amended Motion for Preliminary Injunction. *See* Doc. Nos. 71, 91; *Yamada v. Kuramoto*, 744 F. Supp. 2d 1075 (D. Haw. 2010) ("*Yamada I*"); and *Yamada v. Kuramoto*, 2010 WL 4603936 (D. Haw. Oct. 29, 2010) ("*Yamada II*"). Campaign finance law has continued to evolve since then, and the record in this action has been further developed. The court now faces the same, or similar, issues on Cross Motions for Summary Judgment. Where appropriate, the court draws upon and incorporates parts of *Yamada I* and *Yamada II* in ruling on the current Cross Motions.

*Citizens United* held that limitations on independent campaign expenditures violate the First Amendment because no sufficient government interest justifies suppressing corporate independent speech. 130 S. Ct. at 913. Applying that logic, Courts of Appeals subsequently invalidated restrictions on amounts of *contributions* to organizations that make only independent campaign

expenditures. *See, e.g.*, *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121-22 (9th Cir. 2011) (upholding injunction against enforcement of San Diego ordinance limiting fundraising of independent political committees); *Wisc. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 154-55 (7th Cir. 2011) (holding campaign contribution limit unconstitutional as applied to organizations that engage only in independent expenditures for political speech). Likewise, *Yamada I* preliminarily enjoined enforcement of Hawaii Revised Statutes ("HRS") § 11-358 as applied to Yamada's and Stewart's then-proposed contributions to Aloha Family Alliance-Political Action Committee ("AFA-PAC") -- an entity that engages in solely independent expenditures. *See* 744 F. Supp. 2d at 1087. This Order now makes that injunction permanent.

        *Citizens United* also embraced disclosure and transparency in elections -- organizations that engage in independent campaign spending can do so freely, but should also do so openly. Although disclosure requirements "may burden the ability to speak . . . they impose no ceiling on campaign-related activities and do not prevent anyone from speaking[.]" 130 S. Ct. at 914 (citations and quotation marks omitted). "The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make

informed decisions and give proper weight to different speakers and messages."
*Id.* at 916. Accordingly, *Yamada II* upheld (again, at the preliminary injunction phase) Hawaii campaign finance laws that enable and require disclosure of certain activities that, for example, have the purpose of influencing the nomination or election of candidates. *See* 2010 WL 4603936, at *20 (finding Plaintiffs were unlikely to succeed in their challenges to requirements now codified at HRS §§ 11-302 and 391). This Order now confirms that, as challenged, Hawaii's noncandidate committee, expenditure, and advertisement requirements in HRS §§ 11-302 and 391 are constitutional.

Finally, *Citizens United* did not address whether campaign contributions directly to *candidates* may be limited, and did not change the principle that such restrictions may be justified to prevent corruption or its appearance. *See, e.g.*, *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 154-55 (2003). This Order (addressing an issue not previously pursued by Plaintiffs) upholds Hawaii's ban on direct campaign contributions by government contractors set forth in HRS § 11-355, as applied to A-1, given A-1's past and proposed donations to candidates and its status as a government contractor. Hawaii's "pay-to-play" ban in § 11-355 is constitutional as applied to A-1.

In sum, based on the following, the Cross Motions for Summary

Judgment are GRANTED in PART and DENIED in PART.

## II. BACKGROUND

### A. Factual Background

Plaintiffs' First Amended Verified Complaint, Doc. No. 24 ("FAC"),

seeks declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C.

§ 1983, and challenges the constitutionality of five Hawaii campaign finance laws

(or sets of laws) that regulate Plaintiffs' actual or proposed activities.  Specifically,

Plaintiffs challenge Hawaii's: (1) restrictions on contributions to noncandidate

committees (HRS § 11-358), (2) "noncandidate committee" and related

"expenditure" definitions (HRS § 11-302), (3) "electioneering communication"

disclosure requirements (HRS § 11-341), (4) disclaimer-language requirements for

an "advertisement" (HRS § 11-391), and (5) ban on contributions to candidates by

government contractors (HRS § 11-355).[1]  The FAC was verified by Yamada and

Stewart (as individuals), by A-1 (through Yamada, as A-1's chief executive

officer), and by AFA-PAC (through its Chair Andrew Gerakas).[2]  FAC at 59-60.

---

[1]  Hawaii's campaign finance laws were updated and re-codified in 2010 by Act 211, 2010 Haw. Sess. L. ("Act 211").  *See* Act 211 § 13.  The purpose of Act 211 was to "update, organize, and clarify current [pre-July 2010] campaign finance laws."  Act 211 § 1.  The FAC and this court's prior Orders refer to the challenged provisions as they were temporarily numbered in Act 211.  The sections were subsequently codified in HRS Chapter 11, and this Order now refers to them as they are presently codified.

[2]  AFA-PAC is not a Plaintiff, but its status is important in this action.

Defendant Michael Weaver is the current Hawaii Campaign Spending Commission ("the Commission") chairperson. Defendants Dean Robb, Calmentina Gomes, and G. William Snipes are current members of the Commission. All Defendants are sued in their official capacities as Commission members. FAC ¶ 23; Defs.' Mot. at 2 n.1.[3]

Because the FAC was verified, the court treats it as an affidavit. *See, e.g.*, *Thalheimer*, 645 F.3d at 1116 ("A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief.") (citations omitted). Yamada also submitted declarations, and testified at a preliminary injunction hearing on October 1, 2010 (both individually and as A-1's representative). Stewart and Gerakas also testified and submitted declarations. Given the FAC's verified allegations, testimony at the October 1, 2010 hearing, and the evidence most recently submitted with the Cross Motions, the court finds the facts as described below are essentially undisputed. That is, the parties agree that there are no genuine issues of material fact in dispute, and that the court should decide the legal issues based upon the Cross Motions.

---

[3] The FAC names the Commission members, in their official capacities, as of September 2010. Pursuant to Federal Rule of Civil Procedure 25(d), current Commission members (as of December 2011) Michael Weaver, Calmentina Gomes and G. William Snipes are automatically substituted as Defendants. Dean Robb, whose term has continued throughout the litigation, remains as a Defendant.

Yamada and Stewart are Hawaii residents. As individuals, they each sought to contribute $2,500 to AFA-PAC before the 2010 general election. FAC ¶ 7. Doing so, however, would have exceeded the $1,000 per election contribution limitation contained in HRS § 11-358. In October 2010, after the court preliminarily enjoined enforcement of § 11-358 as to their proposed contributions, they both contributed $2,500 to AFA-PAC. And they both seek to contribute $2,500 to AFA-PAC again in 2012. Pls.' Mot. Exs. 3-4.

AFA-PAC is a Hawaii registered noncandidate committee[4] that makes only "independent expenditures."[5] It does not contribute directly to candidates, and does not coordinate spending for political speech with candidates or political

---

[4] *See* State of Hawaii, Campaign Spending Commission, Organizational Report of AFA-PAC, *available at* https://nc.csc.hawaii.gov/NCFSPublic/ORG_Report.php?OR_ID=20274 (last visited March 12, 2012).

[5] HRS § 11-302 defines an "independent expenditure" as "an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate that is not made in concert or cooperation with or at the request or suggestion of the candidate, the candidate committee, a party, or their agents." In turn, § 11-302 defines a "person" as "an individual, a partnership, a candidate committee or noncandidate committee, a party, an association, a corporation, a business entity, an organization, or a labor union and its auxiliary committees."
Federal law defines "independent expenditure" similarly, as:
[A]n expenditure by a person --
    (A) expressly advocating the election or defeat of a clearly
    identified candidate; and
    (B) that is not made in concert or cooperation with or at the request
    or suggestion of such candidate, the candidate's authorized
    political committee, or their agents, or a political party committee
    or its agents.
2 U.S.C. § 431(17).

parties.  FAC ¶ 8.  Gerakas confirmed at the preliminary injunction hearing that he is chairman of AFA-PAC, and that it "operates like any other independent political action committee."  Transcript of Oct. 1, 2010 Hearing ("Tr.") at 11.  AFA-PAC was created in July 2010, and was formed to "influence passage of legislation that supports traditional marriage, the right to life against such things as physician-assisted suicide, and promoting the issue of life in our community."  *Id.*  AFA-PAC is "committed to endorsing and financially supporting candidates, no matter what their party affiliation, who will stand up in the public square for Hawaii's families."  FAC Ex. 1.  Its goal is to "identify, endorse and elect county, state, and federal officials who favor policies that strengthen and nourish Hawaii's families." *Id.*  It asks people to "register to vote" and make contributions to AFA-PAC so that "[m]onies will be used to support candidates who share and reflect our values."  *Id.* Defendants have not challenged Gerakas's testimony that AFA-PAC makes only independent expenditures.

A-1 is an electrical contractor that is "often a government contractor" -- it previously worked as a contractor for State organizations, provides services for past jobs, and expected to have State contracts in the near future when Plaintiffs filed the FAC in September 2010.  FAC ¶¶ 11-12.  And, as of December 2011, A-1 in fact had State contracts.  Pls.' Mot. Exs. 5-7.  A-1 is registered as a noncandidate

committee, FAC ¶¶ 9-10, but no longer wants to face burdens such as registration and record-keeping associated with such a classification. *Id.* ¶ 28. A-1 wants to make (and has made) contributions to candidates, and has run advertisements that identify candidates, but wants to do so without including a disclaimer otherwise required by Hawaii law. According to Yamada, A-1 "wants to make contributions, while it is a government contractor, to candidates -- like those to whom it contributed in 2010 -- who do not decide whether A-1 receives contracts and who do not oversee the contracts." Pls.' Mot. Ex. 5 ¶ 7. A-1 is not connected with any political candidate or political party, nor with any political committee. A-1 did not form a distinct noncandidate committee to register with the Commission. Rather, it registered itself (as a noncandidate committee) with the Commission "many years ago" pursuant to direction it received from the Commission. FAC ¶ 10; Tr. 30, 35, 37.

A-1 contends it need not comply with noncandidate committee requirements because it does not have "the major purpose of nominating or electing a candidate or candidates for state or local office in Hawaii." FAC ¶ 27. Yamada states that "[p]olitical advocacy is not one of A-1's reasons for existing," and that political advocacy "is not a 'priority' for A-1, in the sense that it does not 'take precedence' over A-1's business activities." Pls.' Mot. Ex. 5 ¶¶ 11-12. It

"reasonably fear[ed] that if it [did] its 2010 speech as a noncandidate committee, it [would] have to continue complying with noncandidate-committee burdens[.]" FAC ¶ 28. It also reasonably fears having to comply with burdens associated with noncandidate committee status, and with burdens associated with making electioneering communications. Tr. 60. Thus, A-1 seeks a declaration that it need not comply with noncandidate committee burdens, and may lawfully terminate its registration.

A-1 contributed $20,100 in total to fourteen different State office candidates before the September 18, 2010 primary election. Defs.' Mot. Ex. 2. The FAC also states that A-1 wanted to make nine separate $250 contributions to Hawaii State-legislative candidates before the 2010 general election. FAC ¶ 11. As of September 3, 2010, A-1 had also contributed $12,500 to the Hawaii Republican Party. Defs.' Mot. Ex. 2. Further, as of September 13, 2010, A-1 had contributed $1,000 to AFA-PAC. Tr. 65; *see also* Defs.' Mot. Ex. 3. And, by October 19, 2010 (for the November 2010 general election), A-1 contributed an additional $18,000 in total to thirty-one candidates for State office. Defs.' Mot. Exs. 4-5. Although the amounts are not specified, it seeks to contribute to "several Hawaii state-legislature candidates . . . again in 2012." Defs.' Mot. Ex. 5 ¶ 4.

During the 2010 election cycle, A-1 published three newspaper

advertisements identifying candidates. They ran in the Honolulu Star-Advertiser immediately before, and the day of, the 2010 primary election -- on September 16, 17, and 18, 2010. Tr. 51, 55; FAC Exs. 14, 15, & Doc. No. 119-1 (substituting FAC Ex. 16).[6] Yamada testified that the advertisements cost "roughly $3,000 each," Tr. 63, and later attested that A-1 spent "more than $2,000 on these ads." Pls.' Mot. Ex. 5 ¶ 9. According to Yamada, "[t]he ads have clearly identified candidates for state office and refer to "PEOPLE WE PUT INTO OFFICE" and "THE REPRESENTATIVES WE PUT INTO OFFICE[.]" *Id.*

All three advertisements state that they are "paid for by A-1 A-Lectrician, Inc.," and contain disclaimer language "published without the approval and authority of the candidate," as required in HRS § 11-391(a)(2)(B). A-1 did not want to include the disclaimer language, and does not want to add disclaimers to future advertisements. FAC ¶ 40; Tr. 60, 63-64. Although Yamada indicates that "it is too early for A-1 to plan similar speech for September or October 2012," Pls.' Mot. Ex. 5 ¶ 10, Plaintiffs also assert that "[i]n materially similar situations in the future, Plaintiffs intend to engage in speech materially similar to all of the speech at issue in this action, such that Hawaii law will apply to them as it does now."

---

[6] Exhibit 14 of the FAC is published as an Appendix to *Yamada II*, 2010 WL 4603936, at *20.

Pls.' Concise Statement of Facts ¶ 19 (citing FAC ¶ 50).  More specifically,

Yamada attests that

> A-1 will engage in such speech in September or October
> 2012 and will buy no more than three ads, the number it
> purchased in 2010.  They will be similar in size to those
> A-1 purchased in 2010.  Like A-l's previous ads, this
> speech will cost more than $2000 in the aggregate, will
> have a clearly identified candidate or candidates for state
> office, and will refer to "PEOPLE WE PUT INTO
> OFFICE" and "THE REPRESENTATIVES WE PUT
> INTO OFFICE[.]"

Pls.' Reply, Attachment One (Yamada Decl. ¶ 7, Jan. 6, 2012).

Yamada considers A-1's advertisements to be "issue ads."  Tr. 59-60.

Specifically, Yamada testified that the purpose of the advertisements was to

express opinions regarding the loss of freedom in the United States.  Tr. 62.

Yamada explained that he included the name of a candidate (Blake Oshiro) as "an

example of how we have lost our freedom . . . .  [T]he issue is not against Blake or

any particular person -- I [also] mentioned [candidate] Calvin Say -- but it's against

leaders in our community that the people need to look up  to . . . .  I think

something needs to be done."[7]  Tr. 62-63.

---

[7]  Blake Oshiro and Calvin Say were Hawaii State representative candidates in the 2010
primary and general elections.  *See* Final Summary Report, General Election -- State of Hawaii --
City and County of Honolulu (Nov. 2, 2010), *available at* http://hawaii.gov/elections/
results/2010/general/files/cch.pdf (last visited March 15, 2012).

**B.     The Challenged Provisions of Hawaii Campaign Finance Law**

As summarized above, Plaintiffs challenge five sets of Hawaii campaign finance laws:  (1) restrictions on contributions to noncandidate committees; (2) "noncandidate committee" and related "expenditure" definitions; (3) "electioneering communication" disclosure requirements; (4) disclaimer-language requirements for an "advertisement"; and (5) a ban on contributions to candidates by government contractors.  The provisions are detailed as follows (with certain key terms and phrases at issue in this action emphasized in bold and italics):

**1.     *Limitations on Contributions to Noncandidate Committees***

Yamada's and Stewart's contributions to AFA-PAC implicate HRS § 11-358, which provides:

> No person shall make contributions to a ***noncandidate committee*** in an aggregate amount greater than $1,000 in an election.  This section shall not apply to ballot issue committees.

(Emphasis added.)

The corresponding term "noncandidate committee" is defined in HRS § 11-302 (which defines many terms in HRS Ch. 11), and that definition in itself is challenged, as set forth next.

## 2.     *The Definitions of "Noncandidate Committee" and "Expenditure"*

Section 11-302 defines a "noncandidate committee" as follows:

> "Noncandidate committee" means an organization, association, party, or individual that has ***the purpose*** of making or receiving contributions, making ***expenditures***, or incurring financial obligations ***to influence*** the nomination for election, or the election, of any candidate to office, or for or against any question or issue on the ballot; provided that a noncandidate committee does ***not*** include:
>
>> (1) A candidate committee;
>>
>> (2) Any individual making a contribution or making an expenditure of the individual's own funds or anything of value that the individual originally acquired for the individual's own use and not for the purpose of evading any provision of this part; or
>>
>> (3) Any organization that raises or expends funds for the sole purpose of producing and disseminating informational or educational communications that are not made ***to influence*** the outcome of an election, question, or issue on a ballot.

(Emphasis added.)  In turn, § 11-302 defines "expenditure" to mean:

> (1) Any purchase or transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, or payment incurred or made, or the use or consumption of a nonmonetary contribution ***for the purpose of***:
>
>> (A)     ***Influencing*** the nomination for election, or

14

the election, of any person seeking nomination for election or election to office, whether or not the person has filed the person's nomination papers;

(B) ***Influencing*** the outcome of any question or issue that has been certified to appear on the ballot at the next applicable election; or

(C) Use by any party for the purposes set out in subparagraph (A) or (B)[.]

(Emphasis added.)

Although a "noncandidate committee" must comply with several other provisions in HRS Ch. 11, A-1 does not challenge any of those particular provisions as unconstitutional. Rather, A-1 characterizes its challenge as one to the noncandidate committee definition itself, arguing that the law imposes unconstitutional burdens such that A-1 should not have to register at all. It understands that if an organization is properly a noncandidate committee, then that status comes with acceptable burdens. (As an example, AFA-PAC is a noncandidate committee that makes only independent expenditures.)

A noncandidate committee must (1) register with the Commission by filing an organizational report as set forth in § 11-323 (including (a) designating a name and address, (b) disclosing a chairperson, treasurer, and officers, (c) requiring "depository institution" account information, and (d) providing names

and addresses of contributors who contributed an aggregate amount of more than $100); (2) have a treasurer as set forth in § 11-324, who shall keep records regarding contributions; (3) comply with reporting requirements set forth in § 11-335, which include schedules disclosing aggregate contributions of over $100, expenditures, receipts, and assets; and (4) comply with other requirements limiting, regulating, or prohibiting contributions -- such as prohibitions on receiving false-name contributions (§ 11-352), anonymous contributions (§ 11-353), government contractor contributions (§ 11-355), and foreign corporations (§ 11-356). A-1 describes these noncandidate committee requirements collectively as "burdensome" and "onerous" as a matter of law. Pls.' Mot. at 54 n.39.

### 3. *Electioneering Communications*

If A-1 does not have to register as a noncandidate committee, it could still be subject to certain requirements if it makes "electioneering communications." A-1 thus challenges the constitutionality of these requirements in the alternative.

These electioneering-communication disclosure requirements may be implicated because A-1 has published, and desires to publish, newspaper advertisements that mention candidates. Specifically, if a person makes an "advertisement" that is an "electioneering communication" it must comply with

16

requirements set forth in HRS § 341(a) (and related terms), as follows:

> [e]ach person who makes a disbursement for electioneering communications in an aggregate amount of more than $2,000 during any calendar year shall file with the commission a statement of information within twenty-four hours of each disclosure date provided in this section.[8]

---

[8] An electioneering communication "statement of information" requires:

> (1) The name of the person making the disbursement, name of any person or entity sharing or exercising discretion or control over such person, and the custodian of the books and accounts of the person making the disbursement;

> (2) The state of incorporation and principal place of business or, for an individual, the address of the person making the disbursement;

> (3) The amount of each disbursement during the period covered by the statement and the identification of the person to whom the disbursement was made;

> (4) The elections to which the electioneering communications pertain and the names, if known, of the candidates identified or to be identified;

> (5) If the disbursements were made by a candidate committee or noncandidate committee, the names and addresses of all persons who contributed to the candidate committee or noncandidate committee for the purpose of publishing or broadcasting the electioneering communications;

> (6) If the disbursements were made by an organization other than a candidate committee or noncandidate committee, the names and addresses of all persons who contributed to the organization for the purpose of publishing or broadcasting the electioneering communications; and

> (7) Whether or not any electioneering communication is made in

(continued...)

In turn, "electioneering communication" means:

> any advertisement that is broadcast from a cable, satellite, television, or radio broadcast station; published in any periodical or newspaper; or sent by mail at a bulk rate, and that:
>
> > (1) Refers to a clearly identifiable candidate;
> >
> > (2) Is made, or scheduled to be made, either within thirty days prior to a primary or initial special election or within sixty days prior to a general or special election; and
> >
> > (3) ***Is not susceptible to any reasonable interpretation other than as an appeal to vote for or against a specific candidate***.

HRS § 11-341(c) (emphasis added).

> "Electioneering communication" shall not include communications:
>
> > (1) In a news story or editorial disseminated by any broadcast station or publisher of periodicals or newspapers, unless the facilities are owned or controlled by a candidate, candidate committee, or noncandidate committee;
> >
> > (2) That constitute expenditures by the disbursing

---

[8](...continued)
> coordination, cooperation, or concert with or at the request or suggestion of any candidate, candidate committee, or noncandidate committee, or agent of any candidate if any, and if so, the identification of the candidate, a candidate committee or a noncandidate committee, or agent involved.

HRS § 11-341(b).

organization;

(3) In house bulletins; or

(4) That constitute a candidate debate or forum, or solely promote a debate or forum and are made by or on behalf of the person sponsoring the debate or forum.

*Id.* And § 11-302 defines "advertisement" as:

. . . any communication, excluding sundry items such as bumper stickers, that:

(1) Identifies a candidate directly or by implication, or identifies an issue or question that will appear on the ballot at the next applicable election; and

(2) ***Advocates or supports*** the nomination, opposition, or election of the candidate, or advocates the passage or defeat of the issue or question on the ballot.

(Emphasis added.)

### 4. *Disclaimer Requirements in Advertisements*

A-1 next challenges the requirement to include a "disclaimer" on advertisements. The requirement is set forth in HRS § 11-391(a)(2), which provides (with the challenged disclaimer language emphasized):

(a) Any advertisement shall contain:

(1) The name and address of the candidate, candidate committee, noncandidate committee, or other person paying for the advertisement; and

(2) A notice in a prominent location stating
either that:

(A) The advertisement is published,
broadcast, televised, or circulated with the
approval and authority of the candidate; provided
that an advertisement paid for by a candidate,
candidate committee, or ballot issue committee
does not need to include the notice; or

*(B) The advertisement is published,
broadcast, televised, or circulated without the
approval and authority of the candidate.*

(b) The fine for violation of this section, if assessed by the
commission, shall not exceed $25 for each advertisement that
lacks the information required by this section, and shall not
exceed an aggregate amount of $5,000.

(Emphasis added.)

## 5. *Contribution Ban by Government Contractors*

Finally, A-1 challenges the constitutionality of Hawaii's ban on direct

campaign contributions by government contractors. The challenged statute reads:

(a) It shall be unlawful for any person who enters into any
contract with the State, any of the counties, or any department
or agency thereof either for the rendition of personal services,
the buying of property, or furnishing of any material, supplies,
or equipment to the State, any of the counties, any department
or agency thereof, or for selling any land or building to the
State, any of the counties, or any department or agency thereof,
if payment for the performance of the contract or payment for
material, supplies, equipment, land, property, or building is to
be made in whole or in part from funds appropriated by the
legislative body, at any time between the execution of the

contract through the completion of the contract, to:

> (1) Directly or indirectly make any contribution, or promise expressly or impliedly to make any contribution to any candidate committee or noncandidate committee, or to any candidate or to any person for any political purpose or use; or

> (2) Knowingly solicit any contribution from any person for any purpose during any period.

(b) Except as provided in subsection (a), this section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any noncandidate committee by any person other than the state or county contractor for the purpose of influencing the nomination for election, or the election of any person to office.

(c) For purposes of this section, "completion of the contract" means that the parties to the government contract have either terminated the contract prior to completion of performance or fully performed the duties and obligations under the contract, no disputes relating to the performance and payment remain under the contract, and all disputed claims have been adjudicated and are final.

HRS § 11-355.

## C.      Procedural Background

Plaintiffs initially filed this action on August 27, 2010.  They followed with the FAC on September 3, 2010, Doc. No. 24, and an Amended Motion for Preliminary Injunction.  Doc. No. 25.  The court held an evidentiary hearing on the preliminary injunction on October 1, 2010, and issued *Yamada I* on October 7,

2010, preliminarily enjoining enforcement of § 11-358 as applied to Yamada's and Stewart's then-proposed contributions to AFA-PAC.  Doc. No. 71.  Defendants appealed that preliminary injunction to the Ninth Circuit Court of Appeals, but withdrew the appeal after *Thalheimer* was released.  Doc. No. 113.

Meanwhile, on October 12, 2010, the Ninth Circuit issued a key opinion, *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1477 (2011), which addressed several of the issues involved in this action.  After receiving supplemental briefing regarding *Human Life*, the court issued *Yamada II* on October 29, 2010, denying the remaining issues pursued in the preliminary injunction Motion.  Doc. No. 91.  Thereafter, the challenging entity in *Human Life* (represented by the same law firm that represents Plaintiffs in this action) filed a writ of certiorari, seeking Supreme Court review.  Given *Human Life*'s importance to this action, the parties agreed to stay this case pending Supreme Court action on the writ of certiorari.  Doc. No. 97.  After the Supreme Court denied the writ, the stay was lifted on June 16, 2011.  Doc. No. 115.

Accordingly, the parties filed Cross Motions for Summary Judgment on all issues on December 5, 2011.  Doc. Nos. 125 & 126.  On December 19, 2011, Oppositions were filed, Doc. Nos. 129 & 130, followed by Replies on January 6,

2012.  Doc. Nos. 132 & 133.  The court heard the Cross Motions on February 6,

2012.  The parties also filed various Notices of Uncited or Supplemental Authority,

including relevant argument or responses.  *See* Doc. Nos. 134, 135, 139, 140, 142,

143, 145, 147 & 148.  The court has reviewed and considered all written

submissions and oral arguments, and now issues this Order ruling on the

constitutionality of the provisions, as challenged by Plaintiffs.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of

Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

# IV. <u>DISCUSSION</u>

The court first addresses whether Plaintiffs have standing to make their claims, and then (satisfied that Plaintiffs have standing) analyzes the claims on their merits.

## A.     Standing

Although Defendants' Motion does not challenge Plaintiffs' standing, at the preliminary injunction phase Defendants questioned whether Plaintiffs had standing to challenge the electioneering communications and advertisement definitions (and the court addressed those arguments, and standing more generally, in *Yamada II*).  The court reiterates its analysis here, based on an updated record, because the court has an independent duty to address jurisdiction and standing "even when not otherwise suggested."  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted); *see also Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002) ("[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing.") (citations omitted).

"Article III restricts federal courts to the resolution of cases and controversies."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) (citation omitted).  "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the

complaint is filed." *Id.* at 732-33 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "[A] claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Id.* at 733 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Id.* at 734 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Courts have long recognized that '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.'" *Cal. Pro-Life Council v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted).

Constitutional challenges alleging freedom of speech violations require a less exacting review of standing. "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) (recognizing the "sensitive nature of constitutionally protected expression," in permitting a pre-enforcement action

involving the First Amendment) and *Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases[.]")). "Thus, 'when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.'" *Ariz. Right to Life*, 320 F.3d at 1006 (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)).

Applying these standards, Yamada and Stewart have standing to challenge § 11-358. They desired to and eventually made contributions to AFA-PAC that exceeded the statutory limitations, giving rise to an actual controversy. *See Davis*, 554 U.S. at 732-33. If § 11-358 is constitutional as applied, they could have been subject to administrative fines or misdemeanor criminal prosecution. *See* HRS § 11-410(a)(1) (providing for possible fines up to $1,000 per occurrence, or three times the amount of unlawful contribution) & § 11-412(a) ("Any person who recklessly, knowingly, or intentionally violates any provision of this part shall be guilty of a misdemeanor."). And they indicate a legitimate desire to make similar contributions in 2012. A favorable ruling would allow them to make further contributions to AFA-PAC in 2012 without violating the law. *Davis*, 554 U.S. at 732-33.

Similarly, A-1 has standing to challenge the "noncandidate

committee" and "expenditure" definitions, "advertising" requirements, and contribution restrictions by government contractors.[9] A-1 is presently registered as a noncandidate committee, but has a good faith basis for believing it should not have to register, giving rise to an actual controversy. *See id.* If A-1 ceases registration, either by affirmatively withdrawing from registration or by failing to comply with various reporting requirements (because it believes it no longer needs to register), but engages in campaign-related activities, it could subject itself to possible fines or actions. *See* HRS §§ 11-410(a)(1) & 11-412(a). A-1 need not actually violate the statutes to challenge their terms. *See, e.g.*, *Cal. Pro-Life Council*, 328 F.3d at 1094; *Bland*, 88 F.3d at 736-37. There is enough of an "injury," particularly in the First Amendment context, to allow it to seek a declaratory judgment so that, if successful, it can cease registration without fear of fine or prosecution. That is, a favorable ruling would allow A-1 to cease registration without violating the law. *See Davis*, 554 U.S. at 732-33.

---

[9] As explained below, A-1's standing specifically to challenge the requirement of an "electioneering communication" statement of information is contingent upon prevailing on its challenge to the noncandidate committee provision. If A-1 has to register as a noncandidate committee, it discloses its electioneering communications through those noncandidate committee requirements. *See* Haw. Admin. R. § 3-160-48 (effective May 29, 2010) ("A noncandidate committee registered with the commission is not required to file a statement of information for disbursements for electioneering communications."). Ultimately, the court need not reach this aspect of the electioneering-communications challenge because A-1's challenge to the noncandidate committee definition fails. That is, in the end, A-1 lacks standing to challenge the requirements of HRS § 341(a).

As to its challenge to the disclaimer provisions for an "advertisement," even if A-1 already published the advertisements with the disclaimers does not mean A-1 faces no injury. A-1 sought, and seeks, a declaration that it need not include disclaimer language in the future. Tr. at 60.[10] And it challenges those statutes facially as well. A-1 does not have to publish the advertisements *without* the disclaimer language (and risk a fine or other enforcement action) in order to give itself standing. *See Bland*, 88 F.3d at 736-37. Again, a favorable ruling will enable A-1 to publish its advertisements without the disclaimer language and without fear of violating the law. *See Davis*, 554 U.S. at 732-33.

Finally, A-1 has standing to challenge HRS § 11-355. It is presently a government contractor. It has made substantial contributions to candidates in the past (presumably, while not a contractor), and seeks to make future contributions while it is a contractor. It need not violate the statute to challenge its terms. *See Bland*, 88 F.3d at 736-37. A favorable ruling would allow it to make contributions as a contractor without violating the law. *See Davis*, 554 U.S. at 732-33.

---

[10] Even if A-1 sought only to run the advertisements before the 2010 primary election, and no longer has specific plans to run the same advertisements, the challenge is not moot -- "there is a reasonable expectation that [A-1] will face the prospect of enforcement of the [challenged provisions] again." *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1002 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1477 (2011).

**B.    Section 11-358's Contribution Limitation to Noncandidate Committees**

The court first addresses Hawaii's $1,000 per-election limitation on contributions to noncandidate committees in § 11-358.  In this regard, *Yamada I* preliminarily enjoined Defendants from enforcing § 11-358 as to Yamada's and Stewart's proposed contributions to AFA-PAC.  *See* 744 F. Supp. 2d at 1087. *Yamada I* relied primarily on *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684 (9th Cir.), *cert. denied*, 131 S. Ct. 392 (2010), and *Speechnow.org v. Federal Election Commission*, 599 F.3d 686 (D.C. Cir.) (en banc), *cert. denied*, 131 S. Ct. 553 (2010), which both held that *contribution* limitations to organizations that make only independent campaign expenditures are invalid.

Defendants appealed *Yamada I* to the Ninth Circuit, but withdrew the appeal after the Ninth Circuit reiterated that such contribution limitations are invalid.  *See Thalheimer*, 645 F.3d at 1121-22.  The Seventh Circuit has since also held the same.  *See Barland*, 664 F.3d at 154-55.  And the Ninth Circuit recently applied the same rationale in striking a Washington state law that limited contributions to recall committees, which by definition also do not coordinate or prearrange their independent expenditures with candidates.  *See Farris v. Seabrook*, 667 F.3d 1051, 1059-60 (9th Cir. 2012).

Given the strength of Plaintiffs' position, Defendants do not oppose Plaintiffs' Motion to the extent it challenges § 11-358 as applied to Yamada's and Stewart's contributions to AFA-PAC. That is, Defendants agree that, given binding precedent, the court should make permanent the preliminary injunction entered in *Yamada I*. In doing so here, the court incorporates and updates some of its analysis from *Yamada I*, which is important not only for analyzing § 11-358, but also for analyzing the other challenges to follow.

### 1. *Level of Scrutiny*

Since *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has distinguished between restrictions on *contributions* to candidates and restrictions on *expenditures* for political speech. *See, e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011); *Thalheimer*, 645 F.3d at 1117. Although campaign contribution limitations "operate in an area of the most fundamental First Amendment activities," *Buckley*, 424 U.S. at 15, contribution limitations generally "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. And so, the court analyzes the constitutional validity of campaign contribution limitations by applying "closely drawn scrutiny." Under this test, "[c]ontribution limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a

'sufficiently important [government] interest.'" *City of Long Beach*, 603 F.3d at

691 (quoting *Randall v. Sorrell*, 548 U.S. 230, 247 (2006)) (other citation omitted);

*see also Thalheimer*, 645 F.3d at 1117-18.

Unlike contributions, *expenditure* limitations directly inhibit speech.

*See Citizens United*, 130 S. Ct. at 910 ("[A]n independent expenditure is political

speech[.]").  "Expenditure limitations may restrict the breadth and depth of

political dialogue and they 'preclude[] most associations from effectively

amplifying the voice of their adherents, the original basis for recognition of First

Amendment protection of the freedom of association.'" *City of Long Beach*, 603

F.3d at 692 (quoting *Buckley*, 424 U.S. at 22) (other citation omitted).  As a result,

limitations on campaign expenditures must pass strict scrutiny -- they are valid

only if narrowly tailored to a compelling government interest.  *Id.*[11]

### 2. *The Government Interest*

Therefore, the court's First Amendment analysis of campaign finance

provisions starts by examining the possible government interests justifying a

limitation, whether it be an expenditure or contribution limitation.  If there is no

valid interest (whether it needs to be "compelling" or "sufficiently important"), the

---

[11]  "*Citizens United*, rather than overruling *Buckley*, noted and reinforced the distinction between independent expenditures on behalf of candidates and direct contributions to candidates."  *Siefert v. Alexander*, 608 F.3d 974, 988 (7th Cir. 2010).  Last term, *Bennett* reaffirmed these dual levels of scrutiny.  *See* 131 S. Ct. at 2816-17.

court need not reach whether a regulation is "narrowly tailored" or "closely drawn" to that interest.  And *Citizens United* largely answers that question here.  Although *Citizens United* struck down an expenditure (and not a contribution) limitation, its discussion of valid government interests provides direct insight in analyzing whether § 11-358's *contribution* limitation can constitutionally apply to limit Yamada's and Stewart's contributions to AFA-PAC.

"The Supreme Court has concluded that preventing corruption or the appearance of corruption are the *only* legitimate and compelling government interests thus far identified for restricting campaign finances."  *City of Long Beach*, 603 F.3d at 694 (citations and internal quotation marks omitted) (emphasis added).[12]  *Citizens United* rejected (by overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)) an "antidistortion" interest -- the government's preventing the "corrosive and distorting effects [in elections] of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's

---

[12]  Other government interests, however, can apply to justify certain *regulation* (*e.g.*, disclosure) of campaign-related speech -- such as an interest in "'providing the electorate with information' about the sources of political campaign funds."  *Speechnow.org v. Fed. Election Comm'n*, 599 F.3d 686, 696 (D.C. Cir. 2010) (quoting *Buckley*, 424 U.S. at 66 (brackets omitted)); *see also Human Life*, 624 F.3d at 1008 ("Campaign finance disclosure requirements . . . advance the important and well-recognized interest of providing the voting public with information with which to assess the various messages vying for their attention in the market-place of ideas.").

political ideas." 130 S. Ct. at 903 (quoting *Austin*, 494 U.S. at 660). Although

*Citizens United* reiterated that "ensur[ing] against the reality or appearance of [*quid*

*pro quo*] corruption" could justify certain limits on direct contributions, *id.* at 908,

it concluded that "*[n]o* sufficient government interest justifies limits on the

political speech of . . . corporations." *Id.* at 913 (emphasis added). That is, no

interest can justify limits on amounts of independent corporate campaign

expenditures.

However specifically defined by statute, an independent expenditure

is not coordinated with a candidate or a candidate's campaign. It is neither

prearranged nor done at the suggestion of a candidate. It is "independent."

*Citizens United* therefore reasoned that such independent expenditures could not

give rise to corruption or the appearance of corruption. *Id.* at 908-09. Under

*Citizens United*, even if independent expenditures could lead to "influence" or

"access," it does not follow that "corruption" exists -- "[t]he appearance of

influence or access . . . will not cause the electorate to lose faith in our democracy."

*Id.* at 910. Therefore, a government interest in preventing the reality or appearance

of corruption cannot justify limiting amounts of independent expenditures for

political speech, even by a corporate entity. *Id.* at 913.

Courts after *Citizens United* have addressed the next logical question:

whether *contribution* limitations to organizations that make only independent campaign expenditures are valid -- precisely the situation with § 11-358 and Yamada's and Stewart's contributions to AFA-PAC. As analyzed in *Yamada I*, *City of Long Beach* applied *Citizens United*'s rationale -- that an anti-corruption interest cannot apply where only independent expenditures are involved -- and specifically held that there is no legitimate government interest in restricting contributions to organizations that engage only in independent spending. *See* 744 F. Supp. 2d at 1083 (citing *City of Long Beach*, 603 F.3d at 696-99). Under such precedent, prevention of corruption or its appearance cannot justify limiting campaign contributions if those contributions can lead only to independent campaign expenditures. *See City of Long Beach*, 603 F.3d at 699 (concluding that "the City's anti-corruption rationale does not support the [City's campaign reform act's] limitations on contributions").

Further, as mentioned above, the Ninth Circuit reaffirmed the logic of *City of Long Beach* in *Thalheimer*, 645 F.3d at 1121-22, and, most recently, in *Farris*, 667 F.3d at 1059-60. And the District of Columbia and Seventh Circuits agree. *See, e.g.*, *Speechnow.org*, 599 F.3d at 694-95 ("In light of the Court's holding [in *Citizens United*] as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption, contributions to

groups that make only independent expenditures also cannot corrupt or create the appearance of corruption."); *Barland*, 664 F.3d at 154 ("[T]he anticorruption rationale cannot serve as a justification for limiting fundraising by groups that engage in independent spending on political speech.").

Although the government can still limit contributions made directly to candidates or parties, "the need for contribution limitations to combat corruption or the appearance thereof tends to decrease as the link between the candidate and the regulated entity becomes more attenuated." *City of Long Beach*, 603 F.3d at 696. If the organization receiving contributions truly engages in only independent expenditures, the link is not only attenuated -- it is broken. Under the logic of this precedent, an anti-corruption or appearance of corruption rationale is nonexistent. It follows that contribution limitations to such organizations violate the First Amendment.

Section 11-358 limits the amount of contributions a person can make to a noncandidate committee. If that noncandidate committee makes only independent expenditures -- as is true with AFA-PAC -- then, under *Citizens United*, Hawaii cannot limit those expenditures. Yamada's and Stewart's contributions to AFA-PAC can only lead to independent expenditures. The record contains no evidence contradicting AFA-PAC's assertion that it "operates like any

other independent political action committee." There is "no basis on which to conclude that [AFA-PAC] ha[s] the sort of close relationship with candidates that supports a plausible threat of corruption or the appearance thereof." *City of Long Beach*, 603 F.3d at 698. Therefore, § 11-358 is unconstitutional as applied to Yamada's and Stewart's contributions to AFA-PAC.[13] Defendants are permanently enjoined from enforcing § 11-358's contribution limitation in that situation.[14]

## C.  The Noncandidate Committee and Expenditure Definitions

A-1 next challenges Hawaii's definitions in § 11-302 of "noncandidate committee" and "expenditure" -- primarily taking issue with their incorporation of the terms "to influence" or "for the purpose of influencing," and a perceived requirement that a committee must have a campaign-related "major purpose" before being subject to such regulation. A-1 challenges the definitions both facially and as-applied to its activities. It contends that the terms are "unconstitutionally vague, and therefore overbroad." FAC ¶ 72. Although courts

---

[13]  Because an anti-corruption interest is invalid under these circumstances, the court need not reach whether the limitation is sufficiently tailored to that interest.

[14]  *Yamada I* also addressed at the preliminary-injunction phase what the court perceived as a *facial* challenge to § 11-358. 744 F. Supp. 2d at 1084-85. Plaintiffs have now clarified that they do not challenge § 11-358 facially. Accordingly, this Order does not address whether § 11-358 is facially unconstitutional.

"have traditionally viewed vagueness and overbreadth as logically related and similar doctrines," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), A-1 makes conceptually distinct overbreadth and vagueness arguments. *See* FAC at 42-44; Pls.' Mot. at 30-32, 34 (distinguishing A-1's overbreadth and vagueness challenges). Therefore, the court first separately addresses A-1's overbreadth and vagueness arguments, and then analyzes whether the definitions survive a First Amendment challenge under an "exacting scrutiny" test.

### 1. Overbreadth

A-1 argues that, in an electoral context, government may not constitutionally regulate an organization's speech unless it is "unambiguously [campaign] related." *Buckley*, 424 U.S. at 80. The definitions are problematic, it reasons, because they rely on the term "to influence" -- they regulate organizations having "the purpose of . . . making expenditures . . . ***to influence***" the election of a candidate (where "expenditure" is then defined as including payments "for the purpose of . . . ***influencing***" an election). According to A-1, the term "influencing" is overbroad because it can reasonably be read to reach a significant amount of non-campaign-related speech (*i.e.*, pure issue discussion), imposing regulatory burdens such as registration, reporting, and disclosure, implicating the First Amendment. *See Buckley*, 424 U.S. at 77 ("It is the ambiguity of this phrase

[("for the purpose of influencing the nomination or election of candidates" in federal statutes)] that poses constitutional problems.").[15]

Buckley addressed the concern that a Federal Election Campaign Act ("FECA") definition of a "political committee" -- referring to expenditures "for the purpose of influencing" a federal election -- was unconstitutionally "vague." *Id.* at 79. And, although *Buckley* formulated its analysis in terms of "vagueness," "there are hints in *Buckley* that the constitutional basis for the Court's concern lay more in overbreadth -- i.e., that statutes that reached issue discussion might be deemed to regulate impermissibly a substantial amount of speech protected by the First Amendment[.]" *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 53 (1st Cir. 2011) (citing cases), *cert. denied*, --- S. Ct. ----, 2012 WL 603080 (U.S. Feb. 27, 2012) (No. 11-599). "[T]he dividing line between issue discussion and express advocacy, as it evolved, came to be associated more strongly with First Amendment overbreadth analysis than with due process vagueness concerns." *Id.* (footnote omitted).

In applying the doctrine of "constitutional avoidance,"[16] *Buckley*

_____

[15] And, as discussed in detail below, ambiguity or "vagueness" can raise Fourteenth Amendment due process concerns, if a speaker cannot reasonably understand what is proscribed. *See, e.g.*, *Buckley*, 424 U.S. at 76-77.

[16] The canon of constitutional avoidance is described as "the elementary rule . . . that
(continued...)

narrowly construed the terms as follows:

> To fulfill the purposes of [FECA] [the words "political committee"] need only encompass organizations that are *under the control of a candidate or the major purpose of which is the nomination or election of a candidate.* Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* (emphasis added). And "to insure that the reach . . . is not impermissibly broad," *Buckley* also narrowly construed "expenditure" (defined in terms of "for the purpose of influencing") so as "to reach only funds used for communications that *expressly advocate* the election or defeat of a clearly identified candidate." *Id.* at 80 (emphasis added).[17]

Given *Buckley*, A-1 argues that Hawaii's definition of a noncandidate

---

[16](...continued)
every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). "Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness." *Buckley*, 424 U.S. at 77-78 (citations omitted).

[17] "[*Buckley*'s] examples of words of express advocacy, such as 'vote for,' 'elect,' 'support,' . . . 'defeat,' and 'reject,' . . . gave rise to what is now known as the 'magic words' requirement." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 191 (2003) (some editorial marks omitted) (referring to *Buckley*, 424 U.S. at 44 n.52), *overruled on other grounds by Citizens United*, 130 S. Ct. at 913. "Express advocacy" was later extended to its "functional equivalent" (that is, communications "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 469-70 (2007). Thus, the "functional equivalent of express advocacy" is synonymous with this "appeal to vote" test.

committee unconstitutionally imposes "political committee" status, with its accompanying burdens, on organizations that engage in only limited political activity (*i.e.*, do not have the "major purpose" of which is political advocacy).  The premise is that government constitutionally can *only* require an organization to register as a "political committee" if that organization is "under control of a candidate" or has the nomination or election of candidates (political advocacy) as its major purpose.  *See Buckley*, 424 U.S. at 79.  If so, A-1 argues, Hawaii's noncandidate committee definition is too broad; it impermissibly regulates organizations that do not meet the "major purpose" test and thus "sweeps up" and regulates organizations that only advocate "issues" outside a campaign-related context, and thereby violates the First Amendment.

But *Human Life* (decided after this action was filed) rejected this very argument.  The Ninth Circuit rejected a bright line rule that "unless the sole major purpose of a group is political advocacy, any regulation of that group will automatically be too burdensome[.]"  624 F.3d at 1009.  The narrowing constructions the Supreme Court applied in *Buckley* "defined the outer limits of permissible political committee regulation."  *Id.* at 1010 (quoting *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 327 (4th Cir. 2008) (Michael, J., dissenting)).  Organizations often have more than one "major" or "primary" purpose, and the

First Amendment does not categorically prohibit government from imposing

disclosure requirements -- such as those accompanying noncandidate committee

status -- on such groups.  *Id.* at 1011.  *See also McKee*, 649 F.3d at 59 ("We find

no reason to believe that this so-called 'major purpose' test, like the other

narrowing constructions adopted in *Buckley*, is anything more than an artifact of

the Court's construction of a federal statute. . . .  The [Supreme] Court has never

applied a 'major purpose' test to a state's regulation of [political action

committees.]").

Indeed, *Citizens United* rejected the contention that "disclosure

requirements *must* be limited to speech that is the functional equivalent of express

advocacy."  130 S. Ct. at 915 (emphasis added).  "Given the Court's analysis in

*Citizens United*, and its holding that the government may impose disclosure

requirements on speech, the position that disclosure requirements cannot

constitutionally reach issue advocacy is unsupportable."  *Human Life*, 624 F.3d at

1016.

In essence, after *Citizens United*, the "unambiguously campaign

related" standard from *Buckley* -- including its "major purpose" test -- articulates

only a safe harbor (from a regulatory perspective).  "*Buckley* left room for

legislative judgment . . . so long as the resulting regulation does not prohibit a

substantial amount of non-electoral speech." *Leake*, 525 F.3d at 327 (Michael, J., dissenting).

Stated another way, that some issue advocacy may fall within a disclosure requirement is not necessarily fatal to the regulation itself. Government may impose reasonable disclosure requirements, but must be careful to avoid "sweeping into its purview groups that only incidentally engage in [political] advocacy" or "only occasionally engage[] in activities on behalf of political candidates and whose central organizational purpose is issue advocacy." *Human Life*, 624 F.3d at 1011 (citations and internal quotation marks omitted). For, as reiterated in *Human Life*, the Supreme Court has rejected the notion that "speakers possess an inviolable First Amendment right to engage in [issue advocacy]." *Id.* at 1016 (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 190 (2003), *overruled on other grounds by Citizens United*, 130 S. Ct. at 913)). "[I]mposing disclosure obligations on communicators engaged in issue advocacy is not per se unconstitutional[.]" *Id.* Rather, the more fundamental question is whether a regulation burdening such speech satisfies the appropriate level of scrutiny -- a question the court addresses after considering A-1's vagueness challenge.

## 2. *Vagueness*

A-1 also attacks the terms "for the purpose of influencing" and "to

influence" as unconstitutionally vague, in violation of the Fourteenth Amendment.

"A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Human Life*, 624 F.3d at 1019 (quoting *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004)). Nevertheless, "[m]any statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.'" *Rose v. Locke*, 423 U.S. 48, 49-50 (1975) (per curiam) (quoting *Robinson v. United States*, 324 U.S. 282, 286 (1945)). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). That is, "[t]he touchstone of a facial vagueness challenge in the First Amendment context . . . is not whether *some* amount of legitimate speech will be chilled; it is whether a *substantial* amount of legitimate speech will be chilled." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) (citing *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976)).

A-1's vagueness challenge to the term "influence" is similar to that discussed above regarding overbreadth -- the term "raise[s] serious problems of vagueness" in that it has the "potential for encompassing both issue discussion and advocacy of a political result." *Buckley*, 424 U.S. at 76-77, 79; *see also McKee*,

649 F.3d at 65 ("Conceivably falling within the meaning of 'influence' are objectives as varied as advocacy for or against a candidate's election; championing an issue for inclusion in a candidate's platform; and encouraging all candidates to embrace public funding.  Without more context, we believe the intended meaning of 'influence' to be uncertain enough that a person of average intelligence would be forced to guess at its meaning and modes of application.") (quotation marks and citation omitted).

In opposing A-1's argument, Defendants -- in their briefing and again during oral argument -- ask the court to apply a "narrowing gloss" to the term "influence."  Specifically, they request the court to construe the meaning of "influence" to communications or activities that constitute express advocacy or its functional equivalent.  *See Buckley*, 424 U.S. at 80; *McKee*, 649 F.3d at 66-67.  It is not clear to the court that such a narrowing construction is necessary, given *Citizens United*'s rejection of the view that disclosure requirements must be limited to express advocacy or its functional equivalent.  Nevertheless, to avoid any lingering vagueness doubts, the court addresses Defendants' request to apply a "narrowing gloss."[18]

---

[18]  The court reads "to influence" and "influencing" in this election context as clearly referring to actions attempting to affect the outcome of an election, either in favor of, or against, a candidate or ballot issue.  Nevertheless, the court recognizes the terms could "present some

(continued...)

Initially, the court rejects A-1's argument that the court in this situation should not adopt a narrowing construction of a *state* statute (as opposed to a federal provision). Federal courts may use such a narrowing gloss if such a construction is "reasonable and readily apparent." *See Boos v. Barry*, 485 U.S. 312, 330 (1988) ("[F]ederal courts are without power to adopt a narrowing construction of a state statute *unless such a construction is reasonable and readily apparent*.") (emphasis added). "When federal courts rely on a 'readily apparent' constitutional interpretation, plaintiffs receive sufficient protection from unconstitutional application of the [state] statute, as it is quite likely nonparty prosecutors and state courts will apply the same interpretation." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004).

Moreover, "[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n.5 (1982) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). Here, Defendants encourage the court to apply a narrowing gloss, and offer convincing arguments why such a construction is "reasonable and readily

_____

[18](...continued)
vagueness problems." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 65 (1st Cir. 2011).

46

apparent." *See White v. City of Norwalk*, 900 F.2d 1421, 1424 (9th Cir. 1990)

(adopting narrow construction of an ordinance to avoid constitutional concerns,

concluding that the ordinance was "readily susceptible" to the interpretation

presented by the City's counsel during the litigation) (citing *Frisby v. Schultz*, 487

U.S. 474, 480-84 (1988)).

The term "to influence" in the challenged State statutes is "reasonably

and readily" interpreted to refer to express advocacy or its functional equivalent for

two reasons.  First, Hawaii's campaign statutes were substantially re-codified and

revised in 1979, in form and terminology similar to the current provisions.  *See*

Defs.' Mot. Ex. 10 (setting forth Act 224, 1979 Haw. Sess. L.).  And Hawaii

specifically enacted Act 224 in 1979 in reaction to (and to conform, in large part,

with) *Buckley*.  *See* Defs.' Mot. Ex. 11 (providing Conf. Comm. Rep. No. 78, in

1979 House J. 1137, 1140).  Hawaii's Legislature was "mindful of" *Buckley*'s

"narrowing construction" and its use of the term "express advocacy."  *Id.*  It is

reasonable to infer, as Defendants argue, that Hawaii's Legislature adopted

terminology such as "to influence" in reliance on the Supreme Court's

interpretation of the same terminology in federal law.

Second, Hawaii's provisions are identical to the federal provisions

analyzed in *Buckley*.  Hawaii's Legislature specifically defined "independent

expenditures" in terms of "express advocacy."  *See* HRS § 11-302 ("'Independent

expenditure' means an expenditure by a person expressly advocating the election

or defeat of a clearly identified candidate that is not made in concert or cooperation

with . . . the candidate[.]").  And when the Supreme Court subsequently adopted a

test for the "functional equivalent" of express advocacy (*i.e.*, the "appeal to vote"

test), it is reasonable to construe Hawaii statutes similarly.  Indeed, the Hawaii

Legislature codified the "appeal to vote" test in defining "electioneering

communications."  *See* HRS § 11-341(c)(3).  Further, the Commission has adopted

-- by regulation -- a definition of "express advocacy" that *includes* that "appeal to

vote" test.  Hawaii Administrative Rule § 3-160-6 defines "expressly advocating"

as follows:

> "Expressly advocating" means a communication when
> taken as a whole and with limited reference to external
> events, could be susceptible to no other reasonable
> interpretation but as an exhortation to vote for or against
> a candidate because:
>> (1) The communication is unmistakable,
>> unambiguous, and suggestive of only one
>> meaning;
>> (2) The communication presents a clear plea
>> for action and is not merely informative; and
>> (3) Reasonable minds could not differ as to
>> whether the communication encourages
>> actions to elect or defeat a clearly identified
>> candidate or encourages some other kind of
>> action.

It is therefore "reasonable and readily apparent" that this court may narrowly construe relevant Hawaii campaign provisions, as in *Buckley* and other cases, to avoid constitutional vagueness concerns. *See, e.g.*, *McKee*, 649 F.3d at 66-67 (limiting meaning of "to influence" to "include only 'communications and activities which expressly advocate for or against [a candidate] or that clearly identify a candidate by apparent and unambiguous reference and are susceptible of no reasonable interpretation other than to promote or oppose the candidate'" as the Maine Commission on Governmental Ethics and Election Practices had proposed);[19] *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 44 (1st Cir.

_____

[19] The court also disagrees with A-1 that, after *Citizens United*, the appeal to vote test is itself unconstitutionally vague. Rather, the court agrees with *McKee*, which rejected the same argument, as follows:

> . . . . [National Organization for Marriage ("NOM")] contends that *Citizens United* eliminated "the appeal-to-vote test as a constitutional limit on government power," and reads into this an implicit holding that the test was unconstitutionally vague.
> NOM's reading finds no support in the text of *Citizens United*, though we agree with NOM that, in striking down the federal electioneering expenditure statute, *Citizens United* eliminated the context in which the appeal-to-vote test has had any significance. It is a large and unsubstantiated jump, however, to read *Citizens United* as casting doubt on the constitutionality of any statute or regulation using language similar to the appeal-to-vote test to define the scope of its coverage. The basis for *Citizens United*'s holding on the constitutionality of the electioneering expenditure statute had nothing to do with the appeal-to-vote test or the divide between express and issue advocacy. Instead, the decision turned on a reconsideration of prior case law holding that a corporation's political speech may be subjected to greater regulation than an individual's.

*McKee*, 649 F.3d at 69 (footnote omitted).

49

2012) (addressing ballot question committees in a "second chapter" of a challenge to Maine's campaign laws, and following *McKee* regarding vagueness and the meaning of "influence").

The court therefore applies the narrowing construction sought by Defendants, and interprets the terms "to influence" and "for the purpose of influencing" as referring to express advocacy or its functional equivalent. So construed, the meaning of "influence" is "considerably more precise," and "ensures that persons of average intelligence will have reasonable notice of the provisions' coverage" so as not to offend due process. *McKee*, 649 F.3d at 67 (citing *Grayned*, 408 U.S. at 108).

Having addressed A-1's overbreadth and vagueness arguments, the court now turns to whether the noncandidate committee and expenditure definitions otherwise survive a First Amendment challenge under an "exacting scrutiny" test.

### 3. *Hawaii's Definition of Noncandidate Committee Survives Exacting Scrutiny*

Distinct from its facial overbreadth and vagueness challenges, A-1 also contends that Hawaii's definition of noncandidate committee cannot be justified by government interests, and, even if it could, it is not sufficiently tailored to any such interests. In this context -- under binding caselaw -- the court applies

50

"exacting" scrutiny (not strict scrutiny) in analyzing the noncandidate committee definition. *See Human Life*, 624 F.3d at 1005 ("The [Supreme] Court has clarified that a campaign finance disclosure requirement is constitutional if it survives exacting scrutiny, meaning that it is substantially related to a sufficiently important governmental interest.") (citing *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010)); *Family PAC v. McKenna*, --- F.3d ----, 2012 WL 266111, at *3 (9th Cir. Jan. 31, 2012) ("Disclosure requirements are subject to exacting scrutiny.").

Importantly, the definition of noncandidate committee itself is a "disclosure requirement" for purposes of this analysis. Many decisions since *Citizens United* have analyzed various definitions of a "political committee," which include the burdens associated with such classification, and considered them to be "disclosure requirements." *See Human Life*, 624 F.3d at 1012 (concluding that "the definition of 'political committee' does not violate the First Amendment," analyzing "the disclosure requirements attached to political committee status"); *see also McKee*, 649 F.3d at 54 n.29 ("Maine's requirement that non-major-purpose PACs register with the Commission is . . . first and foremost a disclosure provision"); *Speechnow.org*, 599 F.3d at 696 (characterizing political committee organizational and reporting requirements as "disclosure requirements"); *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 676 (10th Cir. 2010) (indicating that a

challenge to regulations defining a political committee is a challenge to disclosure regulations); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 741 F. Supp. 2d 1115, 1128 (D. Minn. 2010) ("The law to which Plaintiffs object is, in fact, a disclosure law -- a method of requiring corporations desiring to make independent expenditures to disclose their activities."); *Ctr. for Individual Freedom v. Madigan*, 735 F. Supp. 2d 994, 1000 (N.D. Ill. 2010) (equating "election law disclosure requirements" as discussed in *Citizens United* with "registration requirements, including related reporting, recordkeeping, and disclosure requirements"); *Iowa Right To Life Comm., Inc. v. Smithson*, 750 F. Supp. 2d 1020, 1039 (S.D. Iowa 2010) (similar). This makes sense -- the purpose of requiring registration as a noncandidate committee is transparency and to enable disclosure.

### a. *"Sufficiently important" governmental interests*

The next step under exacting scrutiny is to identify the governmental interests at stake. In this regard, *Human Life* reiterated the primary interest: providing information to the electorate. "[B]y revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention." 624 F.3d at 1005. This is a "sufficiently important, if not compelling, governmental interest." *Id.* at 1005-06.

> Campaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another.

*Id.* at 1008.

And the importance of this informational interest "is only likely to increase" given recent jurisprudence -- as exemplified above by this court's permanent injunction -- striking limits on independent expenditures. *Id.* at 1007-08 (citing *Citizens United*, 130 S. Ct. at 911, and *City of Long Beach*, 603 F.3d at 695-99).

There are other sufficiently important interests. "[D]isclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . . A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Buckley*, 424 U.S. at 67. And, "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of . . . contribution limitations[.]" *Id.* at 67-68.

> [T]he public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether . . . contributions were made towards administrative expenses or independent expenditures. Further, requiring disclosure of such information deters and helps expose violations of other campaign finance restrictions, such as those barring contributions from foreign corporations or individuals.

*Speechnow.org*, 599 F.3d at 698.

Another related interest is anti-circumvention. "[C]ircumvention of valid contribution limits . . . is a valid theory of corruption[.]" *Fed. Election Comm'n v. Colo. Republican Fed. Campaign*, 533 U.S. 431, 456 (2001). *Human Life* also discussed this interest in analyzing and upholding Washington's Disclosure Law, reasoning that if the Washington law exempted groups having only "a" primary purpose of political advocacy (*i.e.*, only regulated groups having "the" (sole) primary purpose of advocacy), political action groups affiliated with a larger, multipurpose organization could circumvent the law simply by merging with the affiliated organization. 624 F.3d at 1011-12.

The legislative history of Hawaii's campaign finance laws confirms that the Hawaii Legislature considered these same interests in enacting Hawaii's campaign disclosure provisions. As summarized above, Hawaii's Legislature adopted Hawaii's "comprehensive disclosure and reporting requirements" specifically to meet the goals identified in *Buckley*:

> (1) its informational value, with the "sources of a
> candidate's financial support" alerting the voters "to the
> interests to which the candidate is most likely to be
> responsive," (2) its deterrence of corruption "by exposing
> large contributions and expenditures to the light of
> publicity[,]" and (3) its value as "an essential means of
> gathering data necessary to detect violations[.]"

Defs.' Mot. Ex. 11, Conf. Comm. Rept. No. 78, Haw. H. J. 1137, 1140 (1979)

(quoting *Buckley*).  Further, although commenting specifically about ballot issues,

the legislative committee also emphasized more generally Hawaii's "informational

interest" and that disclosure requirements were a method of "furthering First

Amendment values by opening the basic processes of our federal election system

to public view."  *Id.*

Similar legislative intent was demonstrated in 1995, when Hawaii's

campaign finance laws were revised.  *See, e.g.*, Defs.' Mot. Ex. 17, Haw. H. J. 853

(Floor Speech of Representative Tom ("The bill before us today seeks to ensure

fair election practices by closing the loopholes in the current law and by mandating

full disclosure . . . .  [I]t increases the effectiveness . . . of the Campaign Spending

Commission in the areas of enforcement and disclosure[.]")); Defs.' Mot. Ex. 15,

S. Stand. Comm. Rpt. No. 1344 on H.B. No. 2094, Haw. S. J. 1346 (1995)

("[R]eforming the campaign spending law is important to restoring the public's

confidence in the political process.  Making candidates, contributors, and others

more accountable by requiring the filing of reports . . . and specifying what information must appear in these reports go[es] a long way to accomplishing these goals.").

Accordingly, the court has little difficulty concluding that Hawaii has sufficient government interests in imposing disclosure requirements such as registration as a noncandidate committee for organizations that participate in the political process on a more than an "incidental" basis (*i.e.*, that have a "purpose" of political advocacy).

b.      *"Substantial relationship"*

Given sufficiently important government interests, the court next analyzes whether the disclosure requirement is substantially related to those interests.  In this regard, Hawaii's definition of noncandidate committee imposes registration, reporting, and other disclosure requirements on groups having "the purpose of making or receiving contributions, making expenditures, or incurring financial obligations to influence the nomination for election, or the election, of any candidate."  HRS § 11-302.  It does not require groups to have *only* the purpose of conducting activities to influence an election.  It specifically *excludes* from its definition "[a]ny organization that raises or expends funds for the sole purpose of producing and disseminating informational or educational

communications that are not made to influence the outcome of an election, question, or issue on a ballot." *Id.* In conformity with *Buckley*, it excludes organizations doing only issue advocacy. And HRS § 11-321(g) requires $1,000 of contributions or expenditures in a two-year election period before noncandidate committee disclosure requirements are triggered.

Addressing a similar issue under Washington law, *Human Life* reasoned that most organizations have more that one "primary" purpose, and so a "political committee" need not be confined only to organizations having political advocacy as their singular purpose. 624 F.3d at 1011. That is, there is a substantial relationship between government's important interests and the disclosure requirements it imposes on groups engaged in multiple purposes including political advocacy. *Id.*

And so, even though Hawaii's definition of noncandidate committee refers to "the" purpose of an organization, it can cover organizations with multiple "purposes." As long as the organization's non-incidental activities include "making or receiving contributions, making expenditures, or incurring financial obligations to influence the nomination for election, or the election, of any candidate," it falls within the purview of a noncandidate committee. If an organization has multiple purposes, as in *Human Life*, "[b]y applying the

disclosure requirements attached to [noncandidate committee] status to organizations with a primary purpose of political advocacy, its coverage vindicates the government's interest in an informed electorate without imposing on nonpolitical organizations unnecessarily." *Id.* at 1012.

Washington's version of "political committee" includes the modifier "primary" before "purpose." This modifier, however, was born of judicial construction -- a political committee was interpreted to mean "only an organization that has as its 'primary or one of the primary purposes' to 'affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions.'" *Id.* at 997 (quoting *Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 49 P.3d 894, 903 (Wash. Ct. App. 2002)). Such a limitation ("primary") "ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* at 1011.

Because Hawaii's definition does not include "primary," it does not automatically fall within *Human Life*'s analysis finding that Washington's definition does not "impos[e] on nonpolitical organizations unnecessarily." *Id.* at 1012. The Ninth Circuit, however, was careful to comment that it was *not* holding that "the word 'primary' or its equivalent is constitutionally necessary," just that it

was "sufficient" to ensure the disclosure law was "appropriately tailored to the government's informational interest." *Id.* at 1011. That is, Hawaii's definition presents a closer call.

The court thus turns to whether Hawaii's limitation improperly "imposes on nonpolitical organizations," *id.* at 1012, by "unnecessarily sweeping into its purview groups that only incidentally engage in such advocacy." *Id.* at 1011. The court could read into or infer a similar meaning (*e.g.*, "primary" or "meaningful") into the kind of "purpose" necessary to require registration as a noncandidate committee in Hawaii. While such meaning might be implicit, it is not necessary to do so. An organization having "the purpose" of political advocacy necessarily means activity that is not "incidental." Thus, it is enough to survive a facial First Amendment challenge -- *i.e.*, the limitation is sufficiently tailored -- where Hawaii's definition: (1) specifically excludes groups engaged exclusively in issue advocacy, (2) can cover organizations with multiple purposes, including political advocacy, and (3) requires that an organization make contributions or expenditures "of more than $1,000, in the aggregate, in a two-year election period[.]" HRS § 11-321(g). These provisions suffice to assure that Hawaii does not unconstitutionally impose on nonpolitical groups or those with incidental political activity. *See Human Life*, 624 F.3d at 1012; *N.C. Right to Life,*

59

*Inc. v. Bartlett*, 168 F.3d 705, 712 (4th Cir. 1999) (finding unconstitutional a definition regulating organizations with a "primary *or incidental*" purpose of political advocacy, reasoning that "unlike the provisions of FECA, North Carolina's definition expressly sweeps within its ambit those groups that only *incidentally* engage in express advocacy. This is a much broader definition of political committee than that at issue in *Buckley*[.]").

Thus, A-1's challenge to Hawaii's definition of noncandidate committee fails. The statute is substantially related to the important governmental interests. "[I]ts coverage vindicates the government's interest in an informed electorate without imposing on nonpolitical organizations unnecessarily." *Human Life*, 624 F.3d at 1012. This conclusion squares with *Citizens United*'s emphasis on transparency and the public's "interest in knowing who is speaking about a candidate," 130 S. Ct. at 915, and the Court's approval of disclosure requirements that serve to inform the electorate about organizations active in electoral politics, even if "influencing" elections is not their major or primary purpose. *See McKee*, 649 F.3d at 59 ("Because we find a substantial relation between Maine's disclosure-oriented regulation of non-major-purpose PACs and its interest in the dissemination of information regarding the financing of political speech, we conclude that the law does not, on its face, offend the First Amendment.").

Hawaii's noncandidate committee requirements do not facially violate the First Amendment.

### 4. A-1's As-Applied Challenge to the Noncandidate Committee Definition

A-1 also contends that Hawaii's noncandidate committee definition is unconstitutional as-applied to A-1's speech because it does not have a "major purpose" of political advocacy. It is not "under the control of a candidate" nor does it pass a "major purpose" test, either by (1) assessing its central organizational purpose, or (2) comparing its electioneering spending with its overall spending. *See Herrera*, 611 F.3d at 678. A-1 has also claimed that it "only incidentally engages in [political] advocacy" and thus cannot constitutionally be required to register as a noncandidate committee.

As explained above, however, A-1's argument that it does not meet a "major purpose" test is misplaced, and largely irrelevant. Falling outside the major purpose test does not mean an organization cannot be regulated as a noncandidate committee. *See Human Life*, 624 F.3d at 1009 (rejecting a bright line rule that "unless the sole major purpose of a group is political advocacy, any regulation of that group will automatically be too burdensome").

The court also rejects the argument that A-1 only "incidentally" engages in political advocacy. As set forth above, A-1 had substantial and varied

election-related activity in the 2010 election cycle.  To reiterate, A-1

(1) contributed a total of $20,100 to fourteen different State office candidates and

$12,500 to the Hawaii Republican Party before the 2010 primary election;

(2) published three advertisements (the day of the primary election and the two

days prior) costing $2,000 to $3000 each, identifying candidates and otherwise

meeting the definition of an "electioneering communication" under Hawaii law;

(3) contributed $1,000 to AFA-PAC; and (4) contributed an additional $18,000 in

total to thirty-one State-office candidates before the 2010 general election.  It seeks

to make contributions "[i]n 2012 and in materially similar situations in the future,"

and plans to run advertisements "in September or October 2012" that will be

similar to those it ran in 2010.  Doc. No. 132-1, Fourth Decl. of A-1 ¶¶ 5, 7, Jan. 6,

2012.

A-1, of course, may participate in our democratic process by making

its views known and by supporting candidates.  But such participation means it

must also comply with Hawaii's valid campaign finance laws.  Hawaii has a

substantial interest in imposing noncandidate committee disclosure requirements

on an organization -- like A-1 -- that actively engages in political activity.  Indeed,

ironically, A-1's very activities exemplify other government interests as well.

For example, as explained in *Human Life*, government has an interest

in "anti-circumvention" -- preventing or minimizing opportunities for speakers to find ways to circumvent campaign finance laws. 624 F.3d at 1011-12. The Ninth Circuit explained that by exempting groups with only "a" primary purpose of political advocacy (*e.g.*, a group that spends significant amounts on political spending, but a small amount proportionally to its overall activity) from registration, it would "effectively encourage[] [affiliated] advocacy groups to circumvent the law by *not* creating political action committees and instead to hide their electoral advocacy from view by pulling it into the fold of their larger organizational structure." *Id.* at 1012 (quoting *Leake*, 525 F.3d at 332 (Michael, J., dissenting) (emphasis in original). Whether it intended to or not, A-1 is such an example. It has purposely not created a separate organizational structure for election-related activity, choosing instead to register itself (A-1 A-Lectrician, Inc.) as a noncandidate committee. Tr. 30, 37. If it were allowed to avoid registration merely because its political activity is small proportionally to its overall activities (as an electrical contractor and perhaps as a pure issue advocacy organization), it would encourage any affiliated noncandidate committee to avoid disclosure requirements by merging its activities into a larger affiliated organization. (This exemplifies why the noncandidate committee definition is construed to be able to regulate "multipurpose" organizations.)

The court is also satisfied that the registration and disclosure requirements that come with noncandidate committee status do not present an undue burden on A-1. It has apparently been complying with the requirements for several years. The requirements satisfy a facial challenge (they are not out of proportion for organizations that have "the purpose" of political advocacy). Although the requirements might be inconvenient, the record does not indicate the burdens on A-1 are onerous as matters of fact or law. *See, e.g.*, Tr. 58-59 ("[W]e do not want to be a noncandidate committee because the registrations are burdened as we are going forward. There's a tough economy. . . . [W]e need to be free to speak.").

And so, A-1's as-applied challenge to the noncandidate committee definition also fails. A-1 actively participates in our democracy; it is not unconstitutional to require it to comply with campaign finance laws that are substantially related to important government interests.

## D.     "Electioneering Communication" Registration Requirements

The court has found that A-1 is not likely to succeed on the merits of its challenge, either facially or as-applied, to Hawaii's noncandidate committee definition. As noted earlier, an organization registering as a "noncandidate committee" does not have to file an electioneering communications report or

otherwise comply with most of the other provisions set forth in HRS § 11-341.  *See* Haw. Admin. R. § 3-160-48 ("A noncandidate committee registered with the commission is not required to file a statement of information for disbursements for electioneering communications.").  Any required reporting of "electioneering communications" would be included as part of the noncandidate committee provisions.

Because A-1 is not relieved of complying with the requirements of registering as a noncandidate committee, the court need not fully address A-1's alternate challenge to § 11-341 (*e.g.*, a challenge to the requirement of providing a statement of information within twenty-four hours of each "disclosure date," which is the date disbursements for electioneering communications exceed $2,000).  A-1 agrees that, if it must register as a noncandidate committee, it lacks standing to challenge the "electioneering communications" disclosure regime.  (The definition of "electioneering communications" remains relevant, however, in the next challenge to the disclaimer requirement in an advertisement.)

## E.     The "Disclaimer" Requirement in an "Advertisement"

The court next addresses A-1's challenge to the statutory requirement that "disclaimer" language be included in any "advertisement" that identifies a candidate and "advocates or supports the nomination, opposition, or election of a

candidate[.]"  *See* HRS § 11-391(a)(2)(B) (requiring a "notice in a prominent

location stating" that "[t]he advertisement is published . . . without the approval

and authority of the candidate").  As set forth earlier, A-1 published advertisements

(what it calls "issue ads") on September 16, 17, and 18, 2010.  Those

advertisements contained the disclaimer language "published without the approval

and authority of the candidate."  A-1 did not want to include the disclaimers in

those advertisements, and does not want to include them in future advertisements.

Section 11-302 defines "advertisement" as:

. . .  any communication, excluding sundry items such as
bumper stickers, that:

(1)  Identifies a candidate directly or by implication, or
identifies an issue or question that will appear on the
ballot at the next applicable election; and

(2)  ***Advocates or supports*** the nomination, ***opposition***, or
election of the candidate, or advocates the passage or
defeat of the issue or question on the ballot.

(Emphasis added.)

A-1 contends the language "advocates or supports" and "opposition"

is unconstitutionally "vague, and therefore overbroad."  FAC at 40.  It also

contends the disclaimer language distracts from its message, and gives the wrong

impression that the advertisement is campaign speech, rather than issue advocacy.

"Disclaimer . . . requirements may burden the ability to speak, but

they impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United*, 130 S. Ct. at 914 (citations and internal quotation marks omitted). Disclaimer requirements are therefore subjected to "exacting scrutiny," which requires a "substantial relation" between the disclaimer requirement and a "sufficiently important" government interest. *Id.*

1. ***"Advocates and Supports" and "Opposes" -- the Facial Vagueness Challenge***

A-1 contends the terms "advocates," "supports," and "opposes" are unconstitutionally vague. Pls.' Mot. at 40-41. This challenge, however, is substantially similar to the challenge (rejected earlier) that A-1 made regarding the use of the term "to influence" in the "noncandidate committee" and "expenditure" definitions. A-1 cites, for example, cases addressing whether a state law defining "political committee" as any group "the primary or incidental purpose of which is to support or oppose any candidate or to influence or attempt to influence the results of an election"[20] and requiring disclosure of payments "for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office."[21] The concern with terms "support or oppose" or "supporting or opposing or otherwise influencing" is the same concern as with the

---

[20] *N. C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 712-13 (4th Cir. 1999).

[21] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662-63 (5th Cir. 2006).

term "influence" -- the concern is that the phrases "could be interpreted to reach both express advocacy and issue advocacy." *Carmouche*, 449 F.3d at 663. *See also Bartlett*, 168 F.3d at 712-13 ("[T]he North Carolina definition of political committee covers groups engaging in issue advocacy by explicitly juxtaposing express and issue advocacy, and thereby indicating that it encompasses both[.]").

And, as with the term "to influence," courts avoided such vagueness concerns by applying a narrowing construction, limiting the reach only to "communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. Again, "express advocacy" was later extended to its "functional equivalent" ("susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). *Wisc. Right to Life, Inc.*, 551 U.S. at 469-70. This functional equivalent test is objective, and (although "contextual factors . . . should seldom play a significant role in the inquiry") "basic background information that may be necessary to put an ad in context" may be considered in determining whether a communication falls within its meaning. *Id.* at 473-74. As explained above, so construed, the definition of an "advertisement" like Hawaii's, which uses "advocates or supports the nomination, opposition, or election of the candidate," is not unconstitutionally vague.

Perhaps more importantly, *Citizens United* rejected a similar challenge to disclaimer requirements under federal law. It specifically refused to import the "express advocacy and its functional equivalent" test from an "expenditure" context into the disclaimer and disclosure regime under federal law: "[W]e reject *Citizens United*'s contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." 130 S. Ct. at 915.[22] "Even if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* Essentially, disclosure requirements can apply to issue advocacy, so long as the exacting scrutiny test is otherwise met. *Human Life*, 624 F.3d at 1015-16. And disclosure and disclaimer requirements -- such as requiring a disclaimer under federal law that a communication "is not authorized by any candidate or candidate's committee" -- satisfy the exacting scrutiny analysis. *Citizens United*, 130 S. Ct. at 914-16. "*Citizens United* has effectively disposed of any attack on . . . attribution and disclaimer requirements." *McKee*, 649 F.3d at 61.

---

[22] Even if disclosure requirements are not "*limited to* speech that is the functional equivalent of express advocacy," it is still true that speech that *is* the functional equivalent (*i.e.*, is not susceptible of any reasonable interpretation other than an appeal to vote for or against a candidate) is subject to disclosure and disclaimer requirements. As with a noncandidate committee definition, the express advocacy or its functional equivalent test functions as a kind of "safe harbor" (from a regulator's perspective). In other words, even if it might be superfluous, it is not irrelevant.

Accordingly, A-1's facial challenge to the disclaimer requirement in § 11-391(a)(2)(B) fails.

## 2.     *Disclaimer Requirement -- the As-Applied Challenge*

A-1 argues that the disclaimer requirement is unconstitutional as applied to its advertisements.  But the court concludes that the advertisements fit within a regulatory "safe harbor" -- they are an "advertisement" that is an "electioneering communication" and are the functional equivalent of express advocacy under § 11-341(c).  The advertisements mention a candidate (Blake Oshiro or Calvin Say or both).  The advertisements ran on primary election day (and the two days prior).  They state that those candidates, for example, "are representatives who do not listen to the people."  FAC Exs. 14, 15, & Doc. No. 119-1 (substituting FAC Ex. 16).  One advertisement states that "the representatives we put into office do not understand the importance of the values that made our nation great" and that "Blake Oshiro and other representatives do not show the aloha spirit in the way they disrespect the legislative process."  FAC Ex. 15.  One states "Blake Oshiro and other representatives are intent on the destruction of the family."  FAC Ex. 16.  These advertisements -- running on election day or the day or two prior -- are not susceptible to any reasonable interpretation other than as an appeal to vote against a candidate.  *See Wisc. Right*

70

*to Life*, 551 U.S. at 474 (allowing courts to consider basic background information necessary to put an advertisement in context). That is, they fit the definition of "electioneering communications" as defined by Hawaii law in § 341(c) -- they refer to a clearly identifiable candidate, within thirty days prior to a primary election or sixty days prior to a general election, and are the "functional equivalent of express advocacy."

And, in any event, *Citizens United* rejected an as-applied challenge to a disclaimer requirement for "commercial advertisements" that otherwise fall within a proper definition of "electioneering communications" (as do the advertisements at issue here). *See* 130 S. Ct. at 915-16. Essentially, advertisements that might include at least some "issue advocacy" can nevertheless be regulated if they mention a candidate shortly before an election. "[D]isclaimers . . . provide the electorate with information, and insure that the voters are fully informed about the person or group who is speaking." *Id.* at 915 (citations and editorial marks omitted). "At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party." *Id.*

For these reasons, the court rejects A-1's as-applied challenge to the disclaimer requirement in § 11-391(a)(2)(B) and the corresponding definition of advertisement in § 11-302, which includes the electioneering communications

definition in § 11-341(c).

**F.      Hawaii's Ban on Contributions by Government Contractors**

A-1 next challenges the constitutionality of Hawaii's ban on direct campaign contributions by government contractors set forth in HRS § 11-355.  As detailed above, A-1 has made numerous contributions to candidates in the past and "seeks to do so again in 2012."  Pls.' Mot. Ex. 5 ¶ 4.  A-1 was a government contractor before, and is one now.  A-1 claims it is forced to choose between engaging in its business and engaging in its speech.  Doc. No. 42-1, A-1 Decl. ¶ 8, Sept. 16, 2010.  The candidates it wants to support are Legislators or prospective Legislators who, A-1 contends, "do not decide whether A-1 receives government contracts or oversee the contracts."  Pls.' Reply Ex. G ¶ 3.

A-1 thus makes an "as-applied" challenge to Hawaii law.  It argues not that § 11-355 is *facially* unconstitutional, but rather that the statute, as applied, violates its First Amendment right to contribute to candidates it believes would not later award or oversee contracts.  Given no perceived connection between a contractor's donations to Legislators who would not award or oversee contracts, A-1 argues there is no plausible justification for banning its contributions.[23]

---

[23]  A-1's challenge is limited to § 11-355's contribution ban by government contractors. Any other part of § 11-355 is not before the court as part of this action.

## 1. The Court Applies "Closely Drawn" Scrutiny

Although *Citizens United* applied strict scrutiny in holding that limitations on independent campaign expenditures are unconstitutional, the action squarely presented no issue regarding contributions. *See* 130 S. Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny."). Accordingly, as explained above when addressing contribution limitations to noncandidate committees (HRS § 11-358), courts still apply "closely drawn scrutiny" in analyzing contribution restrictions. *See Thalheimer*, 645 F.3d at 1117-18 (setting forth traditional distinction between limitations on expenditures and contributions). And the court does so here in analyzing Hawaii's ban on campaign contributions by government contractors. *See Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010) (specifically applying closely drawn scrutiny after *Citizens United* and observing that "[t]he [Supreme] Court has applied the closely drawn standard even when the law in question imposed an outright *ban* on contributions") (citing *Beaumont*, 539 U.S. at 162); *Ognibene v. Parkes*, --- F.3d ----, 2012 WL 89358, at *7 (2d Cir. Jan. 12, 2012) (analyzing a campaign contribution ban on entities "doing business" with New York City, observing that "*Bennett*[, 131 S. Ct. at

2817,] reaffirmed . . . that the lower closely drawn standard applies to contribution

limits[.]").  Under this test, "[c]ontribution limits . . . need only be 'closely drawn'

to match a sufficiently important [government] interest to survive a constitutional

challenge." *Thalheimer*, 645 F.3d at 1117-18 (quoting *Randall*, 548 U.S. at 247)

(other citation omitted)).[24]

## 2. *Sufficiently Important Interests -- Safeguarding Against* Quid Pro Quo *Corruption and its Appearance*

Laws banning direct corporate campaign contributions are hardly new.

*See Citizens United,* 130 S. Ct. at 900 ("At least since the latter part of the 19th

century, the laws of some States and of the United States imposed a ban on

corporate direct contributions to candidates.") (citation omitted); *see also*

*Beaumont*, 539 U.S. at 152-54 & 159-60 (detailing the history of corporate

contribution limitations, and upholding a federal statute barring corporate

contributions to candidates).  In the federal context, "[a]ny attack on the federal

prohibition of direct corporate political contributions goes against the current of a

century of congressional efforts to curb corporations' potentially 'deleterious

---

[24]  Although A-1 is not challenging § 11-355 facially, the court still examines the
government interests that justify the contribution ban and determines whether it is closely drawn
to meet those interests, as applied to A-1's proposed activities.  *See, e.g.*, *Preston v. Leake*, 660
F.3d 726, 735-37 (4th Cir. 2011) (discussing government's anti-corruption interests in analyzing
whether a ban on contributions by lobbyists survives an as-applied challenge).

influences on federal elections[.]'" *Beaumont*, 539 U.S. at 152.[25]  Contribution

limits (and corporate contribution limits in particular) are justified by a

paradigmatic government interest -- prevention of corruption or its appearance in

elections.  *See, e.g.*, *Buckley*, 424 U.S. at 27; *McConnell*, 540 U.S. at 143;

*Thalheimer*, 645 F.3d at 1124 (discussing an anti-circumvention interest as "part of

the familiar anti-corruption rationale").  Such limitations make the most sense

when they restrict *direct* candidate contributions.  *See, e.g.*, *City of Long Beach*,

603 F.3d at 696 ("[T]he state's interest in the prevention of corruption -- and,

therefore, its power to impose contribution limits -- is strongest when the state

limits contributions made directly to political candidates.") (quoting *Leake*, 525

F.3d at 291).

      More specifically, "contribution limits . . . unlike limits on

independent expenditures, have been an accepted means to prevent *quid pro quo*

corruption."  *Citizens United*, 130 S. Ct. at 909.  Further, eliminating the

*appearance* of *quid pro quo* corruption is, by itself, a sufficiently important

---

[25] *Beaumont* relied in part on an "anti-distortion" interest previously articulated in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), *overruled by Citizens United*, 130 S. Ct. at 913.  *Beaumont*, however, was decided before *Citizens United*, which overruled *Austin*. Nevertheless, *Beaumont* remains binding precedent.  Even if *Citizens United* undermined some of its reasoning, it remains good law for present purposes because it had other justifications for upholding the federal ban.  *See Garfield*, 616 F.3d at 199 ("*Beaumont* and other cases applying the closely drawn standard to contribution limits remain good law.").

interest. "Since neither candidate nor contributor is likely to announce a *quid pro quo*, the appearance of corruption has always been an accepted justification for a campaign contribution limitations." *Ognibene*, 2012 WL 89358, at *9 (citation omitted).

> In other words, because the scope of *quid pro quo* corruption can never be reliably ascertained, the legislature may regulate certain indicators of such corruption or its appearance, such as when donors make large contributions because they have business with the City, hope to do business with the City, or are expending money on behalf of others who do business with the City. Furthermore, such donations certainly feed the public perception of *quid pro quo* corruption, and this alone justifies limitations or perhaps an outright ban.

*Id.* (citing *Citizens United*, 130 S. Ct. at 908, 910).

The legislative history of HRS § 11-205.5 (§ 11-355's predecessor) confirms that Hawaii's Legislature passed the government contractor contribution ban in large part precisely because of these concerns -- prevention of both actual corruption and its appearance.[26]

---

[26] Act 203 of the 2005 Hawaii Session Laws amended several sections of Hawaii's campaign finance laws, including the prior HRS § 11-205.5. Act 203 was derived from that session's House Bill ("H.B.") 1747 and a companion Senate Bill ("S.B.") 440. The legislative history of H.B. 1747 and S.B. 440 contains several references to an "anti-corruption" interest. For example, Senator Trimble, speaking in favor of S.B. 440 stated:

> Colleagues, corruption is the cruelest tax. It warps the decision-making process. It demoralizes the public sector, and it reflects poorly on us as a society. . . . I urge that you consider that corruption of money in the political process should not, and does not, distinguish between whether it comes from a corporation or a

(continued...)

union.

2005 Senate Journal, at 349 (statement of Sen. Trimble).  Likewise, Senator Hemmings spoke in support of S.B. 440:

> [I]f the Majority Party is really interested in a level playing field that benefits the people that sent us here, they would pass this amendment to do just what the Senator who's proposing this amendment wants -- eliminate money from corrupting the election process.

*Id.* at 350 (statement of Sen. Hemmings).

Statements from Representatives supporting H.B. 1747 spoke specifically about government contractors.  Representative Blake Oshiro, who introduced H.B. 1747 spoke about the constitutionality of contribution limitations, and addressed contractor limitations:

> . . . . [U]nder Buckley v. [Valeo], the distinction is made that contributions can be limited because the affinity to free speech is not nearly as close [as with expenditure limitations].  And that's what this bill is doing. . . .  The idea behind this is, we are tired of tinkering around the edges.  We're tired of just providing transparency by saying everything has to go through a separate, segregated fund, and blah, blah, blah.  We're tired of saying that contractors cannot give except for these exceptions in these periods of time.  So we're just going to say that we're going to lower campaign contributions across the board. . . .  [W]hen you look at what other states have done, we're actually not doing anything that's not really that drastic.

2005 House Journal, at 476-77 (statement of Rep. B. Oshiro).  Representative Oshiro understood the necessity of tailoring contribution limits to an anti-corruption government interest:

> And for anyone that is fearful of a constitutional challenge, there was a specific court case called Montana Right to Life Association v. Eddleman, where the Montana contribution limits were actually lower than the ones in the bill and yet, the Ninth Circuit Court of Appeals held that we hold Montana's interest in purging corruption and the appearance of corruption from its electoral system is sufficiently important to withstand constitutional scrutiny. . . .  So we are on very firm constitutional grounds moving forward.

*Id.*

Other Representatives also spoke in support of the bill regarding government contractor contributions, and sought -- as was eventually codified -- to simply ban contributions, rather than lower the threshold:

> It's such a complete disappointment for me, Session after Session, year after year, not to see us go after the heart of the problem, which is the "pay-to-play" game.  We should simply outlaw, ban contributions from people who do work with government.  We ought to do it.  It should have been done long ago.  It's done in thirty states.  It's done by the federal government.

*Id.* at 477 (statement of Rep. Fox).

(continued...)

Section 11-355 is directed at government (State and county) contractors and the

*perception* that they donate money to receive favorable treatment in the awarding

of contracts, *i.e.*, the perception that they "pay to play."[27]

———————————————

[26](...continued)
Representative Lee quoted then-Hawaii County Mayor Harry Kim's comments into the
legislative record:

> If I may, I'd like to quote the words of Hawaii County Mayor, Harry Kim when
> he testified in support of this measure. He said, "I know this is a difficult area
> and the details can be mind boggling so I defer to the wisdom of the Legislature
> as to how best to set up a program that levels the playing field, enables candidates
> of limited means to participate meaningfully in the electoral process, and
> recognizes the cynicism and frustration that have been caused rightfully or not by
> the appearance of influence that money has on the electoral process. But whether
> or not House Bill [1747] is the perfect answer, do not let the perfect be the enemy
> of the good."

*Id.* (statement of Rep. Lee).

[27] Defendants submit evidence of the type of contributions that were made before § 11-
205.5 was enacted in 2005 -- indicative of the political climate in which the government
contractor ban was passed. According to Commission records, in the 2004 election numerous
contractors made contributions to both sides of the Honolulu Mayoral race. "At least 100 of the
almost 850 individuals, businesses, and organizations who contributed to [Duke] Bainum's
campaign also contributed to [Mufi] Hannemann's campaign." Doc. No. 127-1, Baldomero
Decl. ¶ 9, Dec. 5, 2011. Further, "[a]t least 44 of the 100 contributors who gave to both
campaigns [including A-1] . . . were businesses (or principals of businesses) that sold goods or
services, or engaged in construction that the City would regularly purchase." *Id.* ¶¶ 10, 12.

   As further indication of the climate and perception of a "pay to play" system in the 2005
time frame, media reports also suggest that § 11-205.5 was established to combat not only actual
corruption, but its appearance, and that it was enacted at least partly in response to a series of
well-publicized investigations by the Commission involving politicians and State contractors.
As summarized by the Honolulu Advertiser in March 2010:

> The law was enacted in 2005 in response to the campaign finance scandals
> involving [former Honolulu Mayor] Harris and other Democrats. More than 30
> local engineers, architects and other donors pleaded no contest to misdemeanor
> charges of violating the state's campaign law between 2003 and 2005 while
> another 90 architects, engineers and other donors paid out more than $1.8 million
> in fines to the state Campaign Spending Commission for making illegal
> donations.

(continued...)

Indeed, A-1 does not seriously question that Hawaii has a sufficiently important governmental interest in prevention of corruption or its appearance in the electoral process. Rather, A-1 argues that the restriction (a *ban* on contributions to *any* candidate, including those candidates that do not select and do not oversee government contracts) is unconstitutional, either because there is no sufficient

---

[27](...continued)
Rick Daysog, *Contract-linked Donations Soar*, Honolulu Advertiser, March 7, 2010.
        More recent attempts to change the law were unsuccessful, reportedly because of the memory of the prior "pay to play" scandals:
                Wary of public perception, the House amended a campaign finance bill to
                preserve a ban on political donations by state and county contractors. The bill
                would have relaxed the ban for contractors who have smaller government
                contracts. State Rep. Barbara Marumoto, R-19th (Kaimuki, Waialae, Kahala),
                said there should be "no return to pay-to-play in any form."
Derrick DePledge, *Furlough Bills Move Forward*, Honolulu Advertiser, March 3, 2010. As
reported in 2003, when versions of the current law were being debated, reasons for a total ban
(including Legislators) were argued:
                Proponents say the changes are long overdue and would restore integrity to a
                system that many view as inherently corrupt. "It's clear that the current system of
                campaign finance doesn't make the public confident that decisions are made on
                their merits," said House Majority Whip Brian Schatz, D-25th (Makiki, Tantalus).
                . . .
                If you're getting a benefit from a government contract and taxpayer money, you
                shouldn't be paying your way in to get that money," [Bob Watada, former head of
                the Commission] said. "That's the evil we're trying to stop: pay to play."
                . . .
                The Legislature last year approved a ban on direct contributions from businesses
                and unions, and barred awarding of government contracts to people who donated
                to candidates for certain offices. But former Gov. Ben Cayetano vetoed the
                measure, saying lawmakers had unfairly exempted themselves from the ban on
                money from contractors. The present bill does not allow that exception. "We
                wanted to make sure we included ourselves, although the reality is that legislators
                don't give out contracts[.]" Schatz said.
*Campaign Finance Legislation off to Senate after House OK*, Honolulu Advertiser, March 31,
2003.

interest in banning such contributions, or because a ban is not "closely drawn" to the government interest of preventing corruption. There can be no connection, it argues, between its proposed contributions and corruption if the candidates that it contributes to do not award or oversee a contract. The court disagrees, and explains below why the ban is closely drawn to the sufficiently important interest.

### 3. The Ban Is Closely Drawn to A-1's Past and Proposed Activities

First, A-1 supports its as-applied challenge by arguing that, because it does not itself "pay to play" or does not "grease the skids," § 11-355 regulates too broadly and is therefore not closely drawn. The Second Circuit, however, recently rejected a similar argument: *Ognibene* upheld (facially) a New York City ban on campaign contributions from organizations "doing business" with the City, rejecting the argument that such a ban was "overbroad because [it] ban[ned] legitimate as well as corrupt acts." 2012 WL 89358, at *12.

> [N]ot only is it difficult to isolate suspect contributions, but more importantly . . . the interest in safeguarding against the *appearance* of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.

*Id.* (quoting *Buckley*, 424 U.S. at 30) (emphasis added). Again, "[such] provisions aim at eliminating, not only corrupt acts, but the appearance of corruption." *Id*.

Applying *Ognibene* (which the court finds persuasive), even if A-1 is not corrupt,

its contributions may have the appearance of impropriety and may thus be barred.

Second, Defendants point out that A-1 has other means of speaking. Any burden on A-1 caused by the contribution ban is lessened because A-1's officers or employees (*e.g.*, Yamada or his family members) may themselves make contributions. *See* HRS § 11-355(b) ("[T]his section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any noncandidate committee by any person other than the state or county contractor for the purpose of influencing the nomination for election, or the election of any person to office.").[28] That is, to the extent A-1's desired contributions to particular legislative candidates are speech, A-1 may speak at least indirectly through those individuals.[29] *See Beaumont*, 539 U.S. at 161 n.8 ("A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information."). Moreover, A-1 may also lawfully make its own independent

_____

[28] *See also* Defs.' Mot. Ex. 19, Hse. Conf. Comm. Rep. No. 185, in 2004 House Journal, at 1828 ("[T]he prohibition on contributions by state and county contractors applies to the specific contracting entity and not to individuals associated with the contractor, such as the individual owners of a contracting entity.").

[29] Other jurisdictions have gone *further* than Hawaii and enacted similar provisions -- upheld against constitutional challenge -- against contributions by certain "principals" and family members of government contractors. *See Green Party of Conn. v. Garfield*, 616 F.3d 189, 202-04 (2d Cir. 2010) (upholding Connecticut ban on campaign contributions made by "principals" of state contractors or prospective state contractors, as well as spouses and children of contractors).

*expenditures* in support of or against particular candidates -- and, following *Citizens United*, it may make *unlimited* expenditures, so long as they are not coordinated with a candidate or party.  A-1 may also make unlimited contributions to organizations that make only independent expenditures.  *See Thalheimer*, 645 F.3d at 1125.

Third, as Defendants emphasize, although individual Legislators might not themselves award or manage contracts, the Legislature itself must appropriate funds for State contracts.  The Legislature routinely holds informational and oversight hearings.  Legislators ask questions, request audits, and otherwise represent constituents and the public in an appropriate role overseeing administration of State contracts and utilization of appropriated funds -- they might criticize, scrutinize, or support contractor performance.  *See, e.g.*, Defs.' Mot. Exs. 24-26 (samples of legislative committee meetings or briefings on State contracts); Defs.' Mot. Ex. 33 (providing a legislative committee report explaining that "it is the function of the Legislature to hold agencies accountable for expenditures of public funds, and therefore the Legislature needs to be provided with certain information regarding . . . construction projects").  Legislators make decisions and hold power over large infrastructure projects, sometimes involving hundreds of millions of dollars, where government contractors stand to benefit.

And Legislators may have power over, or close friendships with, the government

employees or others who *do* award or manage A-1's contracts.[30]

Thus, even more than deterring Legislators from actual corruption in

awarding contracts, the government has an interest in alleviating a public

perception that Legislators or others in public office have power to influence who

is awarded government contracts. The appearance of "quid pro quo" is more than

appearance of straight "dollars for contracts." It is also the appearance of "dollars

for political favors." *Citizens United*, 130 S. Ct. at 910 (quoting *Fed. Election

Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)).

Again, even if individual Legislators do not directly award contracts, it does not

mean contributions by contractors do not have the *appearance* of corruption. That

---

[30] Defendants also point out a clear fallacy in A-1's logic. A-1 cannot know in advance whether any particular candidate will *not* be in a position to control or "oversee" specific contracts if the candidate is later elected. Certain committees have stronger oversight roles, and these (and all) legislative committee assignments change each session, *after* the election. (And *all* Legislators vote on many bills concerning procurement and budgetary issues). Defendants offer an example from the 2011 Legislative Session: A-1 testified -- through Yamada's son Jason (an A-1 officer) -- in favor of a construction and procurement-related bill regarding the University of Hawaii. Defs.' Exs. 34-35. At least three Legislators that served on committees that considered the bill (and voted in favor of it) also received campaign contributions from A-1 in the 2010 elections. Defs.' Mot. at 53; Defs.' Exs. 28, 31. And A-1 made contributions to opponents of fifteen other Legislators who considered the bill. Defs.' Mot. Ex. 31. A-1 cannot have known in advance that candidates would *not* consider contractual oversight issues when it made its contributions in 2010, and likewise cannot know that if it makes contributions to candidates in 2012. This situation exemplifies the Second Circuit's reasoning in *Ognibene v. Parkes*, 2012 WL 89358, at *9 (2d Cir. Jan. 12, 2012) ("Contributions to candidates for [government] office from persons with a particularly direct financial interest in these officials' policy decisions pose a heightened risk of actual and apparent corruption, and merit heightened government regulation.").

a Legislator might not have the power to award a contract directly does not make the connection to the interest any less "closely drawn."

Under A-1's logic, a contractor-contribution limitation would need to be drawn narrowly enough to restrict contributions *only* to those candidates for offices that actually award or oversee specific contracts.  Under its logic, to analyze whether § 11-355 is applied constitutionally, a court would have to know which Legislators have "control" over all types of contractual matters (whether large or small, be them for general electrical work or for a non-bid research study of a particular issue).  But drawing these lines is not the court's role.  As the Second Circuit recognized in upholding a Connecticut ban on government contractor contributions, "we, as judges, cannot consider each possible permutation of a law limiting contributions, and thus we 'cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.'"  *Garfield*, 616 F.3d at 203 (quoting *Randall*, 548 U.S. at 248).  *Garfield* concluded that, in light of Connecticut's past political contractor scandals, a ban on contributions by any current state contractor "is, without question, 'closely drawn' to meet the state's interest in combating corruption and the

appearance of corruption." *Id.* at 202.[31]

Moreover, a complete ban on contractor contributions -- as opposed to a mere limit on the amount or a restriction on the type of contract -- is also closely tailored. Hawaii's Legislature made a judgment to eliminate *any* contribution to alleviate a perception of government contractors receiving benefits for dollars. Questions such as whether to apply the ban only to non-bid contractors or only large contractors, whether to allow small contributions or allow *no* contributions, or whether principals of contractors may contribute, are all legislative choices. *Cf. Preston*, 660 F.3d at 737 ("[W]e find no reason to second-guess the legislative judgment that a ban on all contributions from lobbyists was the best response."). A choice to completely ban direct government contractor contributions indicates, at some level, the strength of the Legislature's intended message combating a perception that government contracts are awarded to friends based on corruption (*i.e.*, indicative of the tailoring of the restriction to the government interest). That a ban is total, that it has no dollar exceptions, might "eliminate[] *any* notion that contractors can influence state officials by donating to their campaigns," *Garfield*,

---

[31] *Garfield* is consistent with Ninth Circuit caselaw upholding other corporate contribution bans. *See Jacobus v. Alaska*, 338 F.3d 1095, 1122 (9th Cir. 2003) (upholding corporate soft money bans); *cf. Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1094 (9th Cir. 2003) (finding statutory limits on campaign contributions by individuals and political action committees were closely drawn to further state's interests).

616 F.3d at 205, and in that sense indicates *closer* tailoring to the important

government interest than if contributions to certain types of Legislators were

excepted.[32]  The wisdom of these particular choices (the scope of the ban or any

exceptions) is not for courts to decide; courts decide whether the choices are

closely tailored to sufficiently important government interests.  And this court

upholds Hawaii's choice.

In sum, the court concludes that, as applied to A-1's proposed

campaign contributions to State Legislators, § 11-355 is closely tailored to an

important government interest.  Given the public role of Legislators and the power

(or perceived power) they can have in contractual matters, applying the

contribution ban is closely connected to the governmental interest in refuting at

least the perception of corruption in the electoral process.  It functions to alleviate

even the appearance of a connection (a *quid pro quo*) between a government

contractor and a candidate for public office.  Hawaii's government-contractor ban

on direct campaign contributions set forth in § 11-355 is constitutional as applied

---

[32]  As *Garfield* reasoned,

> [Connecticut's] *ban* on contractor contributions . . . unequivocally addresses the perception of corruption brought about by Connecticut's recent scandals.  By totally shutting off the flow of money from contractors to state officials, it eliminates any notion that contractors can influence state officials by donating to their campaigns. . . . [A]n outright ban on contributions by contractors. . . is closely drawn to the state's interest in combating the appearance of corruption.

616 F.3d at 205.

to A-1's proposed contributions.

## V. **CONCLUSION**

The Cross Motions for Summary Judgment are GRANTED in PART

and DENIED in PART, as follows:

1. Plaintiffs' Motion as to HRS § 11-358 is GRANTED.

Accordingly, the court enters the following permanent injunction:

> The contribution limit in HRS § 11-358 is unconstitutional as applied to Jimmy Yamada's and Russell Stewart's past and proposed contributions to AFA-PAC (an entity that engages in solely independent expenditures) in excess of the statutory limit. Defendants are permanently ENJOINED from enforcing § 11-358's monetary contribution limit as to Jimmy Yamada's and Russell Stewart's past and proposed campaign donations to AFA-PAC.

2. In all other respects, Plaintiff's Motion is DENIED and

Defendants' Motion is GRANTED. As challenged, HRS §§ 11-302 and 391 are

constitutionally valid disclosure requirements, and HRS § 11-355 is upheld as

applied to A-1 as a constitutionally valid contribution limit. These provisions of

Hawaii's campaign finance laws -- Hawaii's definition of noncandidate committee

(and a related term "expenditure"), the disclaimer provision for an electioneering-

communication advertisement, and the ban on campaign contributions by

government contractors -- all withstand Plaintiffs' constitutional challenges. These

Hawaii provisions promote disclosure and transparency in elections -- values

endorsed, embraced and extended in *Citizens United*.

       3.  There being no other issues remaining, the Clerk of Court shall close the case file.

       IT IS SO ORDERED.

       DATED:  Honolulu, Hawaii, March 21, 2012.



         /s/ J. Michael Seabright
         J. Michael Seabright
         United States District Judge

*Yamada et al. v. Kuramoto et al.*, Civ. No. 10-00497 JMS-RLP, Order (1) Permanently Enjoining Defendants from Enforcing HRS § 11-358 As-Applied to Specified Contributions to AFA-PAC, a Committee Making Only Independent Campaign Expenditures; and (2) Upholding the Constitutionality, as Challenged, of Provisions of HRS §§ 11-302, 355 & 391